# EXHIBIT 1

# SECURED PROMISSORY NOTE

**$1,801,275.00** **Lakeland, Florida** **09-18-2025**

**PROMISE TO PAY.** For Value Received, Brew Hub, LLC, a Delaware limited liability company ("Brew") and Great Southern Copackers LLC, a Florida limited liability company ("Great Southern", and together with Brew, jointly and severally, the "Maker"), promises to pay to the order of Climate First Bank (which together with its successors and assigns and any subsequent owners and holders of this note is called "Payee") at its offices at 182 37th Ave. N, St. Petersburg, Florida 33704, or at such other address as Payee may specify in writing from time to time, the sum of One Million Eight Hundred One Thousand Two Hundred Seventy-five and 00/100 US Dollars ($1,801,275.00) (the "Principal Amount"), in legal and lawful money of the United States of America, with interest thereon from the date hereof until maturity at the per annum rate specified in Section 2 hereof. All undefined capitalized terms contained herein shall have the meanings ascribed to them in the ARPA (defined below).

1. **INTEREST RATE.** The interest rate shall be the Note Rate (as defined herein) or the Maximum Rate (as defined herein), whichever is less.

   a. The term "Note Rate" shall mean the fixed per annum rate of the WSJ Prime Rate plus 3.00%.

   b. The terms "Maximum Rate" and "highest non-usurious rate," as used in this Note, each mean the maximum non-usurious rate of interest per annum permitted by applicable Florida law and U.S. federal law, including, to the extent permitted by applicable law, any amendments thereof hereafter or any new law hereafter coming into effect. The Maximum Rate shall be determined by taking into account all amounts characterized by applicable law as interest on the debt evidenced by this Note, so that the aggregate of all interest does not exceed the maximum nonusurious amount permitted by applicable law (the "Maximum Amount").

2. **MONTHLY COLLATERAL MANAGEMENT FEE.** Maker shall pay Payee a monthly collateral management fee equal to 0.40% of the outstanding principal amount under this Note, payable in arrears on the last day of each month.

3. **FACILITY FEE.** Maker shall pay Payee a facility fee of 1% of the principal amount of this Note, fully earned and payable on the date hereof.

4. **PAYMENT TERMS; MATURITY DATE.** The principal amount of this Note, together with accrued interest thereon, shall be payable as follows:

(a) Monthly Payment Period: Commencing on the date of this Note, and continuing on the same day of each month thereafter until the Maturity Date, Maker shall make monthly payments of principal and interest in the amounts set forth in the amortization schedule attached hereto as Exhibit A (the "Amortization Schedule"), which is incorporated herein by reference.

(b) Maturity Date: The entire unpaid principal balance of this Note, together with all accrued and unpaid interest thereon and any other amounts due hereunder, shall be due and payable Thirty-six (36) months from the date of this Note.

If the final payment under the Amortization Schedule does not fully repay the Note, Maker shall pay any remaining balance on the Maturity Date.

All payments shall be made in lawful money of the United States by wire transfer or other immediately available funds to the Payee at the account designated by Payee in writing, without deduction, setoff, or counterclaim. If any payment date falls on a non-business day, the payment shall be due on the next succeeding business day, and interest shall accrue accordingly.

Any amounts owed under this Note may be offset against funds held or maintained by Payee on behalf of Maker, or offset from amounts owed by Payee to Maker. For avoidance of doubt, the Note is intended to be coterminous with that certain Accounts Receivable Purchasing Agreement, between Maker and Payee, of even or approximate date herewith (as amended, the "ARPA").

5. **PREPAYMENT.** This Note may be prepaid at any time, without penalty. All payments made under this Note shall be applied first to accrued and unpaid interest, then to any fees or other charges then due and owing under this Note or any security agreement associated herewith, and then to principal payments in the inverse order of their maturity.

6. **DEFAULTS**. It shall be a default ("Default") under this Note if (a) any amount due under this Note, whether as principal, interest, or otherwise, is not paid in full when due, regardless of how such amount may have become due; (b) Maker shall default in the payment or performance of any other obligation owing to Payee, including, without limitation, the ARPA; (c) there shall occur any default or event of default under any security agreement or guaranty securing repayment of this Note or the ARPA or under any other Transaction Document (as defined in the ARPA); (d) Maker declares bankruptcy, makes a general assignment for the benefit of creditors, or suffers the appointment of a receiver for any of its property; or (e) any warranty, covenant or representation contained herein proves to be materially false. Upon the occurrence of a Default, the holder hereof shall have the rights to declare the unpaid principal and all accrued but unpaid interest and other charges due hereunder at once due and payable (and upon such declaration, the same shall be at once due and payable), to foreclose any liens and security interests securing payment hereof and to exercise any of its other rights, powers and remedies under this Note, at law or in equity. All of the rights, remedies, powers and privileges (collectively, "Rights" of the holder hereof provided for in this Note are cumulative of each other and of any and all other Rights at law or in equity. The resort to any Right shall not prevent the concurrent or subsequent employment of any other appropriate Right. No single or partial exercise of any Right shall exhaust it, or preclude any other or further exercise thereof, and every Right may be exercised at any time and from time to time. No failure by the holder hereof to exercise, nor delay in exercising any Right, including but not limited to the right to accelerate the maturity of this Note, shall be construed as a waiver of any Default or as a waiver of the Right. Without limiting the generality of the foregoing provisions, the acceptance by the holder hereof from time to time of any payment under this Note which is past due or which is less than the payment in full of all amounts due and payable at the time of such payment, shall not (i) excuse the existence of a Default; (i) constitute a waiver of or impair or extinguish the right of the holder hereof to accelerate the maturity of this Note or to exercise any other Right at the time or at any subsequent time, or nullify any prior exercise of any such Right, or (iii) constitute a waiver of the requirement of punctual payment and performance, or a novation in any respect.

Upon the occurrence of a Default, all sums due hereunder shall bear interest at the rate of eighteen percent (18.00%) per annum or the Maximum Rate, whichever is less.

Maker promises to pay to Payee all of Payee's reasonable and necessary expenses incurred in connection with the collection of this Note, including, but not limited to, court costs and reasonable attorneys' fees.

7. **USURY SAVINGS PROVISION.** All parties to this Note intend to comply with applicable usury laws. All existing and future agreements regarding the debt evidenced by this Note are hereby limited and controlled by the provisions of this Section. In no event (including but not limited to prepayment, default, demand for payment, or acceleration of maturity) shall the interest taken, reserved, contracted for, charged or received under this Note exceed the Maximum Amount. If, from any possible construction of any document, interest would otherwise be payable in excess of the Maximum Amount, then ipso facto, such document shall be reformed and the interest payable reduced to the Maximum Amount, without necessity of execution of any amendment or new document.

8. **GUARANTY/SECURITY**. Payment hereof is secured by, among other things: (i) that certain General Continuing Guaranty Agreement, of even or approximate date herewith, signed by Jeremy Roberts, in favor of Payee; (ii) that certain Security Agreement dated 09-18-2025, between Maker and Payee, and (iii) any other security instruments or guarantees given to Payee by Maker or any obligor to secure the obligations hereunder. Maker authorizes Payee to file any initial financing statements and amendments thereto that: (a) Indicate the collateral as all assets of the Maker regardless of whether any particular asset comprised in the collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail; (b) Contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Maker is an organization, the type of organization, and any organization identification number issued to the Maker and, (ii) in the case of a financing statement filed as a fixture filing or indicating collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the collateral relates; (c) Contain a notification that the Maker has granted a negative pledge to the Payee, and that any subsequent lienor may be tortiously interfering with Payee's rights; and (d) Advise third parties that any notification of Maker's Account Debtors will interfere with Payee's collection rights.

9. **GENERAL PROVISIONS/WAIVERS**. Maker and all sureties, endorsers, guarantors and any other party now or hereafter liable for the payment of this Note in whole or in part, hereby severally (i) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices, filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (ii) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (iii) agree that the holder hereof shall not be required first to institute suit or exhaust its remedies hereon against Maker or others liable or to become liable hereon or to enforce its rights against them or any security herefor; (iv) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; (v) submit (and waive all rights to object) to non- exclusive personal jurisdiction in the State of Florida, and venue in Pinellas County, the county in which payment is to be made as specified on the first page of this Note, for the enforcement of any and all obligations under the Note; (vi) agree that any extension of time for the payment of this Note shall not release or reduce the liability of any obligor, and further waives all notice of each such extension; and (vii) agrees that none of the following shall release or reduce the liability of any obligor in any manner whatsoever: (a) the release of any one or more of the obligors or any settlement or compromise with any one or more of the obligors with respect to this Note; (b) the taking or compromise, modification, substitution, exchange, impairment, waiver, release or surrender of any collateral taken as security for this Note; or (c) the amendment, modification, extension, renewal, increase, or consolidation of this Note, and each obligor waives notice of each such release, settlement, compromise, taking, substitution, exchange, impairment, waiver, surrender, amendment, modification, extension, renewal, increase, or consolidation.

10. **JURISDICTION/VENUE/LEGAL ELECTIONS.** THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY FLORIDA LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE

UNITED STATES FEDERAL LAW. VENUE FOR ENFORCEMENT OF THIS NOTE AND ALL OBLIGATIONS OF PAYEE HEREUNDER IS SET AND AGREED IN PINELLAS COUNTY, FLORIDA FOR ALL PURPOSES. ANY ACTION RELATED TO THIS NOTE OR ANY COLLATERAL AGREEMENT CONNECTED WITH THIS NOTE SHALL BE BROUGHT IN THE STATE OR FEDERAL COURTS SITUATED IN PINELLAS COUNTY, FLORIDA.

11. **CONSTRUCTION OF TERMS.** As used herein, (a) "guarantor" means each guarantor who guarantees the payment of all or any portion of this Note; and (b) "obligor" means each maker, guarantor, endorser, and surety of all or any portion of this Note. In the event of any inconsistency between this Note and the ARPA with respect to the subject matter of this Note, the terms of this Note shall control.

12. JOINT AND SEVERAL LIABILITY. Each Maker signing this Note agrees that their liability is joint and several. This means each Maker is individually and collectively responsible for the full repayment of all principal, interest, and any other amounts due under this Note, regardless of who receives the loan proceeds or benefits from them. If any Maker fails to pay, the Payee may pursue any or all Makers for the entire amount owed, without needing to first seek payment from any other Maker or other obligor.

13. **JURY TRIAL WAIVER**. MAKER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

THIS NOTE AND THE OTHER TRANSACTION DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE OBLIGATIONS THAT ARE THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER OF THIS NOTE.

THIS NOTE MAY NOT BE AMENDED EXCEPT IN A WRITING SPECIFICALLY INTENDED FOR THE PURPOSE AND EXECUTED BY THE PARTY AGAINST WHOM ENFORCEMENT OF THE AMENDMENT IS SOUGHT.

[Execution page follows.]

**IN WITNESS WHEREOF,** Maker has duly executed this Note as of the date first above written.

**MAKER:**
**Great Southern Copackers LLC**

By: Jeremy Roberts
Name: Jeremy Roberts

Title: Sole Member and Manager

Notice Address: 3900 Frontage Rd. S,
Lakeland, FL 33815
Date: 09-19-2025

**Brew Hub, LLC**

By: Jeremy Roberts
Name: Jeremy Roberts

Title: Sole Member and Manager

Notice Address: 3900 Frontage Rd. S,
Lakeland, FL 33815
Date: 09-19-2025

**Amortization Schedule**

| Month | Beginning Balance | Payment | Interest | Principal | Ending Balance |
|---|---|---|---|---|---|
| 1 | $1,801,275.00 | $63,594.60 | $24,467.32 | $39,127.28 | $1,762,147.72 |
| 2 | $1,762,147.72 | $63,594.60 | $23,935.84 | $39,658.76 | $1,722,488.97 |
| 3 | $1,722,488.97 | $63,594.60 | $23,397.14 | $40,197.45 | $1,682,291.51 |
| 4 | $1,682,291.51 | $63,594.60 | $22,851.13 | $40,743.47 | $1,641,548.04 |
| 5 | $1,641,548.04 | $63,594.60 | $22,297.69 | $41,296.90 | $1,600,251.14 |
| 6 | $1,600,251.14 | $63,594.60 | $21,736.74 | $41,857.85 | $1,558,393.29 |
| 7 | $1,558,393.29 | $63,594.60 | $21,168.18 | $42,426.42 | $1,515,966.87 |
| 8 | $1,515,966.87 | $63,594.60 | $20,591.88 | $43,002.71 | $1,472,964.16 |
| 9 | $1,472,964.16 | $63,594.60 | $20,007.76 | $43,586.83 | $1,429,377.32 |
| 10 | $1,429,377.32 | $63,594.60 | $19,415.71 | $44,178.89 | $1,385,198.44 |
| 11 | $1,385,198.44 | $63,594.60 | $18,815.61 | $44,778.98 | $1,340,419.45 |
| 12 | $1,340,419.45 | $63,594.60 | $18,207.36 | $45,387.23 | $1,295,032.22 |
| 13 | $1,295,032.22 | $63,594.60 | $17,590.85 | $46,003.74 | $1,249,028.48 |
| 14 | $1,249,028.48 | $63,594.60 | $16,965.97 | $46,628.63 | $1,202,399.85 |
| 15 | $1,202,399.85 | $63,594.60 | $16,332.60 | $47,262.00 | $1,155,137.86 |
| 16 | $1,155,137.86 | $63,594.60 | $15,690.62 | $47,903.97 | $1,107,233.88 |
| 17 | $1,107,233.88 | $63,594.60 | $15,039.93 | $48,554.67 | $1,058,679.21 |
| 18 | $1,058,679.21 | $63,594.60 | $14,380.39 | $49,214.20 | $1,009,465.01 |
| 19 | $1,009,465.01 | $63,594.60 | $13,711.90 | $49,882.70 | $959,582.31 |
| 20 | $959,582.31 | $63,594.60 | $13,034.33 | $50,560.27 | $909,022.04 |
| 21 | $909,022.04 | $63,594.60 | $12,347.55 | $51,247.05 | $857,775.00 |
| 22 | $857,775.00 | $63,594.60 | $11,651.44 | $51,943.15 | $805,831.84 |
| 23 | $805,831.84 | $63,594.60 | $10,945.88 | $52,648.71 | $753,183.13 |
| 24 | $753,183.13 | $63,594.60 | $10,230.74 | $53,363.86 | $699,819.27 |
| 25 | $699,819.27 | $63,594.60 | $9,505.88 | $54,088.72 | $645,730.56 |
| 26 | $645,730.56 | $63,594.60 | $8,771.17 | $54,823.42 | $590,907.13 |
| 27 | $590,907.13 | $63,594.60 | $8,026.49 | $55,568.11 | $535,339.02 |
| 28 | $535,339.02 | $63,594.60 | $7,271.69 | $56,322.91 | $479,016.12 |
| 29 | $479,016.12 | $63,594.60 | $6,506.64 | $57,087.96 | $421,928.16 |
| 30 | $421,928.16 | $63,594.60 | $5,731.19 | $57,863.41 | $364,064.75 |
| 31 | $364,064.75 | $63,594.60 | $4,945.21 | $58,649.38 | $305,415.37 |
| 32 | $305,415.37 | $63,594.60 | $4,148.56 | $59,446.04 | $245,969.33 |
| 33 | $245,969.33 | $63,594.60 | $3,341.08 | $60,253.51 | $185,715.82 |
| 34 | $185,715.82 | $63,594.60 | $2,522.64 | $61,071.96 | $124,643.86 |
| 35 | $124,643.86 | $63,594.60 | $1,693.08 | $61,901.52 | $62,742.35 |
| 36 | $62,742.35 | $63,594.60 | $852.25 | $62,742.35 | $0.00 |

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
D4GBY-WKTVA-WYAOS-AZQQC

DOCUMENT COMPLETED BY ALL PARTIES ON
19 SEP 2025 17:18:57
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| **JEREMY ROBERTS**<br>EMAIL<br>ROBER1JE26@GMAIL.COM | SENT<br>18 SEP 2025 15:50:58<br>VIEWED<br>19 SEP 2025 16:19:14<br>SIGNED<br>19 SEP 2025 17:18:57 | Jeremy Roberts<br>IP ADDRESS<br>71.42.21.175<br>LOCATION<br>ORLANDO, UNITED STATES |

**RECIPIENT VERIFICATION**

EMAIL VERIFIED
19 SEP 2025 16:19:14

# EXHIBIT 2

CLIMATE FIRST BANK®

# ACCOUNTS RECEIVABLE PURCHASING AGREEMENT

THIS ACCOUNTS RECEIVABLE PURCHASING AGREEMENT ("Agreement") is made 09-18-2025 ("Effective Date"), by and between Brew Hub, LLC ("Brew"), a Delaware limited liability company, Great Southern Copackers LLC ("Great Southern", and together with Brew, the "Seller"), a Florida limited liability company, and CLIMATE FIRST BANK (including its successors and assigns, the "Purchaser"), on the following terms and conditions:

1. **Definitions**. The following terms used herein shall have the following meanings. All capitalized terms not defined in this Agreement or in the Schedule (defined below) shall have the meanings ascribed to such terms in the UCC:

1.1. "**Account**" –means any right of the Seller to payment as a result of the Seller's sale of goods and/or services, and the proceeds thereof, as well as all security interests, guaranties, and other contractual and statutory rights of Seller that support or secure such right to payment, including, but not limited to, any rights of Seller under any mechanic's lien, mineral liens, possessory liens, lien affidavits, payment bonds or other such liens, as well as other rights under similar laws, whether any of such rights are now existing or hereafter created.

1.2. "**Account Debtor**" – means the party or parties obligated to pay an Account.

1.3. "**Affiliated**" - means, with respect to a given person, any person or entity which, directly or indirectly, controls, is controlled by, or is under common control with, the given person.

1.4. "**Audit Fee**"- $250 per day.

1.5. "**Avoidance Claim**" - any claim that any payment received by Purchaser from or for the account of an Account Debtor is avoidable under the United States Bankruptcy Code or any other Insolvency Law.

1.6. "**Business Day**" means a day on which Purchaser is open for business and that is not a Saturday or Sunday.

1.7. "**Clearance Days**" - 3 Business Days.

1.8. "**Closed**" - a Purchased Account is closed upon the first to occur of (i) receipt of full payment by Purchaser or (ii) the Purchased Account has been repurchased by the Seller, including without limitation by charging the unpaid Face Amount to the Reserve Account as set forth herein.

1.9. "**Collateral**" – all personal property and fixtures of the Seller, whether now owned or hereafter arising or acquired and wherever located, including, without limitation, all of Seller's right, title and interest in and to all of the following: all Accounts; all Inventory; all Equipment; all Deposit Accounts; all General Intangibles (including without limitation all Payment Intangibles and Intellectual Property); all Investment Property; all Chattel Paper; all Instruments (including Promissory Notes); all Goods, all Documents; all Letter of Credit Rights; all Commercial Tort Claims; all of Seller's property and interest held in the Reserve Account; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, including, but not limited to, any rights of Seller under any mechanic's lien, payment bond or other similar laws, all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of, any and all of the above, and all Seller's books relating to any and all of the above, and any other property in which Seller grants a security interest to Purchaser pursuant to the Collateral Documents.

1.10. "**Collateral Documents**" – any security agreement executed by Seller pursuant to Section 5 of this Agreement; any other document, including, without limitation, the Equipment Note and the Subordinate Mortgage, pursuant to which Seller, any guarantor or any other person grants to Purchaser liens, security interests, or other collateral rights in personal or real property; and any other instrument, certificate, notice, or other document incidental to any of the foregoing.

1.11. **"Delay Discount"** –0.10959% per day.

1.12. "**Eligible Account**" - an Account which is acceptable for purchase as determined by Purchaser in the exercise of its sole judgment and discretion. Without limiting the generality of the foregoing, Purchaser may determine that an Account is not an Eligible Account, regardless of the creditworthiness of the Account Debtor or any other factor, if purchasing such Account would cause the unpaid balance of all Purchased Accounts to exceed the Line Amount.

1.13. **"Equipment Note"** - that certain Secured Promissory Note, of even date with this Agreement, in the original principal amount of $1,801,275.00, payable to the order of Purchaser, as amended, modified, restated, renewed, extended and/or refinanced.

1.14. "**Events of Default**" - See Section 13.1.

1.15. **"Exposed Payments"** - payments received by Purchaser from or for the account of a Payor that has become subject to a proceeding under any Insolvency Law, to the extent such payments cleared the Payor's deposit account within ninety days of the commencement of said proceeding or are otherwise reasonably susceptible to an Avoidance Claim.

1.16. "**Face Amount**" - the total amount shown to be due on an Account at the time of Purchase.

1.17. **"Initial Term"** – See Section 15.1

1.18. "**Invoice**" - any document that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

1.19. "**Invoice Date**" - the date an Invoice representing the Purchased Account is first transmitted to the Account Debtor, provided, however, that the date printed on the face of an Invoice shall be presumed to be the Invoice Date unless proven otherwise by clear and convincing evidence.

1.20. **"Invoice Delivery Schedule"** - A document, in form required by Purchaser, wherein Seller identifies such of its Accounts offered for sale to Purchaser, and, by delivery of same to Purchaser, thereby transfers, assigns and sells such Accounts to Purchaser in accordance with the terms of this Agreement, subject only to Purchaser's acceptance thereof as set forth in Section 2 of this Agreement.

1.21. **"Insolvency Law"** – the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., any successor statute, and any similar law, whether federal, state, local or foreign, that provides relief to debtors against their creditors generally.

1.22. "**Late Payment Date**" - the date which is ninety (90) days from the date of Purchaser's purchase of the Account.

1.23. "**Line Amount**" – $1,000,000.00

1.24. **"Misdirected Payment Fee**" - fifteen percent (15%) of the amount of any payment on any Account which is received by Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by Seller.

1.25. "**Missing Notation Fee**" – fifteen percent (15%) of the Face Amount of the applicable Invoice.

1.26. "**Net Funds Employed**" – at any given time the amount equal to (a) the gross face amount of a Purchased Account minus (b) the net amount of accrued reserves with respect to such Purchased Account.

1.27. "**Notation**" – a legend on the face of Invoices, satisfactory to Purchaser in its sole discretion, that indicates the Account has been sold and assigned to Purchaser and is payable directly and exclusively to Purchaser at a designated address, such address to be provided to Seller by Purchaser.

1.28. "**Obligations**" - all present and future obligations owing by Seller to Purchaser whether arising hereunder or otherwise, and whether for the payment of money or evidenced by any note, including, but not limited to, the Equipment Note, or other instrument, direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, arising before, during or after the commencement of any bankruptcy case in which Seller is a debtor, including, without limitation, any amounts charged to Seller for the repurchase of Accounts under Section 4 of this Agreement.

1.29. **"Overadvance Fee"** – per day, 0.10959% on the Reserve Shortfall.

1.30. **"Payments"** – See Section 17.1.

1.31. **"Payor"** - An Account Debtor or other obligor on an Account, or entity making payment thereon for the account of such party.

1.32. **"Person"** - any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, government, or any agency or political division thereof, or any other entity.

1.33. **"Preference Reserve"** – See Section 15.5.1

1.34. **"Prime Rate"** – the rate published by the Wall Street Journal from time to time as the base corporate rate posted by at least 75% of the thirty (30) largest banks in the United States of America.

1.35. "**Purchase Date**" - the earlier of (i) the date on which Purchaser advises Seller in writing that Purchaser has agreed to purchase an Account; or (ii) the date on which Purchaser pays the Purchase Price for an Account pursuant to Section 2.1.4.

1.36. "**Purchase Price**" – The Face Amount of a Purchased Account less the Discount.

1.37. "**Purchased Accounts**" - Accounts purchased hereunder which have not been Closed.

1.38. **"Purchaser"** – See introductory paragraph.

1.39. **"Renewal Term"** – See Section 15.1.

1.40. "**Repurchased**" - an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount of the Account.

1.41. **"Repurchase Price"** – with respect to any Purchased Account at any time, the sum of (a) the then-unpaid Face Amount of such Purchased Account and (b) all then-outstanding discounts, fees, expenses, and other Obligations relating to such Purchased Account.

1.42. "**Required Reserve Amount**" - the Reserve Percentage multiplied by the unpaid balance of Purchased Accounts.

1.43. "**Reserve Account**" – A bookkeeping account on the books of Purchaser representing the portion of the Purchase Price which has not been paid by Purchaser to Seller, maintained by Purchaser to secure Seller's performance with the provisions hereof.

1.44. **"Reserve Excess"** – at any time, the amount (if any) by which the Reserve Account exceeds the Required Reserve Amount.

1.45. "**Reserve Shortfall**" – at any time, the amount (if any) by which the Required Reserve Account exceeds the amount in the Reserve Account.

1.46. "**Schedule**" – means the schedule, attached hereto, containing commercial terms that apply to the Agreement and all Account purchases made hereunder. The Schedule shall for all purposes be deemed to be a part of this Agreement, and the same is an integral part of this Agreement.

1.47. **"Seller"** – See introductory paragraph.

1.48. **"Subordinate Mortgage"** - that certain mortgage or Deed of Trust pursuant to which the property located at 210 N. Tubb St., Unit 1101, Oakland, Florida 34760 has been pledged to Purchaser to secure the Obligations, along with any and all amendments, modifications, restatements, renewals, extensions and/or refinancings thereof.

1.49. "**Transaction Documents**" – this Agreement, the Equipment Note, the Collateral Documents, and all other certificates, instruments, and other documents of whatever nature executed or delivered in connection with this Agreement or the Equipment Note, including, without limitation, the Subordinate Mortgage pledged to Purchaser to secure the Obligations.

1.50. "**UCC**" – means the Uniform Commercial Code as in effect from time to time in the State of Florida.

2. **<u>Sale; Estimated Purchase Price; Billing; Reserve; Lockbox</u>**.

2.1. **Assignment and Sale.**

2.1.1. Seller agrees to sell to Purchaser as absolute owner, **with full recourse**, all of Seller's Accounts identified from time to time on Invoice Delivery Schedules and that are approved by Purchaser in Purchaser's sole and absolute discretion. Upon such sale, Seller shall have sold, assigned, transferred, conveyed and delivered to Purchaser, as an outright conveyance and not as a security interest, and Purchaser shall have purchased and accepted from Seller, all right, title and interest of Seller in and to such Accounts. The assignment and sale of each Account will vest absolute ownership in Purchaser, free and clear of all liens, encumbrances and security interests of any and every nature whatsoever.

2.1.2. Seller shall furnish a completed Invoice Delivery Schedule to Purchaser, identifying those Accounts Seller intends to sell to Purchaser. Each Invoice Delivery Schedule shall be accompanied by such documentation supporting and evidencing the Accounts as Purchaser shall from time to time require. Purchaser may rely on any facsimile, electronic mail or telephone request for the transmission of the Invoice Delivery Schedule and request for funds given by a person whom Purchaser believes, in its discretion, to be an authorized representative of Seller, and Seller will indemnify Purchaser for any loss Purchaser suffers as a result of that reliance.

2.1.3. Seller must offer for sale to Purchaser all Accounts owing to Seller by an Account Debtor which owes a Purchased Account to Purchaser. Purchaser may, but shall not be required to, purchase from Seller, such Accounts as Purchaser determines to be Eligible Accounts.

2.1.4. For each Account Purchaser desires to purchase, Purchaser shall pay the Purchase Price thereof, less the Reserve Percentage of the Face Value of the Purchased Account, and any other amounts due to Purchaser from Seller (including, without limitation, any amounts due under Section 2.3.1 hereof). Such net amount shall be paid to any demand deposit account maintained by Seller or represented by an employee of Seller to be maintained by Seller, within two (2) business days of the Purchase Date, whereupon the Account shall be deemed fully purchased by, paid for by, and transferred to Purchaser.

2.1.5. Purchaser does not intend to purchase any Account which will cause a Reserve Shortfall or the unpaid balance of Purchased Accounts to exceed the Line Amount. The foregoing notwithstanding, in the event Purchaser's purchases cause a Reserve Shortfall or the unpaid balance of Purchased Accounts to exceed the Line Amount, Seller shall be liable for all such amounts as well as any and all fees, discounts and other charges as set forth in this Agreement, including, if applicable, at any default rate.

**2.2** **Billing.** Purchaser may send a monthly statement to all Account Debtors itemizing their account activity during any preceding billing period; however, Purchaser is under no obligation to do so. All Account Debtors will be informed that Seller's Accounts have been sold and assigned to Purchaser and instructed to make payments to Purchaser.

2.3 **Reserve Account.**

2.3.1 Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall, and the amount so paid shall be credited to the Reserve Account.

2.3.2 Except during any period in which an Event of Default remains uncured, Purchaser shall pay to Seller the Reserve Excess.

2.3.3 Purchaser may, in its good faith business judgment, withhold the Reserve Excess for any one or more of the following reasons: (a) to reflect events, conditions, contingencies or risks which, as determined by Purchaser in its good faith business judgment, do or may adversely affect (i) the Collateral or any other property which is security for the Obligations or its value (including without limitation any increase in delinquencies of Accounts), (ii) the assets, business or prospects of Seller any Guarantor, or (iii) the security interests and other rights of Purchaser in the Collateral (including the enforceability, perfection and priority thereof); or (b) to reflect Purchaser's good faith belief that any collateral report or financial information furnished by or on behalf of Seller or any Guarantor to Purchaser is or may have been incomplete, inaccurate or misleading in any material respect; or (c) in respect of any state of facts which Purchaser determines in good faith constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default.

2.3.4 Purchaser may, without demand or prior notice, charge the Reserve Account with any Obligation. The Reserve Account shall be debited from time to time to reflect the accrual of the Additional Discount, Cost of Fund Fee or other amounts owed to Purchaser.

2.3.5 Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account. In such event, Purchaser shall be deemed to have released the Reserve Shortfall to Seller to the extent of the credit.

2.3.6 Upon termination of this Agreement, Purchaser may use the Reserve Account to fund the Preference Reserve as set forth in Section 15.5.1.

2.4 **Collection of Accounts/Lockbox.** Seller agrees that any and all Accounts, whether purchased or Collateral of Purchaser, must be collected through the lockbox arrangements established by Purchaser. Seller shall notify all Account Debtors to make all payments to the lockbox. Seller's invoices shall have imprinted or stamped on the face thereof notifications of assignment and check remittance information indicating Purchaser's lockbox address. Purchaser may inform Account Debtors that Seller's Accounts have been sold and assigned to Purchaser and may instruct such Account Debtors to make payments to Purchaser. In the event any payments on, and proceeds of, Accounts are received by Seller, Seller shall hold such funds in trust for Purchaser, and Seller shall immediately deliver all such payments and proceeds to Purchaser in their original form, duly endorsed, to be applied to the Obligations in such order as Purchaser shall determine.

3. **Authorization for Purchases/Seller Instructions.** Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts upon telephonic, facsimile, electronic mail, or other instructions received from

anyone purporting to be an officer, employee or representative of Seller. In addition, Purchaser is authorized to comply with any other instructions, including vendor payment instructions, upon telephonic, facsimile, electronic mail, or other instructions received from anyone purporting to be an officer, employee or representative of Seller. Under no circumstances shall Purchaser ever be liable to Seller or any third party for complying with such instructions, whether verbal or in writing, either on the basis of lack of authority, identity theft, fraud or otherwise, such claims hereby fully waived and released, whether now existing or hereafter arising.

4. <u>**Repurchase Of Accounts.**</u>

4.1. **Requirement to Repurchase.** Purchaser may require that Seller repurchase at the Repurchase Price:

4.1.1. Any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, Purchaser being under no obligation to determine the *bona fides* of such dispute;

4.1.2. Any Purchased Account as to which Seller has breached a covenant under Section 10 or 11, or a representation or warranty under section 12;

4.1.3. All Purchased Accounts upon the occurrence of an Event of Default, or upon the termination of this Agreement;

4.1.4. Any Purchased Account that remains unpaid beyond the Late Payment Date; and

4.1.5. Any Purchased Account owing from an Account Debtor or Payor which (i) in Purchaser's reasonable judgment has become insolvent or (ii) which has indicated an inability or unwillingness to pay the Purchased Account when due.

4.2. **Payment of Repurchase Price.** In the event that Purchaser requires that Seller repurchase one or more Accounts pursuant to Section 4.1, Seller shall pay the Repurchase Price on demand, or, at Purchaser's option, without notice or demand, by Purchaser's charge to the Reserve Account. Accounts shall not be deemed Repurchased until the Repurchase Price has been paid; *provided, however,* that if the Repurchase Price is paid by charging the Reserve Account, such Accounts shall not be deemed Repurchased until the next succeeding business day on which, as of the close of business, the Reserve Shortfall is zero and there are no past-due Obligations. At such time as an Account is deemed Repurchased pursuant to this subsection, it shall be transferred and re-assigned to Seller, without recourse, but shall constitute Collateral for all purposes under this Agreement and the Collateral Documents, as applicable.

5. <u>**Security Interest.**</u> In order to secure the Obligations, Seller assigns the Collateral to Purchaser and grants to Purchaser a continuing first priority security interest in and lien upon the Collateral, which security interest may be evidenced and more fully described in a separate security agreement that has been executed and delivered by Seller in connection herewith. Notwithstanding the granting to Purchaser of a security interest, it is acknowledged that Purchased Accounts are the sole property of Purchaser, and as such, are not Collateral.

5.1. Seller authorizes Purchaser to file any initial financing statements and amendments thereto that:

5.1.1. Indicate the collateral as all assets of the Seller or words of similar effect, regardless of whether any particular asset comprised in the collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail;

5.1.2. Contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Seller is an organization, the type of organization, and any organization identification number issued to the Seller and, (ii) in the case of a financing statement filed as a fixture filing or indicating collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the collateral relates;

5.1.3. Contain a notification that the Seller has granted a negative pledge to the Purchaser, and that any subsequent lienor may be tortiously interfering with Purchaser's rights; and

5.1.4. Advise third parties that any notification of Seller's Account Debtors will interfere with Purchaser's collection rights.

6. <u>**Guaranty.**</u> As further security for the payment of the Obligations, certain parties have fully and unconditionally personally guaranteed the Seller's obligations and performance of this Agreement, as evidenced by Personal Guarantee(s) executed contemporaneously herewith. Such Personal Guarantee(s) and shall be fully enforceable in accordance with their terms. Notwithstanding anything contained herein, the liability of Seller and all guarantors is joint and several, such that Purchaser may proceed against any such persons, or any collateral securing the Obligations, without first proceeding against or joining any other such person or pursuing any other remedy.

7. <u>**Miscellaneous Fees; Reimbursement of Expenses.**</u> In addition to those fees and other charges identified in the Schedule (or anywhere else in this Agreement), Seller shall pay to Purchaser the items set forth in this Section 7, such items to be due and payable without demand or notice, and chargeable, at Purchaser's discretion, to the Reserve Account pursuant to Section 2.3.4 hereof:

7.1. **Audit Fee**. The Audit Fee, which shall be incurred and due each day during which Purchaser or its agents are on-site at Seller's facilities or spend at least six (6) working hours working on the audit of Seller's business. Purchaser shall conduct no more than 1 audits per twelve-month period; provided, however, that nothing herein restricts Purchaser's right to conduct such audits more frequently if (i) Purchaser believes that it is advisable to do so in its good faith business judgment, or (ii) Purchaser believes in good faith that a Default or Event of Default has occurred (in which case the Audit Fee may increase upon notice to Seller). All such audits shall be at Seller's expense and the charge therefor shall be the daily Audit Fee, plus all of Purchaser's out-of-pocket expenses.

7.2. **Delay Discount**. The Delay Discount, which shall accrue daily on (a) any past due Obligations and (b) Reserve Shortfall. The Purchaser may allocate the Delay Discount among Purchased Accounts on a *pro rata* basis, or in any other way that Purchaser, in its sole discretion, deems appropriate.

7.3. **Early Termination Fee**. The Early Termination Fee as provided in Section 15.2 of this Agreement.

7.4. **Missing Notation Fee**. The Missing Notation Fee, which shall accrue on any Invoice that is transmitted by Seller to the applicable Account Debtor and that does not include the Notation.

7.5. **Misdirected Payment Fee**. The Misdirected Payment Fee, which shall accrue on any customer payment that is received by Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by Seller.

7.6. **Overadvance Fee**. The Overadvance Fee, which shall accrue daily and be payable monthly.

7.7. **Reimbursable Expenses**. Reimbursement for all out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement, including but not limited to legal fees as provided in Section 7.8 hereof, wire transfer fees, postage, audit-related expenses (which shall be charged in addition to the Audit Fee) and all other actual out-of-pocket costs.

7.8. **Attorney Fees and Legal Expenses.** Seller shall reimburse Purchaser for all incurred attorneys' fees and all filing, recording, search, title insurance, appraisal, audit (including the Audit Fee), and other reasonable costs incurred by Purchaser, pursuant to, or in connection with, or relating to this Agreement (whether or not a lawsuit is filed), including, but not limited to, any attorneys' fees and costs Purchaser incurs in order to do the following: prepare and negotiate this Agreement and any Transaction Document, and all present and future documents relating to this Agreement or any Transaction Document; obtain legal advice in connection with this Agreement or Seller; enforce, or seek to enforce, any of its rights under this Agreement or any other Transaction Document or in connection with any Account; prosecute actions against, or defend actions by, Account Debtors; commence, intervene in, or defend any action or proceeding; initiate any complaint to be relieved of the automatic stay in bankruptcy or other filings regarding Purchaser's claim against Seller or any Account Debtor in bankruptcy; file or prosecute any probate claim, bankruptcy claim, third-party claim, or other claim; examine, audit, copy, and inspect any of the Collateral or any of Seller's books and records; protect, obtain possession of, lease, dispose of, or otherwise enforce Purchaser's security interest in, the Collateral; and otherwise represent Purchaser in any litigation relating to Seller or this Agreement or any other Transaction Document. If either Purchaser or Seller files any lawsuit against the other predicated on a breach of this Agreement, Purchaser shall be entitled to recover its reasonable costs and attorneys' fees, including (but not limited to) reasonable attorneys' fees and costs incurred in the enforcement of, execution upon or defense of any order, decree, award or judgment. All attorneys' fees and costs to which Purchaser may be entitled pursuant to this Section 7.8 shall immediately become part of Seller's Obligations and due on demand.

8. **ACH Authorization**. Seller shall execute Exhibit B, hereto, granting to Purchaser an irrevocable Power of Attorney authorizing Purchaser to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Seller wherever located for the purpose of effecting payment for any portion of the Obligations. Seller warrants and represents that under no circumstances will it reverse, void, or otherwise render invalid any electronic debit initiated by Purchaser to the extent such debit has been applied to the Obligations.

9. **Account Statement.** Purchaser shall provide Seller with information on all Accounts and a monthly reconciliation of the factoring relationship relating to billing, collection and account maintenance such as aging, posting, error resolution and mailing of statements. All of the foregoing shall be in a format and in such detail, as Purchaser, in its sole discretion, deems appropriate including, but not limited to, electronic access on a website hosted by Purchaser. Purchaser's books and records shall be admissible in evidence without objection as *prima facie* evidence of the status of the Purchased Accounts and non-purchased Accounts and Reserve Account between Purchaser and Seller. Each statement, report, or accounting rendered, issued or other information regularly made available by Purchaser to Seller on any website shall be deemed conclusively accurate and binding on Seller unless within fifteen (15) days after the date of issuance of any written statement or the first of each month as to Purchaser's website content Seller notifies Purchaser to the contrary by registered or certified mail, setting forth with specificity the reasons why Seller believes such statement, report, accounting or website information is inaccurate, as well as what Seller believes to be correct amount(s) therefor. Seller's failure to receive any monthly statement shall not relieve it of the responsibility to request such statement and Seller's failure to do so shall nonetheless bind Seller to the information contained in Purchaser's records and website information at the time. Seller acknowledges that the information Purchaser makes available to Seller electronically pursuant to this Section constitutes and satisfies any duty to respond to a "request for an accounting" or a "request regarding a statement of account" as defined in Section 9.210 of the UCC.

10. **Affirmative Covenants By Seller.**

10.1. **Access.** From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to Seller's primary business premises as well as all other premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes and shall direct each current or later engaged accountant and third party to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

10.2. **Taxes.** Seller shall pay when due all payroll and other taxes and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require. Seller will notify Purchaser in writing immediately upon imposition or assessment of any lien, levy, tax lien, assessment or similar action against Seller or any of Seller's assets.

10.3. **Insurance.** Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion and shall reflect the Purchaser as the loss payee; and the Purchaser shall be listed in the policy as an additional insured entitled to receive notices. Seller shall furnish to Purchaser: (a) upon written request, any and all information concerning such insurance carried; (b) as requested by Purchaser, loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty (30) day's prior written cancellation notice to Purchaser.

10.4. **Payments Received by Seller.** Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee, if the Seller shall receive any payments with respect to any Account, whether such Account has been purchased by Purchaser or represents Collateral of Purchaser, then the Seller shall hold such payments in trust for the benefit of the Purchaser, shall not commingle such payments with Seller's other assets, and shall turn over the check in kind (or if payment was made electronically, the funds), within one (1) business day following the date of receipt by Seller of the payment. Seller shall make its best efforts to insure that each Account Debtor shall receive and comply with any Notation and make payment to Purchaser in accordance therewith, whether indebted on a Purchased Account or a non-Purchased Account.

10.5. **Additional Access and Notification.** Seller shall (i) permit the Purchaser access to all books and records of the Seller during normal business hours; (ii) notify the Purchaser in writing immediately upon imposition or assessment of any lien, levy, tax lien, assessment or similar action against the Seller or any of the Seller's assets; and (iii) furnish the Purchaser, upon request, any and all papers, documents, or records of whatever nature related directly or indirectly to any Accounts.

10.6. **Returned Merchandise Held in Trust.** In the event any Goods sold giving rise to an Account shall be returned to or repossessed by the Seller, such Goods shall be held by the Seller in trust for the Purchaser, separate and apart from the Seller's own property, and subject to the Purchaser's directions and control.

10.7. **Information/Reporting Requirements.** If requested by Purchaser, Seller shall provide Purchaser the following documents:

10.7.1. Unaudited financial reports, each of which shall be dated as of the close of such fiscal month and prepared or certified by Seller's management:

10.7.1.1. unaudited balance sheet and income statement;

10.7.1.2. detailed accounts receivable aging; and

10.7.1.3. detailed accounts payable aging;

10.7.2. Copies of any State Sales Tax Return as filed with the appropriate taxing authority, with proof that any required payment has been made.

10.7.3. Copies of:

10.7.3.1. All federal, state and county income or franchise tax returns or reports;

10.7.3.2. All federal and state payroll tax returns;

10.7.4. Personal financial and cash flow statement and the most recently filed federal tax return on all personal guarantors of this Agreement; and

10.7.5. Such other financial and other documents regarding Seller, any other obligor, Seller's business or any Collateral, as requested by Purchaser in its discretion from time to time, including, without limitation, "view access" to Seller's depository accounts and client portals, if applicable.

10.8. **Dealing with Returned Goods.** With respect to any returned or repossessed Goods, the Seller, at its sole cost and expense, shall (a) provide proper storage therefor, (b) maintain adequate insurance coverage thereon, (c) prepare the same for sale, (d) defend title thereto, (e) take all other actions necessary for the protection thereof, (f) pay freight and related shipping costs, (g) be responsible for any other costs or expenses incurred in connection with the foregoing, including attorney's fees, and (h) immediately notify Purchaser of any authorization Seller provides for the return of Goods.

10.9. **[Reserved]**

10.10. **Indemnification.** Seller shall indemnify, defend (with counsel selected by Purchaser) and hold harmless Purchaser from any claims, demands, losses or liabilities arising out of this Agreement, including but not limited to Avoidance Claims, claims of Account Debtors, and other third-party claims arising out of Seller's business. Seller shall notify Purchaser within two business days of it becoming aware of the assertion of any Avoidance Claim or other claim that is, or may be, the basis of a claim for indemnification under this Section 10.10.

10.11. **Taxpayer Authorizations.** Seller shall fully complete and execute, as taxpayer, prior to or immediately upon the execution of this Agreement, a form 8821 (Rev. October 2011) and/or form 4506 (Rev. January 2012) or form 4506-T (Rev. January 2012) issued by the Department of the Treasury, Internal Revenue Service, as updated and revised from time to time, and such additional forms as may be requested by Purchaser, irrevocably authorizing Purchaser to, among other things, inspect or receive tax information relating to any type of tax, tax form, years or periods or otherwise desired by Purchaser on an ongoing basis.

10.12. **Further Assurances.** Seller shall promptly execute, acknowledge and deliver such further documents and do such other acts and things as Purchaser may reasonably request in order to effect fully the purposes of this Agreement and the other Transaction Documents, including, without limitation, mineral or mechanic lien affidavits, notices and bond claims.

11. <u>Negative Covenants by Seller.</u>

11.1. **Dealing with Account Debtors.** Seller will not, without the prior written consent of Purchaser in each instance: (a) grant, or purport to grant, any extension of time for payment of any of the Accounts, (b) compromise or settle, or purport to compromise or settle, any Account for less than the full amount thereof, (c) release, or purport to release, in whole or in part, any Account Debtor or authorize or allow or purport to authorize or allow any Account Debtor to make payments to Seller, or (d) grant or purport to grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts. Each of the covenants contained in clauses (a) through (d) applies to all of the Accounts, regardless of whether such Accounts constitute Purchased Accounts or Collateral.

11.2. **Notice of Assignment.** Seller will not send any Invoice to an Account Debtor if such Invoice does not include the Notation.

11.3. **Liens.** Except for liens in favor of Purchaser, Seller will not, without the express prior written consent of Purchaser, create, incur, assume or permit to exist any security interest, lien or encumbrance upon or with respect to any Account and/or Collateral now owned or hereafter acquired by Seller. In addition, Seller shall not enter into any agreement with any third party that prohibits the creation or perfection of a lien in favor of Purchaser upon any of Seller's properties or assets, whether now owned or hereafter acquired.

11.4. **No Other Sales of Accounts.** Seller will not, without express prior written consent of Purchaser, sell, pledge, assign or factor any of its Accounts other than to Purchaser until all Purchased Accounts are Closed, all Obligations due Purchaser have been fully satisfied, and Purchaser has filed a UCC termination. **FOR CLARITY, WITHOUT PURCHASER'S PRIOR WRITTEN CONSENT, SELLER SHALL NOT SELL, PLEDGE OR ASSIGN ITS ACCOUNTS OR PAYMENT INTANGIBLES OR GRANT A SECURITY INTEREST THEREIN TO ANY PERSON OR ENTITY OFFERING MERCHANT CASH ADVANCES OR SIMILAR FINANCIAL SERVICES, AND ANY SUCH GRANT, SALE, PLEDGE OR ASSIGNMENT SHALL CONSTITUTE AN EVENT OF DEFAULT.**

11.5. **Fundamental Changes in Business.** Seller will not, without prior written consent by the Purchaser, (a) use any trade name other than that set out at the beginning of this Agreement, (b) change its name or use an assumed name; (c) change its jurisdiction of organization (d) merge or consolidate with any other corporation or entity, (e) dissolve or cease its operations as they are now conducted, or (f) hold any "going out of business" sale or otherwise state publicly that Seller is going out of business, or (g) take any other action that is reasonably likely to cause Account Debtors to withhold, delay, or refuse payment (rightfully or wrongfully) on the Accounts.

11.6. **Distributions, Dividends, and Other Junior Payments.** Seller will not, without the prior written consent of Purchaser, declare any dividends, or purchase, redeem, retire or otherwise acquire any of its capital stock or make any distribution of its assets to any of its members, partners or shareholders or equity investors, or make any payments of any kind to any of the foregoing, other than (i) the reimbursement of actual, ordinary

and necessary business expenses incurred by such person or entity on behalf of Seller in the ordinary course of business; and (ii) if such person is employed by Seller, salaries or other regular compensation at the same rates as are in effect as of the date hereof.

11.7. **Transactions With Affiliates.** Seller will not, directly or indirectly, enter into or permit any transaction with any Affiliate of Seller on terms that are less favorable to the Seller than those that might be obtained at the time from a person who is not an Affiliate of Seller.

11.8. **No Deposit of Account Proceeds**. Seller shall not deposit Account proceeds, whether the funds represent payments for purchased Accounts or non-Purchased Accounts, but shall hold such payments in trust for the benefit of the Purchaser, shall not commingle such payments with Seller's other assets, and shall turn over the check in kind (or if payment was made electronically, the funds), within one (1) business day following the date of receipt by Seller of the payment. Seller shall make its best efforts to insure that each Account Debto shall receive and comply with any Notation and make payment to Purchaser in accordance therewith, whether indebted on a Purchased Account or a non-Purchased Account.

12. <u>Representations and Warranties.</u> The following representations and warranties are made by Seller to Purchaser, with the understanding that Purchaser is relying upon them in entering into this Agreement and purchasing the Purchased Accounts. Each delivery of an Invoice Delivery Schedule shall constitute Seller's reaffirmation that these representations and warranties are true and correct as of the date of such Invoice Delivery Schedule, unless Purchaser has been specifically advised otherwise in writing. All of such representations and warranties shall be considered to have been relied upon by Purchaser, regardless of any investigation made by Purchaser or on its behalf.

12.1. **Authority.** Seller is fully authorized to enter into this Agreement and to perform hereunder.

12.2. **Binding Nature.** Each of the Transaction Documents constitutes the legal, valid and binding obligation of Seller, and is fully enforceable against Seller according to its terms.

12.3. **Solvent and Good Standing.** Seller is solvent and in good standing in the State of its organization.

12.4. **Nature of Accounts.**

12.4.1. The Accounts are *bona fide* existing, outstanding obligations created by the unconditional and fully-completed sale and delivery of goods by the Seller or the complete, full and unconditional rendition of services, in any case, in the ordinary course of Seller's business. The Accounts are unconditionally owed by the Account Debtor free of any and all defenses, including, but not limited to, any disputes, offsets, counterclaims, rights of recoupment, or rights of return or cancellation. The Accounts have not been paid, satisfied or discharged in any manner, in whole or in part.

12.4.2. The Account Debtors on all Accounts, whether Purchased or constituting the Collateral of Purchaser, have been notified and advised that payment on the Accounts shall be made to Purchaser, and have not been given any contrary or conflicting instructions by Seller or its employees, representatives, or Affiliates. All Invoices to Account Debtors include the Notation.

12.4.3. With respect to each Account, the applicable Account Debtor is not Affiliated with Seller, and the terms and conditions of the transactions giving rise to such Account are no more or less favorable to Seller than those that would be offered to an unaffiliated third party dealing with the Seller at arms' length in a free market.

12.4.4. Except as may otherwise be agreed to from time to time, the terms of all Purchased Accounts shall require payment on a net 30 day basis. Seller shall not vary the terms of sale, terms of payment or location of payment set forth in the invoice relating to any Purchased Account without the prior written approval of Purchaser, it being acknowledged and agreed that any Purchased Account is the property of Purchaser.

12.5. **No Notice of Adverse Claims, Bankruptcy, Insolvency, Etc.** Seller has not received notice of, and does not have actual knowledge of, any of the following: (a) the actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of the Account Debtor; (b) any claim or assertion by the Account Debtor which, if successful, would constitute a defense to, payment or satisfaction of, or offset against, the Account; or (c) any claim by any third party pertaining to an Account which, if asserted, would likely cause the Account Debtor to withhold or delay payment on such Account to the Purchaser.

12.6. **No Associated Entities In Competition With Seller.** To the best of Seller's knowledge, there exists no corporation, partnership, limited liability, or other person or entity to which Section 14 of this Agreement applies.

12.7. **Accuracy of Information**. All written information previously provided to Purchaser by Seller (or on Seller's behalf) in connection with this Agreement, including but not limited to all applications, certificates, financial statements, and other written information furnished to Purchaser in contemplation of any transaction, is true and correct.

12.8. **Account Purchase Transaction. None of the payments contemplated by this Agreement constitute payments for the use, forbearance, or detention of money. The parties hereto specifically intend for**

**the purchase of Accounts by Purchaser hereunder to constitute an outright conveyance and true sale of Accounts by the Seller to Purchaser and not a loan or other secured financing transaction. Nothing contained in this Agreement, nor any course of dealing in the future, shall be construed to be anything other than an outright purchase and sale of Accounts. It is agreed that notwithstanding any provision to the contrary in this Agreement, or in any of the documents otherwise relating thereto, no provision shall require the payment or permit the collection of interest.**

12.9. **Consulting With Attorney. Seller has consulted with an attorney of Seller's choice with respect to this Agreement and the transactions contemplated herein (or in the alternative, Seller acknowledges that Purchaser has recommended that Seller consult with an attorney and Seller has knowingly elected not to do so), and Seller has relied solely on the advice of such attorney and/or on its own judgment in deciding to enter into this Agreement.**

12.10. **Determination of Purchase Price.** The Purchase Price of the Accounts has been fairly determined pursuant to arms' length negotiations between Purchaser and Seller, and represents the fair market value thereof, after due consideration has been given to the nature of the Accounts, the probability of prompt collection thereof, the creditworthiness of the Account Debtors, the payment history of the Account Debtors, other economic factors relative to the Accounts; and the services rendered and services that will be rendered in the future by Purchaser in connection with credit investigations of Account Debtors, supervision of ledgering of Accounts, collection of Purchased Accounts, and the assumption of certain credit risks.

13. **<u>Default</u>.**

13.1. **Events of Default.** The occurrence of any one (1) or more of the following events constitutes an immediate Event of Default hereunder: (a) Seller fails to pay any monetary Obligation to Purchaser, or deliver any of the reports or other documents described in Section 10.7, within two (2) business days of the date requested by Purchaser; (b) Seller breaches any of the negative covenants set forth in Section 11 of this Agreement; (c) Seller fails to perform any of the affirmative covenants described in Section 10 (other than Section 10.7, addressed above) within two (2) days from the date on which Seller receives Purchaser's written notice of such failure; (d) any representation or warranty contained in this Agreement or any Transaction Document is false when made (provided, however, that Purchaser's failure to discover such falsity until a later date shall in no way be deemed a waiver of such Event of Default); (e) any guarantor of the Obligations becomes subject to any debtor-relief proceedings, fails to perform or observe any of such guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, including if such guarantor is an individual, the death of such individual guarantor; (f) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations; (g) Seller shall generally not pay, or shall be unable to pay, or shall admit in writing its inability to pay its debts as such debts become due; (h) Seller shall make an assignment for the benefit of creditors, or petition or apply to any tribunal for the appointment of a custodian, receiver, or trustee for it or a substantial part of its assets; (i) Seller shall commence any proceeding under any Insolvency Law, whether now or hereafter in effect; (j) Seller shall have had any such petition or application filed or any such proceeding commenced against it in which an order for relief is entered or an adjudication or appointment is made; (k) Seller shall take any corporate action indicating its consent to, approval of, or acquiescence in any such petition, application, proceeding, or order for relief or the appointment of a custodian, receiver, or trustee for all or any substantial part of its properties; (l) Seller shall suffer any such custodianship, receivership, or trusteeship; (m) Seller shall have failed to comply in any respect with the terms and conditions of this Agreement or related documents; or (n) Purchaser's purchase of Accounts causes a Reserve Shortfall or the unpaid balance of Purchased Accounts to exceed the Line Amount.

13.2. **Effect of Default.** Upon the occurrence of any Event of Default, Purchaser may immediately take the following actions (and all of such remedies are cumulative and not exclusive of any other remedy to which Purchaser may be entitled under this Agreement or applicable law):

13.2.1. require the immediate repurchase of all Purchased Accounts at the Repurchase Price;

13.2.2. declare all Obligations to be immediately due and payable;

13.2.3. limit or terminate Seller's access to Purchaser's online services;

13.2.4. terminate this Agreement, effective immediately, by written notice to Seller, at which point, in addition to the other Obligations, the Early Termination Fee (if applicable) shall be immediately due and payable;

13.2.5. exercise any and all other remedies allowed under this Agreement and the other Transaction Documents; and

13.2.6. take any action otherwise allowed by law and/or in equity.

Without limiting any of Purchaser's rights or remedies following an Event of Default, the Delay Discount shall continue to accrue on all past due Obligations. In the event Seller fails to deliver any of the reports or other documents described in Section 10.7, within two (2) business days of Purchaser's request, in addition to other charges and fees

accruing on the Obligations and without impairing any other rights of Purchaser under this Agreement, Purchaser shall be entitled to assess the Delay Discount on the Net Funds Employed until such documents are delivered.

**13.3 No Implied Waivers, Etc.** No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Purchaser may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by Purchaser of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. Further, Purchaser's failure to charge or accrue any discounts or fees at the rate to which Purchaser is entitled shall not be deemed a waiver by Purchaser of its claim thereto. All rights and remedies granted to Purchaser hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. Any waiver, permit, consent or approval by Purchaser of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

**13.4 Seller's Remedy; Limitation of Liability.** Seller's sole remedy for any breach alleged to have been committed by Purchaser of any obligation or duty owed under the Agreement, any other agreement between Seller and Purchaser or any duty or obligation arising out of or related to this Agreement shall be limited to any amount in the Reserve Account at the time notice of such breach is first given to Purchaser, in writing. **UNDER NO CIRCUMSTANCES SHALL PURCHASER BE LIABLE FOR ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, LOSS OF PROFIT, OR ANY OTHER LOSSES ASSOCIATED THEREWITH, WHETHER PURCHASER DID OR DID NOT HAVE ANY REASON TO KNOW OF THE POSSIBILITY OF SUCH DAMAGES.**

13.5 Waiver of Notice. Seller waives notice of intent to demand, demand, notice of nonpayment, presentment for payment, protest, notice of protest, grace, notice of dishonor, notice of intent to accelerate the Obligations, notice of acceleration, or any other notice whatsoever. Seller expressly agrees that Purchaser may extend or renew from time to time the payment of an Account without notice to or consent by Seller. Seller waives the right to require Purchaser to proceed against any Account Debtor or to proceed against any Collateral that Purchaser may hold including, but not limited to, the Accounts assigned under this Agreement. Seller agrees that Purchaser may proceed against Seller for the amount of any Obligations owing by Seller to Purchaser without taking any action against any Account Debtor or any other party and without selling or otherwise proceeding against or applying any Collateral that Purchaser may hold, including, but not limited to, assigned Accounts.

14. **Associated Entities**. In the event Seller's principal(s) including, but not limited to its officer(s) or director(s), during the term of this Agreement or while Seller remains liable to Purchaser for any Obligations under this Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise become associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise in a business similar to or competitive with that of Seller, such entity shall be deemed to have expressly assumed the Obligations due Purchaser under this Agreement. With respect to any such entity, Purchaser shall be deemed to have been granted Purchaser an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as Debtor, an initial UCC-1 financing statement and to have it filed with any and all appropriate secretaries of state or other UCC filing offices. Purchaser shall be held harmless by Seller and its principals and be relieved of any liability as a result of Purchaser's authentication and filing of any such financing statement or the resulting perfection of its ownership or security interests in such entity's assets. Purchaser shall have the right to notify such entity's Account Debtors of Purchaser's rights, including without limitation, Purchaser's right to collect all Accounts, and to notify any creditor of such entity that Purchaser has such rights in such entity's assets.

15. **Termination; Effective Date.**

15.1. **Term; Renewal.** This Agreement shall take effect on the Effective Date and shall remain in full force for a period of 36 The Agreement shall be automatically extended and renewed for successive 36 month periods following the Initial Term unless notice of non-renewal is provided by the Seller as hereinafter provided (each such 36 month period, a "Renewal Term"). Notice of non-renewal under this Agreement must be in writing

and delivered to Purchaser by Seller not less than ninety (90) days prior to the conclusion of the Initial Term or any Renewal Term.

15.2. **Termination by Purchaser.** This Agreement may be terminated by Purchaser: (a) at any time upon ninety (90) days prior written notice to Seller; or (b) if an Event of Default has occurred and is continuing, upon written notice to Seller, in which case, such termination shall be effective immediately upon the delivery of such notice (or any later date and time specified in such notice). In the event the Agreement is terminated by Purchaser as a result of an Event of Default, in addition to all other Obligations, Seller shall pay Purchaser any applicable Early Termination Fee (defined below).

15.3. **Termination by Seller. Seller may terminate this Agreement other than as a result of non-renewal under Section 15.1, *provided, however*, that in addition to all other Obligations, Seller will pay to Purchaser compensation equal to 1% of the Line Amount**] ("Early Termination Fee"). Purchaser's right to termination compensation under this section shall be without prejudice to any of Purchaser's other rights and remedies under this Agreement.

15.4. **Effect of Termination.** Upon the effective date of termination all Obligations of Seller to Purchaser, including the Early Termination Fee, if applicable, shall become immediately due and payable without further notice or demand irrespective of any maturity dates established prior thereto, and Seller shall be obligated to satisfy all Obligations, which shall include the repurchase of all Purchased Accounts which are not Closed, in accordance with Section 4 of this Agreement. No termination of this Agreement will in any way affect or impair any right of Purchaser arising prior thereto or by reason thereof, nor will any such termination relieve Seller of any duty to Purchaser under, nor deny Purchaser any benefit from, this Agreement or otherwise until all of Obligations have been fully discharged. In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, as well as all indemnities of Seller with respect to dishonored payment items and Avoidance Claims, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller and each guarantor has executed and delivered to Purchaser a general release in the form of Exhibit A hereto. **Seller understands that this provision constitutes a waiver of its rights under §9.513 of the UCC**.

15.5. **Exposed Payments.**

15.5.1. Upon termination of this Agreement, Seller shall pay to Purchaser (or Purchaser may retain), to hold in a non-segregated non-interest bearing account, an amount equal to the aggregate of all Exposed Payments as of the date of termination (the "Preference Reserve").

15.5.2. Purchaser may charge the Preference Reserve with the amount of any Exposed Payments that Purchaser pays to the estate of the Payor that made the Exposed Payment, on account of a claim asserted under any Insolvency Law.

15.5.3. Purchaser shall refund to Seller from time to time that balance of the Preference Reserve for which a claim under Insolvency Laws can no longer be asserted due to the passage of the statute of limitations, settlement with the bankruptcy estate of the Payor, or otherwise.

15.6. **Survival.** Notwithstanding the termination of this Agreement and the full payment and performance of all Obligations, all covenants, representation and warranties made in this agreement as well as the following provisions of this Agreement shall survive and constitute continuing covenants of the parties: Section 10.10, Section 13.4, Section 15.5, Section 16 (all subsections), Section 17 (all subsections), Section 18 (all subsections), and Section 19.

16. **WAIVERS.**

16.1. **<u>JURY TRIAL WAIVER.</u> IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.**

16.2. **<u>WAIVER OF CONSUMER RIGHTS</u>--IN CONNECTION WITH THIS AGREEMENT, SELLER WAIVES ITS RIGHTS, IF ANY, UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), CODIFIED IN PART II, CHAPTER 501 OF THE FLORIDA STATUTES (SECTIONS 501.201–501.213), A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF SELLER'S OWN SELECTION, SELLER VOLUNTARILY CONSENTS TO THIS WAIVER.**

16.3. **<u>Dealings With Account Debtors</u>.** Seller understands that the Purchaser may notify an Account Debtor to make payment to the Purchaser, and in advance waives any rights and claims which it may hereafter have, or hereafter claim to have, based in any way upon such contacts with and/or notifications to such account debtors, including but not limited to claims for disparagement, interference with business relationships, or any other form of damage to the Seller or its business(es).

17. **<u>Power of Attorney</u>.** For so long as any Obligations are owed under this Agreement or any Accounts remain outstanding, Purchaser is hereby irrevocably authorized as Seller's Attorney-in-Fact, with full authority in the place of Seller and in the name of Seller or otherwise, in Purchaser's discretion, to take any action and to execute any instrument which Purchaser may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

17.1. **Collection/Endorsement.** Receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, proceeds of any Collateral, including, without limitation, taking all actions necessary to collect for deposit to Purchaser's account, all checks, drafts and other forms of trade acceptances, negotiable instruments and other forms of payment (hereinafter collectively referred to as the "Payments") which are tendered in payment of Accounts or in payment of insurance claims relating to the Accounts, or which are received by Purchaser. The authorization includes, without limitation, the power to open, cash, endorse, deposit and otherwise collect all such Payments in the event they are not made payable to Purchaser;

17.2. **Contact Account Debtors.** To contact Account Debtors at any time in order to verify and/or collect Accounts and notify any Payor obligated with respect to an Account that the Account has been assigned to Purchaser and that payment thereof is to be made to Purchaser;

17.3. **Insurance.** To obtain and adjust insurance required to be paid to Purchaser;

17.4. **With Regard to Accounts.** To ask, demand, collect, sue for, recover, settle and compromise, extend the time of payment, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Accounts or release or discharge any Account Debtor or other obligor without affecting the Obligations;

17.5. **Filings.** To file, at Seller's expense and in its name, any claims or take any action or institute any proceedings which Purchaser may deem necessary or desirable for the collection of any of the Accounts or any of the collateral securing payment of the Accounts or otherwise to enforce the rights of Purchaser with respect to the Accounts, including filing any claim under any bond or any trust fund; and permitting Purchaser (acting through any of its employees, attorneys or agents) at any time, at its option but without obligation, with or without notice to Seller, and at Seller's sole expense, to execute or file on behalf of Seller any security

agreement, control agreement, deed of trust, mortgage, assignment of personal or real property lease, assignment of rentals from real or personal property, assignment, certificate of title, application for vehicle title, affidavit, report, notice, schedule of Account, and all other documents that Purchaser may, in its sole discretion, deem advisable in order to perfect, maintain or improve Purchaser's security interests in the Collateral or other real or personal property intended to constitute Collateral, or in order to exercise a right of Seller or Purchaser, or in order to fully consummate all the transactions contemplated under this Agreement, and all other present and future agreements.

17.6. **Lien Discharge.** To pay any sums necessary for the discharge of any lien or encumbrances senior to Purchaser's security interest in any assets of the Seller, which sums shall be included as Obligations, including directly paying any vendor of Seller from advances owed to Seller hereunder.

17.7. **Pursuing Mechanic, Mineral or other Lien Claims.** Pursue and enforce, in the name of Seller or Purchaser or both:

17.7.1. Rights under any mechanic, mineral lien or other similar statute, including, without limitation, filing such liens and lien affidavits and sending related notices; and

17.7.2. Claims under any payment or performance bond, in connection with goods or services sold by Seller in connection with the improvement of realty or otherwise.

17.8. **Change of Mailing Address.** After the occurrence of an Event of Default, change the address for delivery of mail to Purchaser and receive and open mail addressed to Seller.

This Power of Attorney is irrevocable and coupled with an interest. Seller hereby acknowledges that Seller is not entitled to any notice, demand or presentation with respect to payment of any Account and agrees that Purchaser may extend or renew or settle and compromise from time to time the payment of any Account without notice to or consent by Seller.

18. **Venue; Jurisdiction.**

18.1. Any suit, action or proceeding arising hereunder or from the interpretation, performance or breach hereof, shall, if Purchaser so elects, be instituted in any court or arbitration sitting or taking place within Pinellas County, Florida (the "Acceptable Forums").

18.2. Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives all objections to jurisdiction or venue. Should such proceeding or arbitration be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser to transfer such proceeding to an Acceptable Forum.

19. **Arbitration. THE PARTIES AGREE THAT ANY AND ALL DISPUTES ARISING HEREUNDER SHALL BE SUBMITTED TO BINDING ARBITRATION IN ST. PETERSBURG, FLORIDA, BY A PANEL OF ONE (1) ARBITRATOR UNDER THE COMMERCIAL DISPUTE RULES OF THE AMERICAN ARBITRATION ASSOCIATION. THE JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATORS MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.** Nothing contained in this Section 19 is intended to limit the right of any party to petition an appropriate court of competent jurisdiction for any temporary or preliminary relief, such as an injunction or garnishment, as such party may deem necessary to protect its interests. The filing for such relief shall not be considered a waiver of any right to arbitration under this section.

20. **Amendment.** Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

21. **Conflicts**. Unless otherwise expressly stated in any other Transaction Document, if a conflict exists between the provisions of this Agreement and the provisions of such other Transaction Document, the provisions of this Agreement shall control.

22. **Severability.** In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

23. **Enforcement and Relationship of Parties.** This Agreement and all agreements relating to the subject matter hereof shall be deemed to be the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly. Notwithstanding that the Purchaser has the rights of a secured party, the relationship of the parties hereto shall not be that of lender and borrower. Purchaser shall at no time be deemed a fiduciary of the Seller, although Seller may be a fiduciary of the Purchaser.

24. **Choice of Law.** This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the laws of the State of Florida, without regard to choice of law principals.

25. **Assignment.** This Agreement may not be assigned by Seller without the express prior written consent of Purchaser. Purchaser may assign this Agreement, the Purchased Accounts, the Obligations, or any of Purchaser's rights under this Agreement, in whole or in part, to any person or entity, and such assignment shall be automatically binding upon Seller.

26. **Notice.** Any notice or communication required or permitted hereunder shall be deemed to have been effectively delivered or given and received on the date personally delivered to the respective party to whom it is directed, or when deposited by registered or certified mail, with postage and charges prepaid and addressed to the parties at the addresses set forth below their signatures to this Agreement, whether or not actually received.

27. **No Obligation to Purchase Future Receivables.** Seller specifically acknowledges and agrees that, anything herein to the contrary notwithstanding, Purchaser has the right to approve or reject any or all future accounts receivable proposed for sale under this Agreement in its SOLE AND ABSOLUTE DISCRETION, and no course of conduct or prior course of dealing shall establish any commitment, obligation or agreement to purchase future accounts receivable.

28. **Usury Savings Clause**. In the event that this Agreement is characterized as a contract for the use, forbearance, or detention of money (which characterization would be contrary to the parties' specific intent as expressed throughout this Agreement), the aggregate interest rate charged or agreed to be paid hereunder, including all charges or fees deemed in the nature of interest under applicable law, shall not exceed the highest rate permitted by applicable law. In the event the Purchaser collects moneys deemed to constitute interest, and which would increase the effective rate of interest to a rate in excess of that permitted by law, all such moneys shall upon such determination and at Purchaser's election be returned to Seller or credited against outstanding Obligations hereunder.

29. **Business Days**. If any day provided in this Agreement for the performance of any obligation should fall on a day that is not a Business Day, the compliance with such obligation or delivery shall be deemed acceptable on the next Business Day following such day.

30. **Receipt of Payment.** Any payment received by Purchaser on a day that is not a Business Day or any payment that is received by Purchaser after 8:00 a.m. on a Business Day, shall be deemed received on the next Business Day, plus the Clearance Days. The foregoing notwithstanding, Purchaser shall not be required to credit Seller's account for the amount of any item of payment which is unsatisfactory to Purchaser in its good faith business judgment, and Purchaser may charge Seller's account for the amount of any item of payment which is returned to Purchaser unpaid.

31. **Use of Facsimiles/Scans/Electronic Signatures/Counterparts.** The parties acknowledge and agree that it is anticipated that execution of this Agreement, as well as account schedules, Invoice Delivery Schedules or any other document executed or anticipated in connection herewith, may be evidenced by electronic signatures, and/or facsimile or scanned signatures, and such documents containing such signatures shall be of the same force and effect as if original signatures had been obtained. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile or electronic mail or other electronic delivery shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by such electronic form to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

32. **Entire Agreement.** This Agreement, together with the other Transaction Documents executed on or after the date of this Agreement, contains the entire understanding and agreement between the parties, and supersedes all other prior or contemporaneous agreements and understandings between the parties, verbal or written, express or implied, relating to the subject matter hereof. No promises, warranties, representations, or understandings of any kind have been made by Purchaser or any third party that are not contained in this Agreement. No course of dealing, course of performance or trade usage, and no parol evidence of any nature, shall be allowable in order to supplement or modify any terms of this Agreement.

33. **Joint and Several Liability.** If Seller consists of more than one Person, each Seller's liability shall be joint and several, and the compromise of any claim with, or the release of, any Seller shall not constitute a compromise with, or a release of, any other Seller.

**THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**[EXECUTION PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

| PURCHASER: | SELLER: |
|---|---|
| CLIMATE FIRST BANK | Great Southern Copackers LLC |
| By: Ryan Jaskiewicz | By: Jeremy Roberts |
| Name: Ryan Jaskiewicz | Name: Jeremy Roberts |
| Title: President of Structured Finance | Title: Sole Member and Manager |

| | SELLER: |
|---|---|
| | Brew Hub, LLC |
| | By: Jeremy Roberts |
| | Name: Jeremy Roberts |
| | Title: Sole Member and Manager |

**EXHIBIT A**

GENERAL RELEASE

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, the undersigned and each of them (collectively "Releasor") hereby forever releases, discharges and acquits ____________________________ ("Releasee"), its parent, officers, directors, shareholders, agents and employees, of and from any and all claims of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether heretofore existing, now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, to the extent that they arise out of or are in way connected to or are related to that certain Accounts Receivable Purchase Agreement dated ___________________ (collectively, the "Claims").

Releasor agrees that the matters released herein are not limited to matters which are known or disclosed.

Releasor acknowledges that factual matters now unknown to it may have given or may hereafter give rise to Claims which are presently unknown, unanticipated and unsuspected, and it acknowledges that this Release has been negotiated and agreed upon in light of that realization and that it nevertheless hereby intends to release, discharge and acquit the Releasee from any such unknown Claims.

Acceptance of this Release shall not be deemed or construed as an admission of liability by any party released.

In the event of any litigation arising out of or related to this Release, the prevailing party shall recover its reasonable attorney's fees and expenses from the unsuccessful party. It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the contrary) that the amount recoverable is the amount billed to the prevailing party by its counsel and that such amount will be reasonable if based on the billing rates charged to the prevailing party by its counsel in similar matters.

Releasor acknowledges that either (a) it has had advice of counsel of its own choosing in negotiations for and the preparation of this release, or (b) it has knowingly determined that such advice is not needed.

DATED: SELLER:

GUARANTOR(S):

**EXHIBIT B**

ACH POWER OF ATTORNEY RIDER
TO ACCOUNTS RECEIVABLE PURCHASING AGREEMENT

The undersigned, Jeremy Roberts as Sole Member and Manager of Great Southern Copackers LLC (Grantor) hereby appoints and irrevocably authorizes CLIMATE FIRST BANK, as Grantor's attorney-in-fact, with full and absolute authority in the place of Grantor and in the name of Grantor or otherwise, to initiate electronic debit or credit entries from any deposit account maintained, held or owned by Grantor, wherever located, through the Automated Clearing House network (ACH).

This Power of Attorney is irrevocable and coupled with an interest.

Grantor:

Great Southern Copackers LLC

By: Jeremy Roberts

Date: 2025-09-19

Name: Jeremy Roberts

Title: Sole Member and Manager

Address: 3900 Frontage Rd. S Lakeland, Florida 33815

**EXHIBIT B**

ACH POWER OF ATTORNEY RIDER
TO ACCOUNTS RECEIVABLE PURCHASING AGREEMENT

The undersigned, Jeremy Roberts as Sole Member and Manager of Brew Hub, LLC (Grantor) hereby appoints and irrevocably authorizes CLIMATE FIRST BANK, as Grantor's attorney-in-fact, with full and absolute authority in the place of Grantor and in the name of Grantor or otherwise, to initiate electronic debit or credit entries from any deposit account maintained, held or owned by Grantor, wherever located, through the Automated Clearing House network (ACH).

This Power of Attorney is irrevocable and coupled with an interest.

Grantor:

Brew Hub, LLC

By: Jeremy Roberts

Date: 09-19-2025

Name: Jeremy Roberts

Title: Sole Member and Manager

Address: 3900 Frontage Rd. S Lakeland, Florida 33815

## SCHEDULE TO ACCOUNTS RECEIVABLE PURCHASING AGREEMENT

This Schedule forms an integral part of the Accounts Receivable Purchasing Agreement between Great Southern Copackers LLC ("Seller") and CLIMATE FIRST BANK ("Purchaser") of even date herewith (the "Agreement"). The following definitions shall apply to the Agreement. In addition to other amounts that may be owed under the Agreement, Seller agrees to pay Purchaser the following fees and discounts, as and when indicated below:

| | |
|---|---|
| **Reserve Percentage:** | 15% |
| **Discount**: | 1.25% of the unpaid Face Amount of any Purchased Account during the first 30 day period from the purchase date that the Account remains unpaid. |
| **Additional Discounts**: Invoices paid to Purchaser over 30 days from the purchase date shall be subject to the following additional discounts (the "Additional Discount"): | Days To Collect:<br>15 Days - 0.65% |
| **Invoices Paid After Late Payment Date**: | Invoices over 90 days from the purchase date shall be assessed an additional 1.50% discount on top of the last assessed Additional Discount for each additional 10 days or portion thereof the Account remains unpaid. |
| **Cost of Funds Fee**: | 0% |
| **Origination Fee**: | 1% of Line Amount, due upon execution of the Agreement. |
| **Anniversary Fee**: | 0% of Line Amount, charged on each anniversary of the Agreement. |
| **Collection Management Fee:** | 0% of the average gross outstanding Purchased Accounts, payable in arrears on the last day of each month. |

Seller hereby acknowledges its agreement to the foregoing terms by its signature below.

SELLER:

Great Southern Copackers LLC

By: Jeremy Roberts

Brew Hub, LLC

By: Jeremy Roberts

Name: Jeremy Roberts
Title: Sole Member and Manager
Address: 3900 Frontage Rd. S Lakeland, Florida 33815

Date: 2025-09-19

Name: Jeremy Roberts
Title: Sole Member and Manager
Address: 3900 Frontage Rd. S, Lakeland, Florida 33815

Date: 09-19-2025

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
D4GBY-WKTVA-WYAOS-AZQQC

DOCUMENT COMPLETED BY ALL PARTIES ON
19 SEP 2025 19:27:11
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| **JEREMY ROBERTS**<br>EMAIL<br>ROBER1JE26@GMAIL.COM | SENT<br>18 SEP 2025 15:50:58<br>VIEWED<br>19 SEP 2025 16:19:14<br>SIGNED<br>19 SEP 2025 17:18:57 | Jeremy Roberts<br>IP ADDRESS<br>71.42.21.175<br>LOCATION<br>ORLANDO, UNITED STATES |
| **RECIPIENT VERIFICATION** | EMAIL VERIFIED<br>19 SEP 2025 16:19:14 | |
| **RYAN JASKIEWICZ**<br>EMAIL<br>RYAN.JASKIEWICZ@CLIMATEFIRSTBANK.COM | SENT<br>18 SEP 2025 15:50:58<br>VIEWED<br>19 SEP 2025 17:23:20<br>SIGNED<br>19 SEP 2025 19:27:11 | Ryan Jaskiewicz<br>IP ADDRESS<br>172.58.164.62<br>LOCATION<br>CHICAGO, UNITED STATES |
| **RECIPIENT VERIFICATION** | EMAIL VERIFIED<br>19 SEP 2025 17:23:20 | |

**Signed with PandaDoc**

# EXHIBIT 3

**CLIMATE FIRST BANK®**

## SECURITY AGREEMENT

This Security Agreement ("Agreement") is made as of 09-18-2025, by Brew Hub, LLC, a Delaware limited liability company ("Brew"), Great Southern Copackers LLC, a Florida limited liability company ("Great Southern", and together with Brew, the "Debtor"), each with their principal office at 3900 Frontage Rd. S Lakeland, Florida 33815, CLIMATE FIRST BANK (including any successors and assigns, the "Secured Party").

### Recitals

A. Secured Party and Debtor have entered into an Accounts Receivable Purchasing Agreement (the "ARPA") of substantially even date herewith (as amended, modified, restated, extended, renewed, and/or refinanced, the "ARPA"). Capitalized terms used but not otherwise defined herein have the meanings given to them in the ARPA.

B. Contemporaneously with the execution of the ARPA, the Debtor has executed a separate Secured Promissory Note, of even or approximate date with the ARPA, payable to the order of Secured Party, in the original principal amount of $1,801,275.00 (as amended, modified, restated, extended, renewed, and/or refinanced, the "Equipment Note").

C. The ARPA contemplates that Debtor will sell and assign to Secured Party as absolute owner, with full recourse, certain accounts receivable that are defined in the ARPA as the "Purchased Accounts." This Security Agreement is delivered by Debtor to secure the Debtor's Obligations arising under the ARPA and the Equipment Note; provided, however, that the Purchased Accounts are the sole property of the Secured Party, and as such, shall not constitute Collateral hereunder until such time (if any) as they are repurchased by Debtor pursuant to the ARPA.

NOW THEREFORE, in consideration and furtherance of the foregoing, the Debtors hereby agree as follows:

1. *Definitions*. As use in this Agreement, the following terms shall have the meanings indicated below:
    1.1. The term "Obligor" shall mean Debtor.
    1.2. The term "Code" shall mean the Uniform Commercial Code as in effect in the State of Florida (or, if this Agreement is governed by the law of another state, such other state) on the date of this Agreement, or as it may hereafter be amended from time to time.
    1.3. The term "Collateral" shall mean all of the personal property of Debtor as set forth below (as indicated), wherever located, and now owned or hereafter acquired:

(i) All "accounts", as defined in the Code (including health-care-insurance receivables), together with any and all books of account, customer lists and other records relating in any way to the foregoing (including, without limitation, computer software, whether on tape, disk, card, strip, cartridge or any other form), and in any case where an account arises from the sale of goods, the interest of Debtor in such goods.

(ii) All "inventory" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(iii) All "chattel paper" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(iv) All "equipment" as defined in the Code, of whatsoever kind and character now or hereafter possessed, held, acquired, leased or owned by Debtor and used or usable in Debtor's business, and in any event shall include, but shall not be limited to, all machinery, tools, computer software, office equipment, furniture, appliances, furnishings, fixtures, vehicles, motor vehicles, together with all replacements, accessories, additions, substitutions and accessions to all of the foregoing, and all manuals, instructions and records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(v) All "instruments" as defined in the Code (including promissory notes), and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(vi) All "investment property" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(vii) All "documents" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(viii) All "deposit accounts" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(ix) All "letter of credit rights" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(x) All "general intangibles" and "payment intangibles" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form), including all payment intangibles, permits, regulatory approvals, copyrights, patents, trademarks, service marks, trade names, mask works, goodwill, licenses and all other intellectual property owned by Debtor or used in Debtor's business and all other contract rights or rights to the payment of money, insurance claims and proceeds, and any statutory lien rights of Debtor with respect to work or services furnished by Debtor under any Account, including Debtor's statutory rights under the mechanic lien laws of any applicable state;

(xi) All "commercial tort claims" as defined in the Code, and all records relating in any way to the foregoing;

(xii) All "securities" as defined in the Code, and all records relating in any way to the foregoing;

(xiii) All "supporting obligations" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form); and

(xiv) Funds or other property held on the Debtor's behalf, including, without limitation, the Reserve Account (as defined in the ARPA).

The term Collateral, as used herein, shall also include all products and proceeds of all of the foregoing (including without limitation, insurance payable by reason of loss or damage to the foregoing property) and any property, securities, guaranties or monies of Debtor which may at any time come into the possession of Secured Party. The designation of proceeds does not authorize Debtor to sell, transfer or otherwise convey any of the foregoing property except finished goods intended for sale in the ordinary course of Debtor's business or as otherwise provided herein.

1.4 The term "Indebtedness" shall mean and refer to the Obligations, as such term is defined in the ARPA, including, without limitation, all amounts owing under the ARPA and the Equipment Note, including all renewals, extensions, modifications and rearrangements thereof.

1.5 The term "Transaction Documents" shall have the meaning ascribed to it in the ARPA.

1.6 The term "Obligated Party" shall mean any party other than Obligor, including, without limitation, Debtor and any guarantor, who secures, guarantees and/or is otherwise obligated to pay all or any portion of the Indebtedness.

1.7 The term "Permitted Liens" shall mean and include all of the following: (i) liens of ad valorem taxing authorities upon the Collateral for indebtedness that is not yet due and payable; (ii) additional security interests and liens which are subordinate to the security interest of Secured Party and are consented to in writing by Secured Party, which consent may be withheld in its good faith business judgment; and (iii) security interests being terminated substantially concurrently with the execution of this Agreement.

All words and phrases used herein which are expressly defined in Section 1.2 or Chapter 9 of the Code shall have the meaning provided for therein. Other words and phrases defined elsewhere in the Code shall have the meaning specified therein except to the extent such meaning is inconsistent with a definition in Section 1.2 or Chapter 9 of the Code.

2. *Security Interest*. Debtor grants to Secured Party, to secure the payment and performance in full of all of the Indebtedness, a security interest in and to and pledges and assigns to Secured Party the Collateral.

3. *Representations and Warranties*. In addition to any representations and warranties of Debtor set forth in the Transaction Documents, which are incorporated herein by this reference, Debtor hereby represents and warrants the following to Secured Party:

a. Authority. The execution, delivery and performance of this Agreement and all of the other Transaction Documents by Debtor have been duly authorized by all necessary corporate action of Debtor, to the extent Debtor is a corporation, by all necessary partnership action, to the extent Debtor is a partnership, or by all necessary limited liability company action, to the extent Debtor is a limited liability company.

b. Accuracy of Information. All information heretofore, herein or hereafter supplied to Secured Party by or on behalf of Debtor with respect to the Collateral is true and correct. The exact legal name, social security number (if applicable), tax identification number, employee identification number and organization number of Debtor is correctly shown in the first paragraph hereof.

c. Enforceability. This Agreement and the other Transaction Documents constitute legal, valid and binding obligations of Debtor, enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights and except to the extent specific remedies may generally be limited by equitable principles.

d. Ownership and Liens. Debtor has good and marketable title to the Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for the Permitted Liens. No dispute, right of setoff, counterclaim or defense exists with respect to Debtor's ownership of all or any material part of the Collateral. Debtor has not executed any other security agreement currently affecting the Collateral and no effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office except (i) as may have been executed or filed in favor of Secured Party; (ii) financing statements or instruments relating to the Permitted Liens.

e. No Conflicts or Consents. Neither the ownership, the intended use of the Collateral by Debtor, the grant of the security interest by Debtor to Secured Party herein nor the exercise by Secured Party of its rights or remedies hereunder, will (i) conflict with any provision of (A) any domestic or foreign law, statute, rule or regulation, (B) the articles or certificate of incorporation, charter, bylaws, partnership agreement, articles or certificate of organization, or regulations as the case may be, of Debtor, or (C) any agreement, judgment, license, order or permit applicable to or binding upon Debtor, or (ii) result in or require the creation of any lien, charge or encumbrance upon any assets or properties of Debtor or of any person except as may be expressly contemplated in the Transaction Documents. Except as expressly contemplated in the Transaction Documents, no consent, approval, authorization or order of, and no notice to or filing with, any court, governmental authority or third party is required in connection with the grant by Debtor of the security interest herein or the exercise by Secured Party of its rights and remedies hereunder.

f. Security Interest. Debtor has and will have at all times full right, power and authority to grant a security interest in the Collateral to Secured Party in the manner provided herein, free and clear of any lien, security interest or other charge or encumbrance. This Agreement creates a legal, valid and binding security interest in favor of Secured Party in the Collateral securing the Indebtedness. To the extent

permitted in the Code, possession by Secured Party of all certificates, instruments and cash constituting Collateral from time to time and/or the filing of the financing statements delivered prior hereto and/or concurrently herewith by Debtor to Secured Party will perfect and establish the first priority (except with respect to the Permitted Liens) of Secured Party's security interest hereunder in the Collateral.

g. Location/Identity. Debtor's principal residence or place of business and chief executive office (as those terms are used in the Code), as the case may be is located at the address set forth on the first page hereof. Except as specified elsewhere herein, all Collateral and records concerning the Collateral shall be kept at such address or the addresses as disclosed to Secured Party in writing. Debtor's organizational structure and state of organization (the "Organizational Information") are as set forth on the first page hereof. Except as specified herein, the Organizational Information shall not change without at least thirty (30) days' advance written notice to the Secured Party.

4. *Affirmative Covenants*. In addition to all covenants and agreements of Debtor set forth in the Transaction Documents, which are incorporated herein by this reference, Debtor will comply with the covenants contained in this Section 4 at all times during the period of time this Agreement is effective unless Secured Party shall otherwise consent in writing.

4.1 Ownership and Liens. Debtor will maintain good and marketable title to all Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for the Permitted Liens and the security interest created by this Agreement and the security interests and other encumbrances expressly permitted herein or by the other Transaction Documents. Debtor will not permit any dispute, right of setoff, counterclaim or defense to exist with respect to all or any part of the Collateral. Debtor will cause any financing statement or other security instrument with respect to the Collateral to be terminated, except with respect to the Permitted Liens or as may exist or as may have been filed in favor of Secured Party. Debtor will defend at its expense Secured Party's right, title and security interest in and to the Collateral against the claims of any third party.

4.2 Further Assurances. Debtor will from time to time at its expense promptly execute and deliver all further instruments and documents and take all further action necessary or appropriate or that Secured Party may request in order (i) to perfect and protect the security interest created or purported to be created hereby and the first priority of such security interest, (ii) to enable Secured Party to exercise and enforce its rights and remedies hereunder in respect of the Collateral, and (iii) to otherwise effect the purposes of this Agreement, including without limitation: (A) executing (if requested) and filing such financing or continuation statements, or amendments thereto; and (B) furnishing to Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral, all in reasonable detail satisfactory to Secured Party.

4.3 Inspection of Collateral. Debtor will keep adequate records concerning the Collateral and will permit Secured Party and all representatives and agents appointed by Secured Party to inspect any of the Collateral and the books and records of or relating to the Collateral at any time during normal business hours, to make and take away photocopies, photographs and printouts thereof and to write down and record any such information.

4.4 Payment of Taxes. Debtor (i) will timely pay all property and other taxes, assessments and governmental charges or levies imposed upon the Collateral or any part thereof, (ii) will timely pay all lawful claims which, if unpaid, might become a lien or charge upon the Collateral or any part thereof, and (iii) will maintain appropriate accruals and reserves for all such liabilities in a timely fashion in accordance with generally accepted accounting principles. Debtor may, however, delay paying or discharging any such taxes, assessments, charges, claims or liabilities so long as the validity thereof is contested in good faith by proper proceedings and provided Debtor has set aside on Debtor's books adequate reserves therefor; provided, however, Debtor understands and agrees that in the event of any such delay in payment or discharge and upon Secured Party's written request, Debtor will establish with Secured Party an escrow acceptable to Secured Party adequate to cover the payment of such taxes, assessments and governmental charges with interest, costs and penalties and a reasonable additional sum to cover possible costs, interest and penalties (which

escrow shall be returned to Debtor upon payment of such taxes, assessments, governmental charges, interests, costs and penalties or disbursed in accordance with the resolution of the contest to the claimant) or furnish Secured Party with an indemnity bond secured by a deposit in cash or other security acceptable to Secured Party. Notwithstanding any other provision contained in this Subsection, Secured Party may at its discretion exercise its rights under Subsection 6(c) at any time to pay such taxes, assessments, governmental charges, interest, costs and penalties.

4.5 Mortgagee's and Landlord's Waivers. Debtor shall use reasonable efforts to cause each mortgagee of real property owned by Debtor and each landlord of real property leased by Debtor to execute and deliver agreements satisfactory in form and substance to Secured Party by which such mortgagee or landlord waives or subordinates any rights it may have in the Collateral.

4.6 Control Agreements. Debtor will cooperate with Secured Party in obtaining a control agreement in form and substance satisfactory to Secured Party with respect to Collateral consisting of:

(i) Deposit Accounts;

(ii) Investment Property;

(iii) Letter-of-credit rights; and

(iv) Electronic chattel paper.

4.7 Condition of Goods. Debtor will maintain, preserve, protect and keep all Collateral which constitutes goods in good condition, repair and working order and will cause such Collateral to be used and operated in good and workmanlike manner, in accordance with applicable laws and in a manner which will not make void or cancelable any insurance with respect to such Collateral. Debtor will promptly make or cause to be made all repairs, replacements and other improvements to or in connection with the Collateral which Secured Party may request from time to time.

4.8 Insurance. Debtor will, at its own expense, maintain insurance with respect to all Collateral which constitutes goods in such amounts, against such risks, in such form and with such insurers, as shall be reasonably satisfactory to Secured Party from time to time. If requested by Secured Party, each policy for property damage insurance shall provide for all losses to be paid directly to Secured Party. If requested by Secured Party, each policy of insurance maintained by Debtor shall (i) name Debtor and Secured Party as insured parties thereunder (without any representation or warranty by or obligation upon Secured Party) as their interests may appear, (ii) contain the agreement by the insurer that any loss thereunder shall be payable to Secured Party notwithstanding any action, inaction or breach of representation or warranty by Debtor, (iii) provide that there shall be no recourse against Secured Party for payment of premiums or other amounts with respect thereto, and (iv) provide that at least thirty (30) days prior written notice of cancellation or of lapse shall be given to Secured Party by the insurer. Debtor will, if requested by Secured Party, deliver to Secured Party original or duplicate policies of such insurance and, as often as Secured Party may reasonably request, a report of a reputable insurance broker with respect to such insurance. Debtor will also, at the request of Secured Party, duly execute and deliver instruments of assignment of such insurance policies and cause the respective insurers to acknowledge notice of such assignment. All insurance payments in respect of loss of or damage to any Collateral shall be paid to Secured Party and applied as Secured Party in its sole discretion deems appropriate.

4.9 Chattel Paper, Documents and Instruments. Debtor will take such action as may be requested by Secured Party in order to cause any chattel paper, documents or instruments to be valid and enforceable and will cause all chattel paper to have only one original counterpart. Upon request by Secured Party, Debtor will deliver to Secured Party all originals of chattel paper, documents or instruments and will mark all chattel paper with a legend indicating that such chattel paper is subject to the security interest granted hereunder.

4.10 Accounts. Debtor's affirmative duties with respect to the handling of Accounts, including both Purchased Accounts and Accounts constituting Collateral, are set forth in the ARPA, which is incorporated herein by reference, as supplemented by any relevant terms contained herein.

5. *Negative Covenants*. Debtor will comply with the covenants contained in this Section 5 at all times during the period of time this Agreement is effective, unless Secured Party shall otherwise consent in writing.

a. Transfer or Encumbrance. Debtor will not (i) sell, assign (by operation of law or otherwise), transfer, exchange, lease or otherwise dispose of any of the Collateral, other than in the ordinary course of business, with the prior written consent of Secured Party, not to be unreasonably withheld or delayed, (ii) grant a lien or security interest in or execute, authorize, file or record any financing statement or other security instrument with respect to the Collateral to any party other than Secured Party, or (iii) deliver actual or constructive possession of any of the Collateral to any party other than Secured Party.

b. Impairment of Security Interest. Debtor will not take or fail to take any action which would in any manner impair the value or enforceability of Secured Party's security interest in any Collateral.

c. Possession of Collateral. Debtor will not cause or permit the removal of any Collateral from its possession, control and risk of loss, nor will Debtor cause or permit the removal of any Collateral (or records concerning the Collateral) from the address on the first page hereof other than (i) as permitted by Subsection 5(a), or (ii) in connection with the possession of any Collateral by Secured Party or by its bailee. If any Collateral is in the possession of a third party, Debtor will join with Secured Party in notifying the third party of Secured Party's security interest therein and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Secured Party.

d. Goods. Debtor will not permit any Collateral which constitutes goods to at any time (i) be covered by any document except documents in the possession of the Secured Party, (ii) become so related to, attached to or used in connection with any particular real property so as to become a fixture upon such real property (unless such real property, or Debtor's interest therein, also constitutes Collateral), or (iii) be installed in or affixed to other goods so as to become an accession to such other goods unless such other goods are subject to a perfected first priority (except with respect to the Permitted Liens) security interest under this Agreement.

e. Compromise of Collateral. Debtor will not adjust, settle, compromise, amend or modify any Collateral, except an adjustment, settlement, compromise, amendment or modification in good faith and in the ordinary course of business; provided, however, this exception shall automatically terminate upon the occurrence of an Event of Default or upon Secured Party's written request. Debtor shall provide to Secured Party such information concerning (i) any adjustment, settlement, compromise, amendment or modification of any Collateral, and (ii) any claim asserted by any account debtor for credit, allowance, adjustment, dispute, setoff or counterclaim, as Secured Party may request from time to time.

f. Financing Statement Filings. Debtor recognizes that financing statements pertaining to the Collateral have been or may be filed in one or more of the following jurisdictions: the location of Debtor's principal residence, the location of Debtor's place of business, the location of Debtor's chief executive office, or other such place as the Debtor may be "located" under the provisions of the Code; where Debtor maintains any Collateral, or has its records concerning any Collateral, as the case may be. Without limitation of any other covenant herein, Debtor will neither cause nor permit any change in the location of (i) any Collateral, (ii) any records concerning any Collateral, or (iii) Debtor's principal residence, the location of Debtor's place of business, or the location of Debtor's chief executive office, as the case may be, to a jurisdiction other than as represented to Secured Party herein, nor will Debtor change its name or Organizational Information unless Debtor shall have notified Secured Party in writing of such change at least thirty (30) days prior to the effective date of such change, and shall have first taken all action required by Secured Party for the purpose of further perfecting or protecting the security interest in favor of Secured Party in the Collateral. In any written notice furnished pursuant to this Subsection, Debtor will expressly state that the notice is required by this Agreement and contains facts that may require additional filings of financing statements or other notices for the purpose of continuing perfection of Secured Party's security interest in the Collateral.

Without limiting Secured Party's rights hereunder, Debtor authorizes Secured Party to file financing statements and amendments thereto under the provisions of the Code as amended from time to time.

g. Marking of Chattel Paper. Debtor will not create any Chattel Paper without placing a legend on the Chattel Paper acceptable to Secured Party indicating that Secured Party has a security interest in the Chattel Paper.

6. *Rights of Secured Party*. Secured Party shall have the rights contained in this Section 6 at all times during the period of time this Agreement is effective.

a. Financing Statements Filings. Debtor hereby authorizes Secured Party to file, without the signature of Debtor, one or more financing or continuation statements, and amendments thereto, relating to the Collateral. Debtor further agrees that a carbon, photographic or other reproduction of this Security Agreement or any financing statement describing any Collateral is sufficient as a financing statement and may be filed in any jurisdiction Secured Party may deem appropriate. Such financing statements may, among other things:

   I. indicate the Collateral as "all assets" of the Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail;

   II. contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Debtor is an organization, the type of organization, the state of organization and any organization identification number issued to the Debtor and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates; and

   III. contain a notification that the Debtor has granted a negative pledge to the Secured Party, and that any subsequent lien or may be tortiously interfering with Secured Party's rights;

   IV. advises third parties that any contact with Debtor's Account Debtors may be tortiously interfering with Secured Party's collection rights.

b. Power of Attorney. Debtor hereby irrevocably appoints Secured Party as Debtor's attorney-in-fact, such power of attorney being coupled with an interest, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, to take any action and to execute any instrument which Secured Party may deem necessary or appropriate to accomplish the purposes of this Agreement, including without limitation: (i) to obtain and adjust insurance required by Secured Party hereunder; (ii) to demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of the Collateral; (iii) to receive, endorse and collect any checks, drafts or other instruments, documents and chattel paper in connection with clause (i) or (ii) above; and (iv) to file any claims or take any action or institute any proceedings which Secured Party may deem necessary or appropriate for the collection and/or preservation of the Collateral or otherwise to enforce the rights of Secured Party with respect to the Collateral.

c. Performance by Secured Party. If Debtor fails to perform any agreement or obligation provided herein, Secured Party may itself perform, or cause performance of, such agreement or obligation, and the expenses of Secured Party incurred in connection therewith shall be a part of the Indebtedness, secured by the Collateral and payable by Debtor on demand.

d. Debtor's Receipt of Proceeds. All amounts and proceeds (including instruments and writings) received by Debtor in respect of such accounts or general intangibles shall be received in trust for the benefit of Secured Party hereunder and shall be delivered to Secured Party in the time and manner provided in the ARPA.

e. Notification of Account Debtors. Secured Party may at its discretion from time to time notify any or all obligors under any accounts or general intangibles (i) of Secured Party's security interest in such accounts or general intangibles and direct such obligors to make payment of all amounts due or to become due to Debtor thereunder directly to Secured Party, and (ii) to verify the accounts or general intangibles with such obligors. Secured Party shall have the right, at the expense of Debtor, to enforce collection of any such accounts or general intangibles and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as Debtor. DEBTOR WAIVES, IN ADVANCE, ANY RIGHTS AND CLAIMS WHICH IT MAY HEREAFTER HAVE, OR HEREAFTER CLAIM TO HAVE, BASED IN ANY WAY UPON SUCH CONTACTS WITH AND/OR NOTIFICATIONS TO SUCH ACCOUNT DEBTORS, INCLUDING BUT NOT LIMITED TO CLAIMS FOR DISPARAGEMENT, INTERFERENCE WITH BUSINESS RELATIONSHIPS, OR ANY OTHER FORM OF DAMAGE TO THE DEBTOR OR ITS BUSINESS.

f. Authorization to Deposit. Debtor authorizes Secured Party to accept, indorse and deposit on behalf of Debtor any checks tendered by an Account Debtor "in full payment" of its obligation to Debtor. Debtor shall not assert against Secured Party any claim arising therefrom, irrespective of whether such action by Secured Party effects an accord and satisfaction of Debtor's claims, under §3-311 of the UCC, or otherwise.

g. Offset Rights. The Secured Party shall have the right to offset from amounts received by Secured Party any amounts that the Secured Party believes that the Debtor owes the Secured Party. However, as to any Account proceeds that do not represent Purchased Accounts, and so long as Debtor is not in default, Secured Party shall be deemed to have received any such proceeds of Accounts as a pure pass-through for and on account of Debtor.

7. *Events of Default*. Each of the following constitutes an "Event of Default" under this Agreement:

a. Default under ARPA. Any Event of Default as such term is defined in the ARPA; or

b. Non-Performance of Covenants. The failure of Obligor or any Obligated Party to timely and properly observe, keep or perform any covenant, agreement, warranty or condition required herein; provided, however, that the Obligor's failure to observe any of the affirmative covenants set forth in Section 4 will not constitute an Event of Default unless and until Secured Party has notified Obligor of such failure, and Obligor has failed to take the required action within fifteen (15) business days from the date of such notice; or

c. Default Under other Transaction Documents. The occurrence of a default or default under any of the other Transaction Documents; or

d. False Representation. Any representation contained herein or in any of the other Transaction Documents made by Obligor or any Obligated Party is false or misleading in any material respect; or

e. Default to Third Party. The occurrence of any event which permits the acceleration of the maturity of any indebtedness owing by Obligor or any Obligated Party to any third party under any agreement or undertaking; or

f. Execution on Collateral. The Collateral or any portion thereof is taken on execution or other process of law in any action against Debtor; or

g. Abandonment. Debtor abandons the Collateral or any portion thereof; or

h. Action by Other Lienholder. The holder of any lien or security interest on any of the assets of Debtor, including without limitation, the Collateral (without hereby implying the consent of Secured Party to the existence or creation of any such lien or security interest on the Collateral), declares a default thereunder or institutes foreclosure or other proceedings for the enforcement of its remedies thereunder; or

i. Liquidation, Death and Related Events. If Obligor or any Obligated Party is an entity, the liquidation, dissolution, merger or consolidation of any such entity or, if Obligor or any Obligated Party is an individual, the death or legal incapacity of any such individual; or

j. *Insecurity. It shall appear at any time, after a reasonable investigation, that Secured Party's security interest is not prior to all other security interests against the Collateral (other than Permitted Liens).*

*8. Remedies and Related Rights*. If an Event of Default shall have occurred, and without limiting any other rights and remedies provided herein, under any of the other Transaction Documents or otherwise available to Secured Party, Secured Party may exercise one or more of the rights and remedies provided in this Section.

(a) Remedies. Secured Party may from time to time at its discretion, without limitation and without notice except as expressly provided in any of the Transaction Documents:

(i) exercise in respect of the Collateral all the rights and remedies of a secured party under the Code (whether or not the Code applies to the affected Collateral), including without limitation, under UCC section 9-607(a), which allows the secured party, upon default, to notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party;

(ii) require Debtor to, and Debtor hereby agrees that it will at its expense and upon request of Secured Party, assemble the Collateral as directed by Secured Party and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties;

(iii) reduce its claim to judgment or foreclose or otherwise enforce, in whole or in part, the security interest granted hereunder by any available judicial procedure;

(iv) (sell or otherwise dispose of, at its office, on the premises of Debtor or elsewhere, the Collateral, as a unit or in parcels, by public or private proceedings, and by way of one or more contracts (it being agreed that the sale or other disposition of any part of the Collateral shall not exhaust Secured Party's power of sale, but sales or other dispositions may be made from time to time until all of the Collateral has been sold or disposed of or until the Indebtedness has been paid and performed in full), and at any such sale or other disposition it shall not be necessary to exhibit any of the Collateral;

(v) buy the Collateral, or any portion thereof, at any public sale;

(vi) buy the Collateral, or any portion thereof, at any private sale if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations;

(vii) apply for the appointment of a receiver for the Collateral, and Debtor hereby consents to any such appointment; and

(viii) at its option, retain the Collateral in satisfaction of the Indebtedness whenever the circumstances are such that Secured Party is entitled to do so under the Code or otherwise, to the full extent permitted by the Code, Secured Party shall be permitted to elect whether such retention shall be in full or partial satisfaction of the Indebtedness.

In the event Secured Party shall elect to sell the Collateral, Secured Party may sell the Collateral without giving any warranties as and shall be permitted to specifically disclaim any warranties of title or the like. Further, if Secured Party sells any of the Collateral on credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the Indebtedness. In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Debtor shall be credited with the proceeds of the sale. Debtor agrees that in the event Debtor or any Obligor is entitled to receive any notice under the Code, as it exists in the state governing any such notice, of the sale or other disposition of any Collateral, reasonable notice shall be deemed given when such notice is deposited in a depository receptacle under the care and custody of the United States Postal Service, postage prepaid, at such party's address set forth on the first page hereof, ten (10) days prior to the date of any public sale, or after which a private sale, of any of such Collateral is to be held. Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) Application of Proceeds. If any Event of Default shall have occurred, Secured Party may at its discretion apply or use any cash held by Secured Party as Collateral, and any cash proceeds received by Secured Party in respect of any sale or other disposition of, collection from, or other realization upon, all or any part of the Collateral as follows in such order and manner as Secured Party may elect:

(i) to the repayment or reimbursement of the reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Secured Party in connection with (A) the administration of the Transaction Documents, (B) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, and (C) the exercise or enforcement of any of the rights and remedies of Secured Party hereunder;

(ii) to the payment or other satisfaction of any liens and other encumbrances upon the Collateral;

(iii) to the satisfaction of the Indebtedness;

(iv) by holding such cash and proceeds as Collateral;

(v) to the payment of any other amounts required by applicable law (including without limitation, Section 9.615(a)(3) of the Code or any other applicable statutory provision); and

(vi) by delivery to Debtor or any other party lawfully entitled to receive such cash or proceeds whether by direction of a court of competent jurisdiction or otherwise.

(c) Deficiency. In the event that the proceeds of any sale of, collection from, or other realization upon, all or any part of the Collateral by Secured Party are insufficient to pay all amounts to which Secured Party is legally entitled, Obligor and any party who guaranteed or is otherwise obligated to pay all or any portion of the Indebtedness shall be liable for the deficiency, together with interest thereon as provided in the Transaction Documents, to the full extent permitted by the Code.

(d) Non-Judicial Remedies. In granting to Secured Party the power to enforce its rights hereunder without prior judicial process or judicial hearing, Debtor expressly waives, renounces and knowingly relinquishes any legal right which might otherwise require Secured Party to enforce its rights by judicial process. Debtor recognizes and concedes that nonjudicial remedies are consistent with the usage of trade, are responsive to commercial necessity and are the result of a bargain at arm's length. Nothing herein is intended to prevent Secured Party or Debtor from resorting to judicial process at either party's option.

(e) Other Recourse. Debtor waives any right to require Secured Party to proceed against any third party, exhaust any Collateral or other security for the Indebtedness, or to have any third party joined with Debtor in any suit arising out of the Indebtedness or any of the Transaction Documents, or pursue any other remedy available to Secured Party. Debtor further waives any and all notice of acceptance of this Agreement and of the creation, modification, rearrangement, renewal or extension of the Indebtedness. Debtor further waives any defense arising by reason of any disability or other defense of any third party or by reason of the cessation from any cause whatsoever of the liability of any third party. Until all of the Indebtedness shall have been paid in full, Debtor shall have no right of subrogation and Debtor waives the right to enforce any remedy which Secured Party has or may hereafter have against any third party, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Secured Party. Debtor authorizes Secured Party, and without notice or demand and without any reservation of rights against Debtor and without affecting Debtor's liability hereunder or on the Indebtedness to (i) take or hold any other property of any type from any third party as security for the Indebtedness, and exchange, enforce, waive and release any or all of such other property, (ii) apply such other property and direct the order or manner of sale thereof as Secured Party may in its discretion determine, (iii) renew, extend, accelerate, modify, compromise, settle or release any of the Indebtedness or other security for the Indebtedness, (iv) waive, enforce or modify any of the provisions of any of the Transaction Documents executed by any third party, and (v) release or substitute any third party.

9. *Indemnity*. Debtor hereby indemnifies and agrees to hold harmless Secured Party, and its officers, directors, employees, agents and representatives (each an "Indemnified Person") from and against any and all liabilities, obligations, claims, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature (collectively, the "Claims") which may be imposed on, incurred by, or asserted against, any Indemnified Person arising in connection with the Transaction Documents, the Indebtedness or the Collateral (including without limitation, the enforcement of the Transaction Documents and the defense of any Indemnified Person's actions and/or inactions in connection with the Transaction Documents). The indemnification provided for in this Section shall survive the termination of this Agreement and shall extend and continue to benefit each individual or entity who is or has at any time been an Indemnified Person hereunder.

10. *Miscellaneous*.

(a) Entire Agreement. This Agreement and the other Transaction Documents contain the entire agreement of Secured Party and Debtor with respect to the Collateral. All security agreements, financing statements, guaranties, other contracts and notices for the benefit of Secured Party shall continue in full force and effect to secure the Indebtedness unless Secured Party specifically releases its rights thereunder by separate release. The rights of Secured Party set forth herein shall be in addition to, and not in lieu of, any rights set forth in the ARPA or any other

Transaction Document. All rights and remedies evidenced hereby, or evidenced or contemplated under the ARPA or any other Transaction Document, shall be cumulative and may be exercised separately or concurrently in the sole discretion of Secured Party.

(b) Amendment. No modification, consent or amendment of any provision of this Agreement or any of the other Transaction Documents shall be valid or effective unless the same is authenticated by the party against whom it is sought to be enforced, except to the extent of amendments specifically permitted by the Code without authentication by the Debtor or Obligor.

(c) Actions by Secured Party. The lien, security interest and other security rights of Secured Party hereunder shall not be impaired by (i) any renewal, extension, increase or modification with respect to the Indebtedness, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Secured Party may grant with respect to the Collateral, or (iii) any release or indulgence granted to any endorser, guarantor or surety of the Indebtedness. The taking of additional security by Secured Party shall not release or impair the lien, security interest or other security rights of Secured Party hereunder or affect the obligations of Debtor hereunder.

(d) Waiver by Secured Party. Secured Party may waive any Event of Default without waiving any other prior or subsequent Event of Default. Secured Party may remedy any default without waiving the Event of Default remedied. Neither the failure by Secured Party to exercise, nor the delay by Secured Party in exercising, any right or remedy upon any Event of Default shall be construed as a waiver of such Event of Default or as a waiver of the right to exercise any such right or remedy at a later date. No single or partial exercise by Secured Party of any right or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right or remedy hereunder may be exercised at any time. No waiver of any provision hereof or consent to any departure by Debtor therefrom shall be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to or demand on Debtor in any case shall of itself entitle Debtor to any other or further notice or demand in similar or other circumstances.

(e) Costs and Expenses. Debtor will upon demand pay to Secured Party the amount of any and all costs and expenses (including without limitation, attorneys' fees and expenses), which Secured Party may incur in connection with (i) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, (ii) the exercise or enforcement of any of the rights of Secured Party under the Transaction Documents, or (iii) the failure by Debtor to perform or observe any of the provisions hereof.

(f) **RELEASE. DEBTOR HEREBY RELEASES AND DISCHARGES SECURED PARTY, ITS OFFICERS, EMPLOYEES AND DESIGNEES, FROM ANY LIABILITY ARISING FROM ANY ACTS UNDER THIS SECURITY AGREEMENT OR IN FURTHERANCE THEREOF WHETHER OF OMISSION OR COMMISSION, AND WHETHER BASED UPON ANY ERROR OF JUDGMENT OR MISTAKE OF LAW OR FACT, EXCEPT FOR MATTERS ARISING FROM SECURED PARTY'S GROSS NEGLIGENCE OR INTENTIONAL OR WILLFUL MISCONDUCT. IN NO EVENT WILL SECURED PARTY HAVE ANY LIABILITY TO DEBTOR FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, DEBTOR RELEASES SECURED PARTY FROM ANY CLAIMS WHICH DEBTOR MAY NOW OR HEREAFTER HAVE ARISING OUT OF SECURED PARTY'S ENDORSEMENT AND DEPOSIT OF CHECKS ISSUED BY DEBTOR'S CUSTOMERS STATING THAT THEY WERE IN FULL PAYMENT OF AN ACCOUNT, BUT ISSUED FOR LESS THAN THE FULL AMOUNT WHICH MAY HAVE BEEN OWED ON THE ACCOUNT. FURTHER, THE SECURED PARTY SHALL HAVE NO LIABILITY TO THE SELLER FOR ANY MISTAKE IN ITS DEALINGS WITH ANY ACCOUNT DEBTORS OR IN THE APPLICATION OF ANY PAYMENT RECEIVED BY IT WITH RESPECT TO ANY ACCOUNT EXCEPT TO THE EXTENT OF THE AMOUNT OF THE MISAPPLICATION UNLESS BASED ON SECURED PARTY'S GROSS NEGLIGENCE OR INTENTIONAL WILLFUL MISCONDUCT. DEBTOR ACKNOWLEDGES THAT THIS PROVISION RELEASES SECURED PARTY FROM THE CONSEQUENCES OF ITS OWN FUTURE NEGLIGENCE.**

**(g) GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA AND APPLICABLE FEDERAL LAWS, EXCEPT TO THE EXTENT PERFECTION AND THE EFFECT OF PERFECTION OR NONPERFECTION OF THE SECURITY INTEREST GRANTED HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL, ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF FLORIDA.**

(h) Venue. This Agreement has been entered into in the county in Florida where Secured Party's address for notice purposes is located, and it shall be performable for all purposes in such county. Courts within the State of Florida shall have jurisdiction over any and all disputes arising under or pertaining to this Agreement and venue for any such disputes shall be in Pinellas County, Florida.

(i) Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, shall not impair or invalidate the remainder of this Agreement and the effect thereof shall be confined to the provision held to be illegal, invalid or unenforceable.

(j) No Obligation. Nothing contained herein shall be construed as an obligation on the part of Secured Party to extend or continue to extend credit to Obligor.

(k) Notices. All notices, requests, demands or other communications required or permitted to be given pursuant to this Agreement or the other Transaction Documents shall be in writing and given by (i) personal delivery, (ii) expedited delivery service with proof of delivery, or (iii) United States mail, postage prepaid, registered or certified mail, return receipt requested, sent to the intended addressee at the address set forth on the first page hereof or to such different address as the addressee shall have designated by written notice sent pursuant to the terms hereof and shall be deemed to have been received either, in the case of personal delivery, at the time of personal delivery, in the case of expedited delivery service, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of mail, upon deposit in a depository receptacle under the care and custody of the United States Postal Service. Either party shall have the right to change its address for notice hereunder to any other location within the continental United States by notice to the other party of such new address at least thirty (30) days prior to the effective date of such new address.

(l) Binding Effect and Assignment. This Agreement (i) creates a continuing security interest in the Collateral, (ii) shall be binding on Debtor and the heirs, executors, administrators, personal representatives, successors and assigns of Debtor, and (iii) shall inure to the benefit of Secured Party and its successors and assigns. Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Indebtedness and its rights under this Agreement and any of the other Transaction Documents to any other party. Debtor's rights and obligations hereunder may not be assigned or otherwise transferred without the prior written consent of Secured Party.

(m) Conflicts with ARPA. To the extent that the ARPA or the Equipment Note, on the one hand, and this Security Agreement, on the other hand, address the same or similar covenants, representations, warranties, rights, remedies, or other subject matter, such documents shall be construed, if possible, in a manner by which all such covenants, representations, warranties, rights, remedies or other subject matter are independent of one another and each fully enforceable according to its own terms, it being the parties' explicit intention that all rights and remedies of the parties described in the Transaction Documents shall be cumulative of one another. In the event that a harmonious construction of the documents in not reasonably possible, then this Security Agreement (including any provisions of the ARPA or the Equipment Note that are incorporated herein by reference) shall control solely with respect to the Collateral, and the ARPA and Equipment Note, as applicable, shall control as to all other matters.

(n) Descriptive Headings. The headings in this Agreement are for convenience only and shall in no way enlarge, limit or define the scope or meaning of the various and several provisions hereof.

(o) Jury Trial Waiver. **IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.**

[Remainder of page left blank]

EXECUTED as of the date first written above.

**DEBTOR**:

Great Southern Copackers LLC

By: Jeremy Roberts

Name: Jeremy Roberts

Title: Sole Member and Manager

Date: 2025-09-19

Brew Hub, LLC

By: Jeremy Roberts

Name: Jeremy Roberts

Title: Sole Member and Manager

Date: 09-19-2025

**SECURED PARTY**:

CLIMATE FIRST BANK

By: Ryan Jaskiewicz

Name: Ryan Jaskiewicz

Title: President of Structured Finance

Date: 2025-09-19

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
D4GBY-WKTVA-WYAOS-AZQQC

DOCUMENT COMPLETED BY ALL PARTIES ON
19 SEP 2025 19:27:11
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| **JEREMY ROBERTS**<br>EMAIL<br>ROBER1JE26@GMAIL.COM | SENT<br>18 SEP 2025 15:50:58<br>VIEWED<br>19 SEP 2025 16:19:14<br>SIGNED<br>19 SEP 2025 17:18:57 | *Jeremy Roberts*<br>IP ADDRESS<br>71.42.21.175<br>LOCATION<br>ORLANDO, UNITED STATES |
| **RECIPIENT VERIFICATION** | EMAIL VERIFIED<br>19 SEP 2025 16:19:14 | |
| **RYAN JASKIEWICZ**<br>EMAIL<br>RYAN.JASKIEWICZ@CLIMATEFIRSTBANK.COM | SENT<br>18 SEP 2025 15:50:58<br>VIEWED<br>19 SEP 2025 17:23:20<br>SIGNED<br>19 SEP 2025 19:27:11 | *Ryan Jaskiewicz*<br>IP ADDRESS<br>172.58.164.62<br>LOCATION<br>CHICAGO, UNITED STATES |
| **RECIPIENT VERIFICATION** | EMAIL VERIFIED<br>19 SEP 2025 17:23:20 | |

# EXHIBIT 4

SPI CORPORATE SOLUTIONS, INC.

| Debtor Name | Jurisdiction | Type of Search | Thru Date | Results |
|---|---|---|---|---|
| Great Southern Copackers LLC | Florida Secretary of State | UCC/FTL/Judgment Liens | 07/29/2026 | 9 UCC<br>1 Amendment<br>1 Termination<br>No Federal Tax Liens<br>No Judgment Liens |

* Searches on an **entity** account for all endings including: LLC, Inc., L.P., etc with the exception of Maine and New Hampshire which are exact name search only.
* Searches on an **individual** are searched with and without a middle name/initial
* **Court searches** - Local and Federal - are performed on the defendant only, covering 10 years.

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
DAVID BOOTH; 5862427976

B. Email DBOOTH@NHLPA.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

**FILED**

2025 Jun 26 04:11 PM

********* 202502254440 *********

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(1a OR 1b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>GREAT SOUTHERN COPACKERS | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>3900 FRONTAGE RD S | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>LAKELAND | STATE<br>FL | POSTAL CODE<br>33815 | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY **ONE** SECURED PARTY **(3a OR 3b)**

| | | | | |
|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME | | | | |
| 3.b INDIVIDUAL'S SURNAME<br>BOOTH | FIRST PERSONAL NAME<br>DAVID | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>552 GLEN ABERNATHY RD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>ADAMSVILLE | STATE<br>TN | POSTAL CODE<br>38310 | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

EQUIPMENT PACKAGE LOCATED AT 3900 FRONTAGE RD S LAKELAND FL 33815

**5.** ALTERNATE DESIGNATION (if applicable)

- ☐ LESSEE/LESSOR
- ☐ CONSIGNEE/CONSIGNOR
- ☐ BAILEE/BAILOR
- ☐ AG LIEN
- ☐ NON-UCC FILING
- ☑ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

- ☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
- ■ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

EQUIPMENT PACKAGE LOCATED AT 3900 FRONTAGE RD S

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT AMENDMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
DANIEL W. HARTMAN; 8504431754

B. Email DAN@FLLEGALTEAM.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

FILED

2025 Oct 07 09:46 PM

********* 202503851809 *********

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE #**
202502254440

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2. CURRENT RECORD INFORMATION – DEBTOR NAME** – INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)**

2a. ORGANIZATION'S NAME
GREAT SOUTHERN COPACKERS

2b. INDIVIDUAL's NAME (Surname, First Personal Name, Additional Name(s)/Initials, Suffix)

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME** – INSERT ONLY **ONE** SECURED PARTY NAME **(3a OR 3b)**

3a. ORGANIZATION'S NAME

3b. INDIVIDUAL's NAME (Surname, First Personal Name, Additional Name(s)/Initials, Suffix)
BOOTH DAVID

4. ■ **TERMINATION**: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

5. ☐ **CONTINUATION**: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

6. ☐ **ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and give name of assignor in item 11.

7. ☐ **AMENDMENT** (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

**Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.**

☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.

☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.

☐ **ADD** name: Complete item 9a or 9b, and 9c.

**8. CURRENT RECORD INFORMATION** – INSERT ONLY **ONE** NAME **(8a OR 8b)** – Do Not Abbreviate or Combine Names

8a. ORGANIZATION'S NAME

8b. INDIVIDUAL's NAME (Surname, First Personal Name, Additional Name(s)/Initials, Suffix)

**9. CHANGED (NEW) OR ADDED INFORMATION:** – INSERT ONLY **ONE** NAME **(9a OR 9b)** – Do Not Abbreviate or Combine Names

| 9.a ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 9.c MAILING ADDRESS Line One | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | | COUNTRY |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral ☐ ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

11a. ORGANIZATION'S NAME

11b. INDIVIDUAL's NAME (Surname, First Personal Name, Additional Name(s)/Initials, Suffix)

**12. OPTIONAL FILER REFERENCE DATA**

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
CORPORATION SERVICE COMPANY; 18008585294

B. Email FLSOSUCCFILINGSV3@CSCGLOBAL.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

FILED

2025 Jun 03 01:36 PM

********* 202501724648 *********

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(1a OR 1b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>GREAT SOUTHERN COPACKERS LLC | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>400 PITTMAN ST. ORLANDO FL 32801 101 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>ORLANDO | STATE<br>FL | POSTAL CODE<br>32801 | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY **ONE** SECURED PARTY **(3a OR 3b)**

| | | | | |
|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME<br>CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>PO BOX 2576 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>SPRINGFIELD | STATE<br>IL | POSTAL CODE<br>62708 | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

ALL OF EACH DEBTOR'S PRESENT AND FUTURE PERSONAL PROPERTY, ACCOUNTS, CHATTEL PAPER, DEPOSIT ACCOUNTS, GOODS, ASSETS AND FIXTURES, LETTER OF CREDIT RIGHTS, DOCUMENTS, SECURITIES ENTITLEMENTS, SECURITIES ACCOUNTS, COMMODITY ACCOUNTS, COMMODITY CONTRACTS, INVESTMENT PROPERTY, PAYMENT INTANGIBLES, GENERAL INTANGIBLES, INSTRUMENTS, EQUIPMENT, INVENTORY, COMMERCIAL TORT CLAIMS, ALL SUPPORTING OBLIGATIONS OF THE FOREGOING, ALL CASH AND CASH EQUIVALENTS, AND ALL PROCEEDS AND PRODUCTS OF THE FOREGOING, AND ALL ADDITIONS AND ACCESSIONS THERETO, SUBSTITUTIONS THEREFOR AND REPLACEMENTS THEREOF, IN EACH CASE WHETHER NOW OWNED OR HEREAFTER ARISING OR ACQUIRED BY ANY DEBTOR AND WHEREVER LOCATED. UNLESS OTHERWISE CONSENTED TO IN ADVANCE IN WRITING BY SECURED PARTY, EACH DEBTOR IS PROHIBITED FROM (I) ENTERING INTO ANY MERCHANT CASH ADVANCE OR ANY LOAN AGREEMENT WITH ANY PARTY OTHER THAN SECURED PARTY OR THE U.S. SMALL BUSINESS ADMINISTRATION (THE "SBA") OR ANY EQUIPMENT LENDER SECURED SOLELY BY NEW

**5.** ALTERNATE DESIGNATION (if applicable)

☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☒ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

3140 30379

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM – ADDITIONAL INFORMATION

**8. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GREAT SOUTHERN COPACKERS LLC | | | |
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**9. ADDITIONAL COLLATERAL DESCRIPTION:**

EQUIPMENT PURCHASED WITH THE PROCEEDS OF ITS LOAN, (II) INCURRING ANY OTHER INDEBTEDNESS FOR BORROWED MONEY WITH ANY PARTY OTHER THAN SECURED PARTY OR THE SBA OR ANY EQUIPMENT LENDER SECURED SOLELY BY NEW EQUIPMENT PURCHASED WITH THE PROCEEDS OF ITS LOAN, (III) SELLING OR GRANTING ANY SECURITY INTEREST IN ANY CURRENT OR FUTURE RECEIVABLE(S) OF SUCH DEBTOR, OR (IV) ENTERING INTO ANY OTHER TYPE OF FINANCING AGREEMENT OR ARRANGEMENT WHEREBY SUCH DEBTOR IS REQUIRED TO MAKE PERIODIC PAYMENTS, DELIVERIES, OR REMITTANCES TO A THIRD PARTY OTHER THAN FINANCING AGREEMENTS OR ARRANGEMENTS WITH THE SBA OR ANY EQUIPMENT LENDER SECURED SOLELY BY NEW EQUIPMENT PURCHASED WITH THE PROCEEDS OF ITS LOAN OR EQUIPMENT LEASES OF NEW EQUIPMENT.UCCSPREP@CSCINFO.COM

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

Florida Secured Transaction Registry

**FILED**

2025 Jun 03 01:36 PM

********* 202501724656 *********

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
CORPORATION SERVICE COMPANY; 18008585294

B. Email FLSOSUCCFILINGSV3@CSCGLOBAL.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(1a OR 1b)** - Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>GREAT SOUTHERN COPACKERS LLC | | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>400 PITTMAN ST. ORLANDO FL 32801 101 | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY<br>ORLANDO | STATE<br>FL | | POSTAL CODE<br>32801 | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)** - Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY **ONE** SECURED PARTY **(3a OR 3b)**

| | | | | | |
|---|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME<br>CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>PO BOX 2576 | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY<br>SPRINGFIELD | STATE<br>IL | | POSTAL CODE<br>62708 | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

ALL OF EACH DEBTOR'S PRESENT AND FUTURE PERSONAL PROPERTY, ACCOUNTS, CHATTEL PAPER, DEPOSIT ACCOUNTS, GOODS, ASSETS AND FIXTURES, LETTER OF CREDIT RIGHTS, DOCUMENTS, SECURITIES ENTITLEMENTS, SECURITIES ACCOUNTS, COMMODITY ACCOUNTS, COMMODITY CONTRACTS, INVESTMENT PROPERTY, PAYMENT INTANGIBLES, GENERAL INTANGIBLES, INSTRUMENTS, EQUIPMENT, INVENTORY, COMMERCIAL TORT CLAIMS, ALL SUPPORTING OBLIGATIONS OF THE FOREGOING, ALL CASH AND CASH EQUIVALENTS, AND ALL PROCEEDS AND PRODUCTS OF THE FOREGOING, AND ALL ADDITIONS AND ACCESSIONS THERETO, SUBSTITUTIONS THEREFOR AND REPLACEMENTS THEREOF, IN EACH CASE WHETHER NOW OWNED OR HEREAFTER ARISING OR ACQUIRED BY ANY DEBTOR AND WHEREVER LOCATED. UNLESS OTHERWISE CONSENTED TO IN ADVANCE IN WRITING BY SECURED PARTY, EACH DEBTOR IS PROHIBITED FROM (I) ENTERING INTO ANY MERCHANT CASH ADVANCE OR ANY LOAN AGREEMENT WITH ANY PARTY OTHER THAN SECURED PARTY OR THE U.S. SMALL BUSINESS ADMINISTRATION (THE "SBA") OR ANY EQUIPMENT LENDER SECURED SOLELY BY NEW

**5.** ALTERNATE DESIGNATION (if applicable)
- ☐ LESSEE/LESSOR
- ☐ CONSIGNEE/CONSIGNOR
- ☐ BAILEE/BAILOR
- ☐ AG LIEN
- ☐ NON-UCC FILING
- ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

- ■ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
- ☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

3140 30806

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE
## FINANCING STATEMENT FORM – ADDITIONAL INFORMATION

**8. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GREAT SOUTHERN COPACKERS LLC | | | |
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**9. ADDITIONAL COLLATERAL DESCRIPTION:**

EQUIPMENT PURCHASED WITH THE PROCEEDS OF ITS LOAN, (II) INCURRING ANY OTHER INDEBTEDNESS FOR BORROWED MONEY WITH ANY PARTY OTHER THAN SECURED PARTY OR THE SBA OR ANY EQUIPMENT LENDER SECURED SOLELY BY NEW EQUIPMENT PURCHASED WITH THE PROCEEDS OF ITS LOAN, (III) SELLING OR GRANTING ANY SECURITY INTEREST IN ANY CURRENT OR FUTURE RECEIVABLE(S) OF SUCH DEBTOR, OR (IV) ENTERING INTO ANY OTHER TYPE OF FINANCING AGREEMENT OR ARRANGEMENT WHEREBY SUCH DEBTOR IS REQUIRED TO MAKE PERIODIC PAYMENTS, DELIVERIES, OR REMITTANCES TO A THIRD PARTY OTHER THAN FINANCING AGREEMENTS OR ARRANGEMENTS WITH THE SBA OR ANY EQUIPMENT LENDER SECURED SOLELY BY NEW EQUIPMENT PURCHASED WITH THE PROCEEDS OF ITS LOAN OR EQUIPMENT LEASES OF NEW EQUIPMENT.UCCSPREP@CSCINFO.COM

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
CORPORATION SERVICE COMPANY; 18008585294

B. Email FLSOSUCCFILINGSV3@CSCGLOBAL.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

FILED

2025 Jul 28 03:20 PM

********* 202503031321 *********

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(1a OR 1b)** - Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>GREAT SOUTHERN COPACKERS LLC | | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>3900 FRONTAGE RD. | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY<br>LAKELAND | | STATE<br>FL | POSTAL CODE<br>33815 | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)** - Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY **ONE** SECURED PARTY **(3a OR 3b)**

| | | | | | |
|---|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME<br>CLIMATE FIRST BANK | | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>182 37TH AVE. N | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY<br>ST. PETERSBURG | | STATE<br>FL | POSTAL CODE<br>33704 | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

ALL EXISTING AND LATER ACQUIRED ASSETS OF DEBTOR, INCLUDING, BUT NOT LIMITED TO, ALL PROCEEDS THEREOF.

**5.** ALTERNATE DESIGNATION (if applicable)
☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☒ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

4249852

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT AMENDMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
CORPORATION SERVICE COMPANY; 18008585294

B. Email FLSOSUCCFILINGSV3@CSCGLOBAL.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

**FILED**

2025 Aug 07 11:59 AM

********* 202503203289 *********

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE #**
202503031321

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2. CURRENT RECORD INFORMATION – DEBTOR NAME** – INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)**

2a. ORGANIZATION'S NAME
GREAT SOUTHERN COPACKERS LLC

2b. INDIVIDUAL's NAME (Surname, First Personal Name, Additional Name(s)/Initials, Suffix)

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME** – INSERT ONLY **ONE** SECURED PARTY NAME **(3a OR 3b)**

3a. ORGANIZATION'S NAME
CLIMATE FIRST BANK

3b. INDIVIDUAL's NAME (Surname, First Personal Name, Additional Name(s)/Initials, Suffix)

**4.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6.** ☐ **ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and give name of assignor in item 11.

**7.** ☑ **AMENDMENT** (PARTY INFORMATION): This Amendment affects ☑ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

**Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.**

☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.
☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.
☑ **ADD** name: Complete item 9a or 9b, and 9c.

**8. CURRENT RECORD INFORMATION** – INSERT ONLY **ONE** NAME **(8a OR 8b)** – Do Not Abbreviate or Combine Names

8a. ORGANIZATION'S NAME

8b. INDIVIDUAL's NAME (Surname, First Personal Name, Additional Name(s)/Initials, Suffix)

**9. CHANGED (NEW) OR ADDED INFORMATION:** – INSERT ONLY **ONE** NAME **(9a OR 9b)** – Do Not Abbreviate or Combine Names

9.a ORGANIZATION'S NAME
BREW HUB, LLC

| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 9.c MAILING ADDRESS Line One | This space not available. | | | |
|---|---|---|---|---|
| 3900 FRONTAGE RD. | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | LAKELAND | FL | 33815 | USA |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral ☐ ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

11a. ORGANIZATION'S NAME
CLIMATE FIRST BANK

11b. INDIVIDUAL's NAME (Surname, First Personal Name, Additional Name(s)/Initials, Suffix)

**12. OPTIONAL FILER REFERENCE DATA** 4283778

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
WOLTERS KLUWER LIEN SOLUTIONS; 8003313282

B. Email CTLSWEBACK@WOLTERSKLUWER.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

FILED

2025 Nov 07 12:14 PM

********* 202504183753 *********

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(1a OR 1b)** - Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>GREAT SOUTHERN COPACKERS LLC | | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>400 PITTMAN ST. | This space not available. | | | | |
| MAILING ADDRESS Line Two<br>SUITE 101 | CITY<br>ORLANDO | | STATE<br>FL | POSTAL CODE<br>32801 | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)** - Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY **ONE** SECURED PARTY **(3a OR 3b)**

| | | | | | |
|---|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME<br>BFG CORPORATION | | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>2801 LAKESIDE DRIVE | This space not available. | | | | |
| MAILING ADDRESS Line Two<br>SUITE 212 | CITY<br>BANNOCKBURN | | STATE<br>IL | POSTAL CODE<br>60015 | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

1) USED 2018 CROWN C51050-50 PNEUMATIC GAS TRUCK S/N: 10077228

**5.** ALTERNATE DESIGNATION (if applicable) ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☒ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

106494114-72855416

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
CORPORATION SERVICE COMPANY; 18008585294

B. Email FLSOSUCCFILINGSV3@CSCGLOBAL.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

FILED

2025 Nov 26 03:14 PM

********* 202504473336 *********

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(1a OR 1b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>GREAT SOUTHERN COPACKERS LLC | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>400 PITTMAN ST | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>ORLANDO | STATE<br>FL | POSTAL CODE<br>32801 | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY **ONE** SECURED PARTY **(3a OR 3b)**

| | | | | |
|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME<br>CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>P.O. BOX 2576 UCCSPREP@CSCGLOBAL.COM | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>SPRINGFIELD | STATE<br>IL | POSTAL CODE<br>62708 | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

ALL OF EACH DEBTOR'S PRESENT AND FUTURE PERSONAL PROPERTY, ACCOUNTS, CHATTEL PAPER, DEPOSIT ACCOUNTS, GOODS, ASSETS AND FIXTURES, LETTER OF CREDIT RIGHTS, DOCUMENTS, SECURITIES ENTITLEMENTS, SECURITIES ACCOUNTS, COMMODITY ACCOUNTS, COMMODITY CONTRACTS, INVESTMENT PROPERTY, PAYMENT INTANGIBLES, GENERAL INTANGIBLES, INSTRUMENTS, EQUIPMENT, INVENTORY, COMMERCIAL TORT CLAIMS, ALL SUPPORTING OBLIGATIONS OF THE FOREGOING, ALL CASH AND CASH EQUIVALENTS, AND ALL PROCEEDS AND PRODUCTS OF THE FOREGOING, AND ALL ADDITIONS AND ACCESSIONS THERETO, SUBSTITUTIONS THEREFOR AND REPLACEMENTS THEREOF, IN EACH CASE WHETHER NOW OWNED OR HEREAFTER ARISING OR ACQUIRED BY ANY DEBTOR AND WHEREVER LOCATED. UNLESS OTHERWISE CONSENTED TO IN ADVANCE IN WRITING BY SECURED PARTY, EACH DEBTOR IS PROHIBITED FROM (I) ENTERING INTO ANY MERCHANT CASH ADVANCE OR ANY LOAN AGREEMENT WITH ANY PARTY OTHER THAN SECURED PARTY OR THE U.S. SMALL BUSINESS ADMINISTRATION (THE "SBA") OR ANY EQUIPMENT LENDER SECURED SOLELY BY NEW

**5.** ALTERNATE DESIGNATION (if applicable)

☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

■ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

4863436

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM – ADDITIONAL INFORMATION

**8. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GREAT SOUTHERN COPACKERS LLC | | | |
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**9. ADDITIONAL COLLATERAL DESCRIPTION:**

EQUIPMENT PURCHASED WITH THE PROCEEDS OF ITS LOAN, (II) INCURRING ANY OTHER INDEBTEDNESS FOR BORROWED MONEY WITH ANY PARTY OTHER THAN SECURED PARTY OR THE SBA OR ANY EQUIPMENT LENDER SECURED SOLELY BY NEW EQUIPMENT PURCHASED WITH THE PROCEEDS OF ITS LOAN, (III) SELLING OR GRANTING ANY SECURITY INTEREST IN ANY CURRENT OR FUTURE RECEIVABLE(S) OF SUCH DEBTOR, OR (IV) ENTERING INTO ANY OTHER TYPE OF FINANCING AGREEMENT OR ARRANGEMENT WHEREBY SUCH DEBTOR IS REQUIRED TO MAKE PERIODIC PAYMENTS, DELIVERIES, OR REMITTANCES TO A THIRD PARTY OTHER THAN FINANCING AGREEMENTS OR ARRANGEMENTS WITH THE SBA OR ANY EQUIPMENT LENDER SECURED SOLELY BY NEW EQUIPMENT PURCHASED WITH THE PROCEEDS OF ITS LOAN OR EQUIPMENT LEASES OF NEW EQUIPMENT.UCCSPREP@CSCINFO.COM

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
WOLTERS KLUWER LIEN SOLUTIONS; 8003313282

B. Email CTLSWEBACK@WOLTERSKLUWER.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

FILED

2026 Feb 27 09:14 AM

********* 20260055922X *********

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(1a OR 1b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>GREAT SOUTHERN COPACKERS LLC | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>400 PITTMAN STREET | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>ORLANDO | STATE<br>FL | POSTAL CODE<br>32801 | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY **ONE** SECURED PARTY **(3a OR 3b)**

| | | | | |
|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME<br>CROWN EQUIPMENT CORPORATION | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>44 S. WASHINGTON STREET | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>NEW BREMEN | STATE<br>OH | POSTAL CODE<br>45869 | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

ALL OF LESSEE'S RIGHT, TITLE, AND INTEREST IN ALL EQUIPMENT NOW OR HEREAFTER LEASED FROM LESSOR BY LESSEE PURSUANT TO ANY MASTER LEASE AGREEMENT BETWEEN LESSOR AND LESSEE, TOGETHER WITH ALL SCHEDULES, EXHIBITS, SUPPLEMENTS, AMENDMENTS, RENEWALS, AND MODIFICATIONS THERETO, INCLUDING BUT NOT LIMITED TO ALL MATERIAL HANDLING EQUIPMENT, BATTERIES, CHARGERS, ATTACHMENTS, TRUCKS, MISCELLANEOUS BATTERY HANDLING EQUIPMENT AND RELATED EQUIPMENT AND ALL ADDITIONS, ACCESSIONS, SUBSTITUTIONS, ATTACHMENTS, IMPROVEMENTS AND REPAIRS THERETO AND THEREFOR, WHETHER CURRENTLY EXISTING OR HEREAFTER ARISING, AND ALL PROCEEDS THEREOF.

**5.** ALTERNATE DESIGNATION (if applicable)
☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

■ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

107889591-73546653

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
WOLTERS KLUWER LIEN SOLUTIONS; 8003313282

B. Email CTLSWEBACK@WOLTERSKLUWER.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

**FILED**

2026 Apr 13 11:14 AM

********* 20260103211X *********

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(1a OR 1b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>GREAT SOUTHERN COPACKERS LLC | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>400 PITTMAN ST STE 101 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>ORLANDO | STATE<br>FL | POSTAL CODE<br>32801 | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)** - Do Not Abbreviate or Combine Names

| | | | | |
|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY **ONE** SECURED PARTY **(3a OR 3b)**

| | | | | |
|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME<br>C T CORPORATION SYSTEM, AS REPRESENTATIVE | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>330 N BRAND BLVD, SUITE 700: ATTN: SPRS | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY<br>GLENDALE | STATE<br>CA | POSTAL CODE<br>91203 | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

COLLATERAL: THIS FINANCING STATEMENT COVERS THE FOLLOWING COLLATERAL: RECEIVABLES- ALL ASSETS NOW OWNED OR HEREAFTER ACQUIRED AND WHEREVER LOCATED, INCLUDING BUT NOT LIMITED TO, THE FOLLOWING SUBCATEGORIES OF ASSETS: A. ACCOUNTS RECEIVABLES, INCLUDING BUT NOT LIMITED TO, CREDIT CARD RECEIVABLES; B. CHATTEL PAPER; C. INVENTORY; D. EQUIPMENT; E. INSTRUMENTS, INCLUDING BUT NOT LIMITED TO, PROMISSORY NOTES; F. INVESTMENT PROPERTY; G. DOCUMENTS; H. DEPOSIT ACCOUNTS: I LETTER OF CREDIT RIGHTS; J. GENERAL INTANGIBLES; K. SUPPORTING OBLIGATIONS; AND I. LETTER OF CREDIT RIGHTS; J. GENERAL INTANGIBLES; K. SUPPORTING OBLIGATIONS; AND I. PROCEEDS AND PRODUCTS OF THE FOREGOING. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY

**5.** ALTERNATE DESIGNATION (if applicable)
☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

■ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

108488949-73842226

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM – ADDITIONAL INFORMATION

**8. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GREAT SOUTHERN COPACKERS LLC | | | |
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**9. ADDITIONAL COLLATERAL DESCRIPTION:**

INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
LEE MCDONALD; 4695451411

B. Email LEE@ALLBEV.COM

C. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

**FILED**

2025 Sep 10 10:57 AM

********* 202503561061 *********

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(1a OR 1b)** - Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>GREAT SOUTHERN COPACKERS, LLC | | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>3900 FRONTAGE ROAD SOUTH | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY<br>LAKELAND | STATE<br>FL | POSTAL CODE<br>33815 | | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY **ONE** DEBTOR NAME **(2a OR 2b)** - Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY **ONE** SECURED PARTY **(3a OR 3b)**

| | | | | | |
|---|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME<br>ALLBEV LLC | | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>1901 FM 546 | This space not available. | | | | |
| MAILING ADDRESS Line Two<br>SUITE 200 | CITY<br>MCKINNEY | STATE<br>TX | POSTAL CODE<br>75069 | | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

1. DMM CONTINUOUS MOTION CARTONER MODEL NUMBER: CHA-3-5C SERIAL NUMBER: 2208 2. SKA DEPAL MODEL: CAN-I-BUS SERIAL NUMBER: 0420-645 3. MCE INTRALOX CONVEYOR OVER STAINLESS STEEL FRAME (APPROX. 18" X 10') MODEL NUMBER: DEBTOR ACKNOWLEDGES THAT THE MODEL NUMBER TAG IS PARTIALLY RUBBED OFF. SECURED PARTY BELIEVES MODEL NUMBER IS MCE 41319-949 BUT DOES NOT WARRANT THIS.

**5.** ALTERNATE DESIGNATION (if applicable)

☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☒ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

CLIENT.MATTER: 3532388.0013

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re: Great Southern Copackers LLC
aka Great Southern Beverages,

Debtor.

Case No. 8:26-bk-07442-LER

Chapter 11
Subchapter V Election

_______________________________________________/

**DECLARATION PURSUANT TO 28 U.S.C. § 1746.**

1. My name is Chad Kerr. I am over eighteen (18) years of age and am competent to testify as to the matters set forth herein. I am employed by Climate First Bank ("CFB") as Senior Vice President & Director of Structured Finance. I have personal knowledge of the facts set forth in this Declaration, or have acquired knowledge of such facts through my review of CFB's books and records maintained in the ordinary course of business, and if called upon to testify, I could and would competently testify to the matters stated herein.

2. CFB is a secured creditor of Great Southern Copackers LLC ("Great Southern" or the "Debtor"), which filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 20, 2026 (the "Petition Date"), Case No. 8:26-bk-07442-LER, in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division.

3. On or about September 18, 2025, the Debtor, together with its affiliate Brew Hub, LLC ("Brew Hub," and together with the Debtor, the "Obligors"), executed a Secured Promissory Note in favor of CFB in the original principal amount of $1,801,275.00 (the "Equipment Note"), together with a contemporaneous Accounts Receivable Purchasing Agreement (the "ARPA") and a Security Agreement of even date (the "Security Agreement," and together with the Equipment Note and the ARPA, the "Transaction Documents").

4. Pursuant to the Security Agreement, the Obligors granted CFB a security interest in substantially all of their personal property, including, without limitation, all "equipment" as defined in the Uniform Commercial Code, together with all related books, records, and proceeds (the "Collateral"), to secure repayment of the Equipment Note and all other obligations arising under the ARPA and the other Transaction Documents (collectively, the "Obligations").

5. CFB perfected its security interest in the Collateral, including the Debtor's equipment (the "Equipment"), by filing UCC-1 financing statements. CFB's lien on the Equipment is a first-priority lien. CFB is also the first-priority creditor on the Debtor's accounts.

6. As of the Petition Date, the outstanding amount owed by the Debtor to CFB under the Equipment Note and the ARPA, inclusive of principal, accrued and unpaid interest, and fees and expenses chargeable under the Transaction Documents, is at least $1,747,196.80, and continues to accrue interest, fees, and the collateral management and other charges provided for in the Equipment Note and the ARPA (collectively, the "Outstanding Indebtedness").

7. The Debtor is in default under the Transaction Documents by reason of, among other things, the following events of default:

a. The Debtor failed to make payments when due under the Equipment Note. The Debtor's last monthly installment payment under the Equipment Note was made in January 2026, and the Debtor has failed to make any further installment payments due since the January 2026 payment.

b. The Debtor is in default of Section 11.5 of the ARPA by, among other things, ceasing its operations several weeks prior to the Petition Date.

8. No payment, credit, offset, or other reduction has been applied to the Outstanding Indebtedness other than the payments and credits reflected in CFB's books and records, and no part of the Outstanding Indebtedness has been satisfied, released, or discharged.

Docusign Envelope ID: 1AB1C62C-30D8-842A-8179-94997F323136

9. A junior creditor, Breakout Capital, LLC, holds a subordinate security interest in the Debtor's assets pursuant to an Intercreditor Agreement and Amendment dated October 7, 2025, under which CFB's lien on the Senior Creditor Collateral (defined therein to include the Equipment and accounts) is senior in all respects to Breakout Capital's lien. Breakout Capital's subordinate debt is approximately $912,000.

10. Prior to the Petition Date, and as a direct consequence of the Debtor's default and cessation of operations, CFB had been proceeding toward a private, commercially reasonable disposition of the Equipment under Article 9 of the Uniform Commercial Code with a prospective buyer (the "Buyer") on the terms summarized below (the "Article 9 Sale"). The Article 9 Sale provided for the sale of all of the Debtor's Equipment, except for certain excluded equipment, in exchange for a purchase price of $1,750,000.

11. CFB and the Buyer were on the verge of closing the Article 9 Sale on the Petition Date. All that was required to close was execution of the prepared and approved bill of sale and the wiring of the purchase price proceeds. The filing of the Debtor's chapter 11 case on August 20, 2026, and the resulting imposition of the automatic stay under section 362(a) of the Bankruptcy Code, halted the Article 9 Sale before it could close.

12. Upon information and belief, the Debtor does not currently maintain insurance on the Equipment or has failed to provide proof of insurance to CFB, its first-priority secured creditor, despite CFB's entitlement to such proof under the Transaction Documents.

13. On August 18, 2026, there was an inspection of the Equipment at the Debtor's facility located at 3900 Frontage Road South, Lakeland, Florida 33815 (the "Facility"). That inspection revealed that an entire bottling line that had been present at the Facility during CFB's inspection on May 21 and 22, 2026 was missing from the Facility. That bottling line had an

Docusign Envelope ID: 1AB1C62C-30D8-842A-8179-94997F323136

appraised forced liquidation value of approximately $135,000 and an appraised orderly liquidation value of approximately $178,000.

14. The Equipment was appraised by Tiger Valuation Services, LLC in a machinery and equipment appraisal commissioned by CFB, effective as of July 23, 2025, and issued on August 22, 2025 (the "Appraisal"). The Appraisal values the production and support Equipment at a gross orderly liquidation value of approximately $3,231,050 and a net orderly liquidation value of approximately $2,648,750.

15. The facts set forth above are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 9, 2026, 2026.

Signed by:
Chad A. Kerr
40A5D1E82E02481...

Chad Kerr
Senior Vice President & Director of
Structured Finance
Climate First Bank

# EXHIBIT 6

# INTERCREDITOR AGREEMENT AND AMENDMENT

This INTERCREDITOR AGREEMENT AND AMENDMENT (this "Agreement"), dated as of October 7, 2025 (the "Effective Date"), is among Breakout Capital, LLC, a Delaware limited liability company (the "Subordinating Creditor"), Great Southern Copackers LLC, a Florida limited liability company ("Great Southern"), Brew Hub, LLC, a Delaware limited liability company ("Brew Hub," and together with Great Southern, the "Debtor"), and Climate First Bank (the "Senior Creditor").

## RECITALS

A. The Senior Creditor is extending a financing facility to the Debtor consisting of an accounts receivable factoring facility and equipment financing, and in connection therewith, has or expects to acquire a security interest in substantially all of the Debtor's existing and hereafter acquired assets, including, but not limited to, existing and future Accounts, Equipment, and Related Rights.

B. The Debtor and Subordinating Creditor are parties to that certain Business Loan and Security Agreement dated as of June 3, 2025 (as amended, modified, restated, renewed, extended or refinanced, the "Subordinating Creditor Loan Agreement"), pursuant to which the Subordinating Creditor has extended a loan to the Debtor in the original principal amount of $500,000.00, and secured by a security interest in all assets of the Debtor.

C. The Creditors are executing this Agreement to set forth their lien priorities with respect to the Senior Creditor Collateral.

D. To induce Senior Creditor to extend such financial accommodations to the Debtor, the Subordinating Creditor has agreed to subordinate in favor of Senior Creditor its security interest in the Senior Creditor Collateral.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Creditors hereby agree as follows:

## AGREEMENT

1. **DEFINITIONS.** The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code, as enacted in the Chosen State on the date hereof:

1.1 "**Accounts**: All accounts receivable, payment intangibles, and other rights to payment, whether now existing or arising hereafter.

1.2"**Account Related Rights**" – All rights, titles, and interests of the Debtor in, to, and under any and all of the following, whether now existing or hereafter arising, related to or arising from the Accounts:

o All books, records, ledger cards, files, correspondence, computer programs, tapes, disks, and related data processing software that at any time evidence or contain information relating to any of the Accounts or are otherwise necessary or helpful in the collection thereof or realization thereupon.

o All guarantees, indemnities, letters of credit, security agreements, or other agreements or arrangements of whatever character from time to time supporting or securing payment of any of the Accounts.

o All proceeds (as defined in the Uniform Commercial Code as in effect in the State of Florida) of any of the foregoing, including, without limitation, collections, insurance proceeds, and any other amounts or property received or recovered with respect to the Accounts or related rights, whether in the form of money, instruments, securities, or otherwise, and all products and accessions thereof.

o All deposit accounts, cash collateral accounts, or other bank accounts into which any proceeds of the Accounts are deposited or held, to the extent such accounts are subject to a control agreement or other arrangement in favor of Senior Creditor.

1.3 "**Bankruptcy Code**" – Title 11 of the United States Code.

1.4 "**Chosen State**" – Florida.

1.5 "**Creditors**" –The Subordinating Creditor and the Senior Creditor.

1.6 "**Debtor**" – See preamble.

1.7 "**Equipment**" – All "equipment" as such term is defined in Article 9 of the Uniform Commercial Code, whether now owned or hereafter acquired by the Debtor and wherever located, including but not limited to all machinery, machine tools, motors, furniture, furnishings, fixtures, vehicles (including motor vehicles and trailers), tools, parts, goods (other than consumer goods, farm products, or inventory), computers, office equipment, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing.

1.8 "**Equipment Related Rights**": All rights, titles, and interests of the Debtor in, to, and under any and all of the following, whether now existing or hereafter arising, related to or arising from the Equipment:

o All books, records, ledger cards, files, correspondence, computer programs, tapes, disks, and related data processing software that at any time evidence or contain information relating to any of the Equipment or are otherwise necessary or helpful in the collection thereof or realization thereupon.

o All guarantees, indemnities, warranties, insurance policies, service contracts, or other agreements or arrangements of whatever character from time to time supporting or securing the value, use, or disposition of any of the Equipment.

o All proceeds (as defined in the Uniform Commercial Code as in effect in the State of Florida) of any of the foregoing, including, without limitation, sale proceeds, rental income, insurance proceeds, and any other amounts or property received or recovered with respect to the Equipment or related rights, whether in the form of money, instruments, securities, or otherwise, and all products, accessions, attachments, and improvements thereof.

o All deposit accounts, cash collateral accounts, or other bank accounts into which any proceeds of the Equipment are deposited or held, to the extent such accounts are subject to a control agreement or other arrangement in favor of Senior Creditor.

1.9 "**Obligor**" – Any person or entity obligated to pay the Senior Creditor Obligations, including, without limitation, the Debtor and any other person or entity under a guaranty agreement or other similar agreement.

1.10 "**Party**" – Each of the Subordinating Creditor, the Debtor, and the Senior Creditor.

1.11 "**Related Rights**" – Together, the Account Related Rights and Equipment Related Rights.

1.12 "**Secondary Collateral**" – Collateral of a Creditor holding a security interest which is inferior to the priority of the other Creditor

1.13 "**Senior Creditor**" – See preamble.

1.14 "**Senior Creditor Agreements**" -- All agreements now or hereafter entered into between Senior Creditor and Debtor which create an obligation owing from Debtor to Senior Creditor.

1.15 "**Senior Creditor Collateral**" – All Accounts and Equipment and all Related Rights.

1.16 "**Senior Creditor Obligations**" - Obligations of the Debtor to the Senior Creditor secured by the Senior Creditor Collateral.

1.17 "**Subordinating Creditor**" – See Preamble.

1.18 "**Subordinating Creditor Agreements**" – All agreements now or hereafter entered into between Subordinating Creditor and Debtor which create an obligation owing from Debtor to Subordinating Creditor, including, without limitation, that certain Subordinating Creditor Loan Agreement.

1.19 "**Subordinating Creditor Collateral**" – All Collateral other than the Senior Creditor Collateral.

1.20 "**Subordinating Creditor Obligations**" – Indebtedness owed by the Debtor to the Subordinating Creditor under the Subordinating Creditor Agreements.



Document Ref: D8T57-6CDNO-8THTP-FDPIZ

## 2. PRIORITY.

2.1 Notwithstanding the terms or provisions of any agreement or arrangement which either Creditor may now or hereafter have with the Debtor or any rule of law, and irrespective of the time, order, or method of attachment or perfection of any security interest or the recordation or other filing in any public record of any financing statement, the Senior Creditor Obligations and any security interests in the Senior Creditor Collateral only now or hereafter held by the Senior Creditor, whether or not perfected, are and shall remain senior to:

2.1.1 The Subordinating Creditor Obligations as they relate to the Senior Creditor Collateral; and

2.1.2 Any lien or security interest therein now or hereafter held by the Subordinating Creditor in the Senior Creditor Collateral.

2.2 Notwithstanding the terms or provisions of any agreement or arrangement which either Creditor may now or hereafter have with the Debtor or any rule of law, and irrespective of the time, order, or method of attachment or perfection of any security interest or the recordation or other filing in any public record of any financing statement, the Subordinating Creditor Obligations and any security interests in the Subordinating Creditor Collateral only now or hereafter held by the Subordinating Creditor, whether or not perfected, are and shall remain senior to:

2.2.1 The Senior Creditor Obligations as they relate to the Subordinating Creditor Collateral; and

2.2.2 Any lien or security interest therein now or hereafter held by the Senior Creditor in the Subordinating Creditor Collateral.

## 3. ENFORCEMENT OF SECURITY INTEREST.

3.1 The Subordinating Creditor shall have no right to take any action with respect to the Senior Creditor Collateral, whether by judicial or non-judicial foreclosure, recordation or enforcement of mechanics liens, notification to the Debtor's Account Debtors, the seeking of the appointment of a receiver for any portion of the Debtor's assets other than the Subordinating Creditor Collateral, setoff, or otherwise, unless and until all Senior Creditor Obligations have been fully and indefeasibly paid.

3.2 The Senior Creditor shall have no right to take any action with respect to the Subordinating Creditor Collateral, whether by judicial or non-judicial foreclosure, recordation or enforcement of mechanics liens with respect to the Subordinating Creditor Collateral only, the seeking of the appointment of a receiver for any portion of the Debtor's assets other than the Senior Creditor Collateral, setoff, or otherwise, unless and until all Subordinating Creditor Obligations have been fully and indefeasibly paid.

3.3Notwithstanding the foregoing, the Creditors shall, subject to the Standstill Agreements (defined below) contained herein, retain all rights under the Senior Creditor Agreement and the Subordinating Creditor Agreement, as applicable, to foreclose upon or otherwise seek recovery from such Creditor's senior priority collateral and further pursue the Obligors for amounts due and owing thereunder.

3.4 If the Senior Creditor or Subordinating Creditor shall commence, prosecute, or participate in any suit, action, or proceeding against the Debtor or initiate any foreclosure sale or proceeding or any other action to enforce its lien on such Creditor's Secondary Collateral in contravention of the terms of this Agreement, then the Debtor may interpose as a defense or plead the making of this Agreement, and the non-breaching Creditor may intervene and interpose such defense or plea in its name or in the name of the Debtor.

3.5 If Senior Creditor, pursuant to the rights granted to the Senior Creditor under the terms of this Agreement or applicable law, shall dispose of any or all of the Senior Creditor Collateral such disposition shall be deemed commercially reasonable if, in the written opinion of three (3) commercial loan officers with three (3) or more years of workout experience each, the manner of the disposition is not inconsistent with the manner in which such commercial loan officers would have handled the disposition. If Subordinating Creditor, pursuant to the rights granted to the Subordinating Creditor under the terms of this Agreement or applicable law, shall dispose of any or all of the Subordinating Creditor Collateral such disposition shall be deemed commercially reasonable if, in the written opinion of three (3) commercial loan officers with three (3) or more years of workout experience each, the manner of the disposition is not inconsistent with the manner in which such commercial loan officers would have handled the disposition.

4. **PROCEEDS OF COLLATERAL.**

4.1 Any proceeds of the Senior Creditor Collateral, or proceeds of proceeds, received by Subordinating Creditor shall be, immediately upon discovery, paid to the Senior Creditor. Any proceeds of the Subordinating Creditor Collateral, or proceeds of proceeds, received by the Senior Creditor shall be, immediately upon discovery, paid to the Subordinating Creditor.

5. **CREDITOR COVENANTS AND WARRANTIES.**

5.1 The Creditors each warrants covenant and represent that it:

5.1.1 Is the owner of the respective Senior and Subordinating Creditor Obligations.

5.1.2 Is the Secured Party of record in each UCC Financing Statement listed on the attached Exhibit 5.1.2

5.1.3 Will not, at any time while this Agreement is in effect assign any of the Senior Creditor Obligations or Subordinating Creditor Obligations to any entity which does not agree in a writing, satisfactory in form and substance to the other Creditor, to be

bound by all of the obligations of the non-assigning Creditor hereunder. In the case of any such proposed assignment by the Subordinating Creditor, it will notify the non-assigning Creditor at least 10 days prior to the date of any such assignment.

5.1.4 Waives any rights it may have to claim that the enforceability of this Agreement may be affected by any subsequent modification, increase, release, extension, or other change, material or otherwise, in the Senior or Subordinating Creditor Obligations.

## 6. PERMITTED AND RESTRICTED PAYMENTS.

6.1Permitted and Restricted Payments. Notwithstanding the terms of the Subordinating Creditor Agreements, the Debtor hereby agrees that it shall not make (and will not permit any other Obligor to make), and the Subordinating Creditor agrees that it will not accept, any payment with respect to any of the Subordinating Creditor Obligations until the Senior Creditor Obligations are paid in full; provided, however, that so long as no Event of Default has occurred or is continuing under any Senior Creditor Agreement or would result from the making of any contemplated payment hereunder, Subordinating Creditor may accept from Debtor only regularly-scheduled payments of principal and interest under the Subordinating Creditor Loan Agreement (as such scheduled payments are currently in effect as of the Effective Date).

6.2 Notwithstanding the foregoing or anything to the contrary herein, Subordinating Creditor shall have the right at all times to make demands (on a non-accelerated basis in the event that the Subordinating Creditor has been notified in writing by Senior Creditor of any default or event of default under the Senior Creditor Agreements) or otherwise exercise rights under and in accordance with the terms of that certain Direction Letter Agreement dated on or about the date hereof among the Subordinating Creditor, the Debtor, Jeremy Roberts as guarantor ( "Guarantor"), and Senior Creditor (the "Direction Letter Agreement") and to file proofs of claim and exercise rights in respect of the Subordinating Creditor Collateral only consistent with the subordinated lien priority set forth herein during any bankruptcy or insolvency of the Debtor and to foreclose on or otherwise exercise remedies against the Subordinating Creditor Collateral following the expiration of a 90-day standstill period (the "Standstill Period") commencing on the date of delivery to Debtor, with a copy to Subordinating Creditor, by the Company of a notice of a payment default or event of default under the Senior Creditor Agreements.

## 7. REMEDY FOR BREACH.

7.1 Any breach hereof is likely to cause irreparable damage to the aggrieved party. Therefore, the relief to which such party shall be entitled in such event shall include, but not be limited to: (a) a mandatory injunction for specific performance, (b) judicial relief to prevent a violation of any of the provisions of this Agreement, (c) damages, and (d) any other relief to which it may be entitled at law or in equity.

8. **AMENDMENT OF CREDITOR AGREEMENTS.**

8.1 This Agreement shall be deemed an amendment to all present and future Senior Creditor Agreements and Subordinating Creditor Agreements, which cannot be further amended to affect the rights of Senior Creditor hereunder.

8.2 The consent of a Creditor shall not be required for any further amendment of the Creditor Agreements.

9. **EFFECT OF BANKRUPTCY.**

9.1 This Agreement shall remain in full force and effect notwithstanding the filing of a petition for relief by or against the Debtor under the Bankruptcy Code and, without limiting the foregoing shall apply with full force and effect with respect to all Senior Creditor Collateral acquired by the Debtor, and obligations incurred by the Debtor to the Senior Creditor, subsequent to the date of any such petition.

9.2 If the Debtor shall become subject to a proceeding under the Bankruptcy Code and if a Creditor shall permit the use of cash collateral or provides financing to Debtor under either Section 363 or Section 364 of the Bankruptcy Code:

9.2.1 Adequate notice to the other Creditor shall have been provided if the non-moving Creditor receives notice three business days prior to the entry of the appropriate order.

10. **NO DUTY TO PROVIDE FINANCIAL ACCOMMODATIONS.**

10.1 Nothing contained herein or in any prior agreement or understanding between the Creditors shall be deemed to create any duty on the part of either Creditor to extend or continue to extend financial accommodations to the Debtor.

11. **CHOICE OF LAW.**

11.1 This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

12. **AMENDMENT AND WAIVER.**

12.1 Only a writing signed by all parties hereto may amend this Agreement. No failure or delay in exercising any right hereunder shall impair any such right that a Creditor may have, nor shall any waiver by a Creditor hereunder be deemed a waiver of any default or breach subsequently occurring. Each Creditor's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that a Creditor would otherwise have.

## 13. **CONSTRUCTION OF AGREEMENT**

13.1 This Agreement and all agreements relating to the subject matter hereof is the product of negotiation and preparation by and among each Party and its respective attorneys. Therefore, the parties expressly acknowledge and agree that such agreements shall not be deemed prepared or drafted by one Party or other and shall be construed accordingly.

## 14. **BENEFITS OF THIS AGREEMENT.**

14.1 This Agreement is solely for the benefit of and shall bind the Creditors and their respective successors and assigns and no other entity shall have any right, benefit, priority, or interest hereunder. No fiduciary relationship is created between the Creditors by this Agreement.

14.2 In the event that a Creditor assigns its rights hereunder in connection with an assignment of either the Subordinating or Senior Creditor Obligations, the assignee ("Assignee") shall enjoy the benefits hereof, without any requirement of the consent of the non-assigning Creditor so long as the Assignee notifies the non-assigning Creditor:

14.2.1 Of such assignment, and

14.2.2 That the Assignee agrees to bound by the terms hereof as if it were a Creditor.

## 15. **TERM.**

15.1 The rights and obligations of the Creditors as set forth herein may only be terminated with the written consent of the Creditors.

15.2 A Creditor must consent to the termination of this subordination upon the occurrence of all of the following:

15.2.1 Payment in full of such Creditor's Obligations.

15.2.2 Termination of all security agreements which create Security Interests which secure such Creditor's Obligations.

15.2.3 Upon the occurrence of Sections 15.2.1 and 15.2.2, written receipt for a request for such consent is received by the applicable Creditor from the notifying Creditor.

## 16. **ATTORNEYS FEES.**

16.1 In the event that any Party finds it necessary to retain counsel in connection with the interpretation, defense, or enforcement of this agreement, the prevailing Party shall recover its reasonable attorney's fees and expenses from the unsuccessful Party. It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the

contrary) that the amount recoverable is the amount billed to the prevailing Party by its counsel and that such amount will be reasonable if based on the billing rates charged to the prevailing Party by its counsel in similar matters.

17. **COUNTERPARTS.**

17.1 This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any Party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other Party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other Party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

18. **NOTICE.**

18.1 All notices shall be effective upon: (a) the sending of an email to one of the email addresses below or (b) delivery to a recognized overnight delivery service of a properly addressed notice, delivery prepaid, with instructions to make delivery on the next business day. For purposes hereof, the addresses of the parties are as set forth below or as may otherwise be specified from time to time in writing sent by one party to the other in accordance with the provisions hereof:

**Subordinating Creditor**

Address: 1775 Tysons Blvd
FL 5
McLean, VA 22102_

Attention: McLean Wilson
Email: mwilson@breakoutfinance.com

**Debtor**

Address: 3900 Frontage Rd S.
Lakeland, FL 33815
Attention: Jeremy E. Roberts
Email: rober1je26@gmail.com

**Senior Creditor**

Address: 182 37th Ave N
St. Petersburg, FL 33704
Attn: Ryan Jaskiewicz
Email: ryan.jaskiewicz@climatefirstbank.com

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

Subordinating Creditor:

Breakout Capital, LLC

By: McLean Wilson

Name: McLean Wilson

Title: Authorized Signer

Debtor(s):

Great Southern Copackers LLC

By: Jeremy Roberts

Name: Jeremy E. Roberts

Title: Sole Member and Manager

Senior Creditor:

Climate First Bank

By: Ryan Jaskiewicz

Name: Ryan Jaskiewicz

Title: President of Structured Finance

## EXHIBIT 5.1.2

**Subordinating Creditor Filings:**

| FILING DATE | FILING NUMBER | FILING OFFICE JURISDICTION |
|---|---|---|
| 6.3.25 | 202501724648 | Florida Secretary of State |
| 6.3.25 | 202501724656 | Florida Secretary of State |
| 6.3.25 | 20253945893 | Delaware Secretary of State |
| 6.3.25 | 20253945919 | Delaware Secretary of State |

**Senior Creditor Filings:**

| FILING DATE | FILING NUMBER | FILING OFFICE JURISDICTION |
|---|---|---|
| 8.7.25 | 2025 5774655 | Delaware Secretary of State |
| 7.28.25 | 202503031321 | Florida Secretary of State |

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
D8T57-6CDNQ-6THTR-FDPIZ

DOCUMENT COMPLETED BY ALL PARTIES ON
07 OCT 2025 20:07:34
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| **JEREMY ROBERTS**<br>EMAIL<br>ROBER1JE26@GMAIL.COM | SENT<br>07 OCT 2025 14:08:18<br>VIEWED<br>07 OCT 2025 14:18:13<br>SIGNED<br>07 OCT 2025 14:18:27 | <br>IP ADDRESS<br>172.56.78.83<br>LOCATION<br>ORLANDO, UNITED STATES |
| **RECIPIENT VERIFICATION** | EMAIL VERIFIED<br>07 OCT 2025 14:18:13 | |
| **MCLEAN WILSON**<br>EMAIL<br>MWILSON@BREAKOUTFINANCE.COM | SENT<br>07 OCT 2025 14:08:18<br>VIEWED<br>07 OCT 2025 15:49:09<br>SIGNED<br>07 OCT 2025 15:50:16 | <br>IP ADDRESS<br>107.137.16.30<br>LOCATION<br>CHARLESTON, UNITED STATES |
| **RECIPIENT VERIFICATION** | EMAIL VERIFIED<br>07 OCT 2025 15:49:09 | |

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
D8T57-6CDNQ-6THTR-FDPIZ

DOCUMENT COMPLETED BY ALL PARTIES ON
07 OCT 2025 20:07:34
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| **RYAN JASKIEWICZ**<br>EMAIL<br>RYAN.JASKIEWICZ@CLIMATEFIRSTBANK.COM | SENT<br>07 OCT 2025 14:08:18<br>VIEWED<br>07 OCT 2025 20:07:20<br>SIGNED<br>07 OCT 2025 20:07:34 | Ryan Jaskiewicz<br>IP ADDRESS<br>174.192.70.250<br>LOCATION<br>SCHAUMBURG, UNITED STATES |

**RECIPIENT VERIFICATION**

EMAIL VERIFIED
07 OCT 2025 20:07:20

Date: October 7, 2025

Climate First Bank
1150 S Orlando Ave
Winter Park, FL 32789

Re: Direction Letter Agreement

Ladies and Gentlemen:

Brew Hub, LLC ("Brew"), a Delaware limited liability company, and Great Southern Copackers LLC ("Great Southern", and together with Brew, "we" or "us") are or may become indebted to Breakout Capital, LLC, a Delaware limited liability company ("Lender"), arising out of that certain Business Loan and Security Agreement entered into or contemplated to be entered into among us, Jeremy Roberts , as guarantor ("Guarantor"), and Lender (as may be amended, amended and restated, supplemented, assigned, refinanced by Lender or otherwise modified from time to time, the "Loan Agreement"), which indebtedness is or shall be secured by all or substantially all of the personal property of us. Each of We, Guarantor, Lender and Climate First Bank ("Factor") is referred to individually herein as a "Party" and collectively as the "Parties" and this letter agreement is hereby referred to as the "Direction Letter Agreement".

We contemplate entering into, or have entered into, an Accounts Receivable Purchasing Agreement of even of approximate date herewith with Factor (the "Accounts Receivable Purchase Agreement"), a true and complete copy of which (or, if not yet executed, the form of which) Lender represents having received from Factor. We, Guarantor and Factor hereby represent to Lender that such Accounts Receivable Purchase Agreement remains in full force and effect.

To induce the Lender to extend credit to us under the Loan Agreement, and to provide Lender with a method of payment of our obligations to Lender (the "Lender Obligations"), We and Guarantor hereby authorize and direct Factor to make payments as described herein to Lender and to be bound by the terms of this Direction Letter Agreement, including, without limitation, the terms set forth in paragraphs 1 through 7 below.

1. From time to time upon the occurrence and during the continuation of any Event of Default (as defined in the Loan Agreement), and solely in accordance with the limitations and procedures set forth herein, Lender shall be entitled to make one or more demands upon Factor relating to the Lender Obligations (each, a "Demand"), each substantially in the form of Exhibit A attached hereto; provided, however, that (i) Lender shall have no right to issue any Demand unless and until Lender has first delivered to Factor a Notice of Default (as defined below) and the applicable cure period has expired without full cure of the specified defaults; and (ii) in no event shall Lender issue more than four (4) Demands during any rolling twelve (12)-month period (the "Demand Frequency Limitation"), measured from the date of the first Demand issued in such period. For purposes hereof, a "Notice of Default" shall mean a written notice delivered by Lender to Factor (with a copy to us and Guarantor), substantially in the form of Exhibit B attached hereto, which shall (i) specify in reasonable detail each Event of Default that has occurred and is continuing under the Loan Agreement, including the nature and extent of such Event of Default; (ii) state the exact amount required to cure each such Event of Default (including any past-due regular payments, fees, interest, or other amounts, but expressly excluding any accelerated principal or other amounts that would not be due but for acceleration); (iii) provide a cure period of at least ten (10) business days from the date of receipt of such Notice of Default by Factor (the "Cure Period") during which we, Guarantor, Factor, or any other party may cure the specified defaults; and (iv) confirm that no acceleration of the Lender Obligations has occurred or will occur prior to the expiration of the Cure Period. Factor shall have no obligation to respond to or act upon any Notice of Default, but may, in its sole discretion, elect to cure or assist in curing any specified

defaults during the Cure Period. If, and only if, the specified defaults remain uncured in full at the expiration of the Cure Period, Lender may then issue a Demand to Factor, subject to the Demand Frequency Limitation. Notwithstanding anything to the contrary herein, no Demand shall be effective or enforceable if (a) it would violate the Demand Frequency Limitation (and any purported Demand in excess of such limit shall be null and void ab initio, with Factor having no obligation to honor it provided Factor notifies Lender of its rejection of the notice and the reason for such rejection), or (b) at the time of Factor's receipt of such Demand, an event of default has occurred and is continuing under the Accounts Receivable Purchase Agreement (a "Factor Default"), and Factor shall have the right to disregard any such Demand upon providing written notice to Lender of the existence of such Factor Default or violation of the Demand Frequency Limitation. Lender's delivery of a Notice of Default shall not be deemed a Factor Default under the Accounts Receivable Purchase Agreement notwithstanding any terms thereof.

2. Lender shall send a copy of each Notice of Default and each Demand to us and Guarantor concurrently or substantially concurrently with its sending such Notice of Default or Demand to Factor.

3. Factor shall have no duty to investigate any Notice of Default or Demand and shall honor a Demand that complies with the terms hereof, but only to the extent such Demand is expressly permitted hereunder and despite any contrary instructions Factor may receive from us or Guarantor; provided, however, that Factor shall have no obligation to honor any Demand that does not strictly comply with the form and substance requirements set forth in Exhibit A or that violates any limitation herein, including the Amount Limitation (as defined below) or the Demand Frequency Limitation.

4. Upon and following receipt of a valid and effective Demand in accordance with the terms hereof: (a) Factor shall remit to Lender amounts that would otherwise be payable to us under or pursuant to the Accounts Receivable Purchase Agreement, subject to the limitations herein; and (b) Factor shall withhold up to the full remaining unsatisfied amount of such Demand (subject to the Amount Limitation) from any payment for the purchase of any account receivable or proceeds thereof or any advance secured by any account receivable or proceeds thereof or any other amount otherwise payable to us under or pursuant to the Accounts Receivable Purchase Agreement, and shall pay Lender the amount so withheld, in each case until Factor has paid Lender an aggregate amount in respect of such Demand equal to the full amount set forth in such Demand (but not exceeding the Amount Limitation). Notwithstanding the foregoing, in no event shall any Demand or payments thereunder exceed an aggregate amount equal to the past-due regular payments (including scheduled principal, interest, and fees, but expressly excluding any balloon payment of principal due at maturity, accelerated principal, prepayment penalties, or other amounts that would not be due but for an acceleration ) under the Loan Agreement for the immediately preceding two (2) months (the "Amount Limitation"). Any payment by Factor to Lender pursuant to this paragraph 4 shall be deemed to constitute a payment to us under the Accounts Receivable Purchase Agreement satisfying such payment obligation to us thereunder, including with respect to any payments that may be made to Lender in excess of any Amount Limitation or Demand Frequency Limitation.

5. Factor shall have no liability or obligation to make payment on any date pursuant to a particular Demand (i) to the extent that on such date no payments or advances, as applicable, are due to us pursuant to the Accounts Receivable Purchase Agreement; (ii) to the extent that such Demand is not substantially in the form of Exhibit A attached hereto or does not comply with the requirements of this Direction Letter Agreement, including the prior delivery of a Notice of Default, expiration of the Cure Period without cure, absence of a Factor Default, adherence to the Amount Limitation, and compliance with the Demand Frequency Limitation; or (iii) if such Demand would require Factor to pay any amounts in violation of the Accounts Receivable Purchase Agreement or applicable law.

6. We and Guarantor jointly and severally hereby agree to pay, indemnify and hold each of Factor and its successors and assigns hereunder and their respective directors, officers, employees and agents

(collectively, the "Factor Indemnitees") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including reasonable attorney's fees and expenses) arising out of, relating to or resulting from (i) any payments made to Lender hereunder (including payments made in excess of the Amount Limitation or Demand Frequency or in violation of any other limitation), (ii) disputes arising in connection with this Direction Letter Agreement; (ii) any Notice of Default, Demand, or redirection hereunder; (iii) any misrepresentation, inaccuracy, or non-compliance by Lender in any Notice of Default or Demand; or (iv) any actions or omissions by Lender, us, or Guarantor. Lender agrees to pay, indemnify and hold each of the Factor Indemnitees harmless from and against any and all claims, actions, proceedings and suits brought by any third parties and any and all expenses (including reasonable attorneys' fees and expenses) arising therefrom, in each case to the extent caused by or arising from (i) any payments or remittances to Lender hereunder (including payments made in excess of the Amount Limitation or Demand Frequency or in violation of any other limitation), (ii) misrepresentation or inaccuracy in any Notice of Default or Demand made by Lender, or (iii) disputes arising in connection with this Direction Letter Agreement. The indemnities set forth in this paragraph 6 shall survive the termination of this Direction Letter Agreement and shall be enforceable regardless of any investigation made by the indemnified party.

7. Factor shall make all payments pursuant to this Direction Letter Agreement to Lender as follows:

By ACH/EFT:

Breakout Capital, LLC
FBO: Great Southern Copackers
CIBC Bank USA
Routing # (ach): 071006486
Account #: 2765780

By Wire Transfer:
Breakout Capital, LLC
FBO: Great Southern Copackers
CIBC Bank USA
Routing # (wires): 071006486
Account #: 2765780

By Check:
Breakout Capital, LLC
FBO: Great Southern Copackers
1451 Dolley Madison Blvd., Suite 200
McLean, VA 22101

Waiver, Release and Acknowledgment. We and Guarantor, jointly and severally, hereby irrevocably and unconditionally waive, release, acquit, and forever discharge Factor and the Factor Indemnitees from any and all manner of claims, demands, actions, causes of action, suits, counterclaims, defenses, rights of set-off, liabilities, obligations, losses, damages, costs, expenses (including, without limitation, reasonable attorneys' fees and expenses), judgments, penalties, or proceedings of any kind or nature whatsoever, whether at law or in equity, known or unknown, foreseen or unforeseen, liquidated or unliquidated, suspected or unsuspected, which We or Guarantor ever had, now have, or might hereafter have against Factor or any Factor Indemnitee, arising out of, relating to, or in connection with any payments, withholdings, or remittances made by Factor to Lender pursuant to this Direction Letter Agreement or otherwise in connection with any Demand or redirection hereunder, including, without limitation, any such payments, withholdings, or remittances that exceed the Amount Limitation, violate the Demand Frequency

Limitation, or contravene any other limitations, conditions, or requirements set forth in this Direction Letter Agreement (whether due to error, oversight, misrepresentation, or otherwise). This waiver and release is intended to be as broad as possible under applicable law and shall include, without limitation, any claims based on contract, tort, negligence, strict liability, breach of fiduciary duty, fraud, misrepresentation, or any other legal or equitable theory. We and Guarantor further acknowledge and agree that any and all such payments, withholdings, or remittances by Factor to Lender shall be deemed to constitute payments made directly to us and for our sole benefit, as if such amounts had been paid or advanced directly to us under the Accounts Receivable Purchase Agreement, and shall fully satisfy and discharge any corresponding obligations of Factor thereunder, regardless of whether such amounts exceed any limitations herein, were made in error, or would otherwise not have been payable to us. We and Guarantor shall have no right to reclaim, recover, dispute, or seek reimbursement, refund, or credit from Factor for any such amounts, and covenant not to assert any such claim or initiate any proceeding against Factor or any Factor Indemnitee in respect thereof. This paragraph 8 shall survive the termination or expiration of this Direction Letter Agreement and shall be binding on We, Guarantor, and their respective successors, assigns, heirs, and representatives.

Each of the Parties hereto hereby agrees that all Notices of Default, Demands and other notices hereunder may be delivered electronically to the email address for notice set forth in the signature pages hereto, in addition to by overnight courier or any form of USPS mail, whether registered, certified, priority or regular to the address set forth in the signature pages hereto.

The Parties hereby agree that for purposes of the Loan Agreement, Lender hereby consents to our sale of receivables to Factor, and to our grant of security interests to Factor, pursuant to and in accordance with the Accounts Receivable Purchase Agreement.

The Parties hereby further agree that for purposes of the Accounts Receivable Purchase Agreement and any document executed or delivered in connection therewith (collectively, the "ARPA Documentation"), our incurrence of indebtedness and liens in favor of Lender pursuant to and in accordance with the Loan Agreement, and our execution, delivery and performance of this Direction Letter Agreement and such Loan Agreement, shall not in any case constitute a default or event of default or mandatory prepayment event under the ARPA Documentation.

The Parties agree that this Direction Letter Agreement (i) shall be binding on the Parties and their respective successors and assigns, (ii) is irrevocable and may not be terminated or modified, except as otherwise expressly consented to in writing by all of the Parties, and (iii) may not be waived except in advance in writing expressly waiving the applicable right by the Party entitled to the benefit thereof.

This Direction Letter Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its choice of laws principles that would apply the law of any other jurisdiction. The Parties hereby agree that any legal action or proceeding arising out of or relating to this Direction Letter Agreement shall be subject to the exclusive jurisdiction of federal and state courts sitting in the County of Pinellas, Florida. Each Party hereby waives, to the fullest extent permitted by law, any objection that it may now or later have to the laying of venue as provided herein and any claim that any action or proceeding brought in any such court has been brought in an inconvenient forum.

EACH PARTY, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF, UNDER OR RELATING TO THIS DIRECTION LETTER AGREEMENT.

The Parties agree that each of them fully participated in, and was adequately represented by (or had full opportunity to be represented by) counsel in the negotiation and preparation of, this Direction Letter Agreement. In the event of any ambiguity or other necessity for interpretation of this Direction Letter Agreement, this Direction Letter Agreement shall not be construed in favor of or against any Party as a consequence of any other Party having had a greater role in the preparation of this Direction Letter Agreement.

If any term in this Direction Letter Agreement is found to be illegal, invalid or unenforceable by any competent authority, such provision shall be deleted from this Direction Letter Agreement and the remaining provisions of this Direction Letter Agreement shall continue to have full force and effect.

Facsimile signatures hereon, or other electronic means reflecting the Party's signature hereto, shall be deemed acceptable for all purposes. This Direction Letter Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument. Execution and delivery of this Direction Letter Agreement by exchange of facsimile or other electronically transmitted counterparts bearing the signature of a Party shall be equally as effective as delivery of a manually executed counterpart by a Party.

Very truly yours,

Great Southern Copackers LLC

By: Jeremy Roberts

Name: Jeremy Roberts

Title: Sole Member + Manager

Address for notices and Demands:

3900 Frontage Rd., Lakeland, FL 33815
Email: roberlje26@gmail.com

Brew Hub, LLC

By: Jeremy Roberts

Name: Jeremy Roberts

Address for notices and Demands:

3900 Frontage Rd., Lakeland, FL 33815
Email: roberlje26@gmail.com

ACCEPTED AND AGREED TO:

Climate First Bank

By: Ryan Jaskiewicz

Name: Ryan Jaskiewicz

Title: President of Structured Finance

Address for notices and Demands:

182 37th Ave N, St. Petersburg, FL 33704
Email: ryan.jaskiewicz@climatefirstbank.com

ACCEPTED AND AGREED TO:

BREAKOUT CAPITAL, LLC

By: McLean Wilson

Name: McLean Wilson

Title: Authorized Signor

Address for notices and Demands:

1451 Dolley Madison Blvd. Suite 200

McLean, VA 22101

mwilson@breakoutfinance.com

EXHIBIT A

FORM OF DEMAND

Date:

[Insert Factor name and address]

Re: Demand

Ladies and Gentlemen:

This letter constitutes a Demand, as defined in and pursuant to that certain Direction Letter Agreement dated _______, _____ (the "Direction Letter Agreement") among Climate First Bank, Breakout Capital, LLC, [merchant] ("Debtor") and [guarantor] as guarantor.

A Notice of Default was delivered on [insert date], specifying the Events of Default and cure amounts, and the Cure Period has expired without full cure. No Factor Default exists as of the date hereof. This Demand complies with the Demand Frequency Limitation. Debtor owes us $_________ in past-due regular payments (excluding any accelerated principal or non-regular amounts) . Please pay this amount (not to exceed the Amount Limitation) to us out of funds otherwise payable, or otherwise to be advanced, by you to the Debtor under the Accounts Receivable Purchase Agreement (as defined in the Direction Letter Agreement) as provided in the Direction Letter Agreement.

Thank you.

Very truly yours,

BREAKOUT CAPITAL, LLC

By:

Name:

Title:

EXHIBIT B

FORM OF NOTICE OF DEFAULT

Date:

[Insert Factor name and address]

Re: Notice of Default

Ladies and Gentlemen:

This letter constitutes a Notice of Default, as defined in and pursuant to that certain Direction Letter Agreement dated _______, _____ (the "Direction Letter Agreement") among Climate First Bank, Breakout Capital, LLC, [merchant] ("Debtor") and [guarantor] as guarantor.

The following Events of Default have occurred and are continuing under the Loan Agreement: [specify in reasonable detail each Event of Default, including nature and extent]. The exact amount required to cure each such Event of Default is as follows: [itemize amounts, limited to past-due regular payments, fees, interest, etc., excluding accelerated principal]. The Cure Period shall be ten (10) business days from your receipt hereof. No acceleration of the Lender Obligations has occurred or will occur prior to the expiration of the Cure Period.

Thank you.

Very truly yours,

BREAKOUT CAPITAL, LLC

By:

Name:

Title:

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
D8T57-6CDNQ-6THTR-FDPIZ

DOCUMENT COMPLETED BY ALL PARTIES ON
07 OCT 2025 20:07:34
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| **JEREMY ROBERTS**<br>EMAIL<br>ROBER1JE26@GMAIL.COM | SENT<br>07 OCT 2025 14:08:18<br>VIEWED<br>07 OCT 2025 14:18:13<br>SIGNED<br>07 OCT 2025 14:18:27 | *Jeremy Roberts*<br>IP ADDRESS<br>172.56.78.83<br>LOCATION<br>ORLANDO, UNITED STATES |
| **RECIPIENT VERIFICATION** | EMAIL VERIFIED<br>07 OCT 2025 14:18:13 | |
| **MCLEAN WILSON**<br>EMAIL<br>MWILSON@BREAKOUTFINANCE.COM | SENT<br>07 OCT 2025 14:08:18<br>VIEWED<br>07 OCT 2025 15:49:09<br>SIGNED<br>07 OCT 2025 15:50:16 | *McLean Wilson*<br>IP ADDRESS<br>107.137.16.30<br>LOCATION<br>CHARLESTON, UNITED STATES |
| **RECIPIENT VERIFICATION** | EMAIL VERIFIED<br>07 OCT 2025 15:49:09 | |

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
D8T57-6CDNQ-6THTR-FDPIZ

DOCUMENT COMPLETED BY ALL PARTIES ON
07 OCT 2025 20:07:34
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| **RYAN JASKIEWICZ**<br>EMAIL<br>RYAN.JASKIEWICZ@CLIMATEFIRSTBANK.COM | SENT<br>07 OCT 2025 14:08:18<br>VIEWED<br>07 OCT 2025 20:07:20<br>SIGNED<br>07 OCT 2025 20:07:34 | Ryan Jaskiewicz<br>IP ADDRESS<br>174.192.70.250<br>LOCATION<br>SCHAUMBURG, UNITED STATES |

**RECIPIENT VERIFICATION**

EMAIL VERIFIED
07 OCT 2025 20:07:20

# EXHIBIT 7



# Great Southern Copackers, LLC

| | |
|---|---|
| PREPARED FOR | Climate First Bank |
| MACHINERY AND EQUIPMENT APPRAISAL | Net Orderly, Forced, Fair Market Value |
| EFFECTIVE DATE | July 23, 2025 |
| ISSUE DATE | August 22, 2025 |
| APPRAISER | Bryan Seeley |
| ANALYST | Aaron Yagel |
| REPORT EDITOR | Genevieve Whitbourne |
| REVIEWER | Matthew Robison |

TIGER

ASSET INTELLIGENT

# Executive Summary

**Client:** Climate First Bank
**Company:** Great Southern Copackers, LLC
**Assets Appraised:** Machinery and Equipment
**Effective Date:** July 23, 2025

**Eric Schloemer**
Director of Business Development
(617) 523-7055
ESchloemer@TigerGroup.com

**Bryan Seeley**
Director, Machinery and Equipment
(212) 315-5275
BSeeley@TigerGroup.com

## Appraisal Facts

| | |
|---|---|
| Company Name | Great Southern Copackers, LLC |
| Industry | Beverage Manufacturing |
| Corporate Office | 3900 Frontage Road South<br>Lakeland, FL 33815 |

## Value Summary

| Value Summary | Orderly Liquidation Value | Forced Liquidation Value |
|---|---|---|
| Gross Liquidation Value | $3,231,050 | $2,586,650 |
| Liquidation Expenses | 582,300 | 233,800 |
| Net Liquidation Value | $2,648,750 | $2,352,850 |
| Sale Term | 5 Months | 3 Months |

## Value by Asset Class

| Asset Classification | Orderly Liquidation Value | Forced Liquidation Value |
|---|---|---|
| Gross Liquidation Value | | |
| Production Equipment | $2,702,000 | $2,171,250 |
| Support Equipment | 529,050 | 415,400 |
| Total: Gross Liquidation Value | $3,231,050 | $2,586,650 |
| Liquidation Expenses | 582,300 | 233,800 |
| Net Liquidation Value | $2,648,750 | $2,352,850 |

## Collateral Snapshot

Great Southern Copackers, LLC is a manufacturer and packager of beverages, including beer, wine, spirits, juice, and energy drinks. The Company's machinery and equipment assets consist of production machinery and support equipment.

## Key Valuation Considerations

**Production Machinery –** The Company's production machinery includes fermentation, blending, and storage tanks; a brewhouse; a pasteurization system; keg, bottle, and can filling lines; and packaging equipment (collectively accounting for about 84% of gross values). The key factors that impact value are the age, condition, and state of the market. Most of the equipment ranges in model year from 2010 to 2022 and is in average to good condition. The secondary market for beverage production and packaging equipment has softened during the past several years; there have been many liquidations in the beverage industry, which has led to a significant rise in the quantity of equipment available on the secondary market. As the quantity of equipment increased, sale prices decreased.

**Support Equipment –** The Company has assets that can be found in many manufacturing facilities, such as compressed air equipment, chilled water and boiler equipment, stretch wrappers, and lift trucks (collectively accounting for about 16% of gross values). In a sale, there would be a wide market for these assets.

# Table of Contents


Scope of Work ..... 2
Company Overview ..... 3
Summary of Values ..... 4
  Asset Overview ..... 4
Value Conclusions ..... 5
  Projected Liquidation Values by Asset Class ..... 5
  Sale Assumptions ..... 6
  Sale Costs ..... 6
  Approaches to Value ..... 7
  Value Definitions ..... 7
  Current Appraisal Assumptions ..... 7
  Appraisal Process ..... 7
Statement of Limitations ..... 8
Appraisal Certification ..... 9
Engagement Letter ..... 10


## List of Exhibits


A – Projected Liquidation Expenses

B – Machinery and Equipment Values

C – Photographs

D – Appraiser’s Qualifications

## Scope of Work

### Client / Company

Tiger Valuation Services, LLC ("Tiger") has been retained by Scott Frederick of Climate First Bank ("Climate First" or the "Lender") to provide a Net Orderly Liquidation Value ("NOLV") and Net Forced Liquidation Value ("NFLV") for the assets owned by Great Southern Copackers, LLC ("Great Southern" or the "Company"). Tiger recognizes that this appraisal will be used for asset-based lending purposes by the Lender.

### Appraisal Development

Tiger prepared a schedule of all eligible items, which included a comprehensive description as well as make, model, serial number, and age of all major items where available.

### Field Inspection

Tiger conducted a field inspection at the Company's facility in Lakeland, FL. Tiger appraisers inspected all major machinery and equipment items and performed a cursory inspection of all minor items. Photographs have been included to document the subject machinery and equipment.

### Basis of Orderly Sale

Tiger has assumed that the orderly liquidation of eligible assets would be conducted on a non-guaranteed commission basis, with the liquidator's fee assumed to be 7% of the total gross orderly liquidation value. If the liquidator were to provide an equity bid guarantee for the assets, the net recovery values would likely be lower than those presented in this appraisal, since the liquidator would be assuming more of the risks associated with the sale. In addition, if the assets were to be sold in a forced scenario, the values would be lower compared to what is presented in this report.

### Basis of Forced Sale

Tiger has assumed that the forced liquidation of eligible assets would be conducted on a non-guaranteed commission basis; Tiger has assumed that the liquidator's agent would be compensated with a buyer's premium, which Tiger has not included in the revenue or expenses of this report.

If the liquidator were to provide an equity bid guarantee for the assets, the net recovery values would likely be lower than those presented in this appraisal, since the liquidator would be assuming more of the risks associated with the sale.

### Timing

The valuation is effective as of July 23, 2025, the date that Tiger personnel completed inspections.

### Eligible Assets

The Company reported all major assets as owned.

### Confidentiality

The contents of this appraisal and valuation are confidential and for the use of the Lender only and shall not be transmitted to any third party without the express written consent of Tiger.

## Company Overview

Founded in 2012, Great Southern Copackers, LLC is a manufacturer and packager of beverages. The Company brews its own beer and also produces and packages various beverages for third parties.

Great Southern brews various types of beer, including Goon Squad, a hazy Imperial IPA; Rome City, a citrus American IPA; and Citrus City, a session IPA with lemon, lime, orange, and grapefruit. The Company has a tasting room at its Lakeland facility, which is open Wednesday through Sunday.

The Company produces a wide assortment of beverages for third parties, including beer, wine, spirits, cider, and energy drinks. The Company packages beverages in bottles and cans and offers other packaging options upon request. The Company's customers include Disney, Rosen Hotels & Resorts, World of Beer, Epcot, and Carnival Cruise Lines.

| Lakeland, FL | |
|---|---|
| **Facility Overview** | |
| Date of Visit | July 22, 2025 through July 23, 2025 |
| Address | 3900 Frontage Road South, Lakeland, FL 33815 |
| Primary Functions | Manufacturing, warehouse, and offices |
| Number of Buildings | Two |
| Square Footage | 70,000 square feet |

**Photos**




Satellite view of facility




Exterior view of the facility

## Summary of Values

Tiger presented a Net Orderly Liquidatoin Value and a Net Forced Liquidation Value, the definitions of which are provided below.

**Net Orderly Liquidation Value (NOLV)** is defined as the net proceeds in terms of money that could be expected from a properly advertised and conducted orderly liquidation sale of the items appraised. It presumes that the facilities are not in operation and the seller is under compulsion to sell. The items would be disposed of individually or through appropriate lots, under which scenario the purchaser(s) is (are) buying as-is, where-is, for cash or cash equivalent and is (are) responsible for removal of the items purchased. The Net Orderly Liquidation Value takes into consideration current economic trends, condition, location, difficulty of removal, and marketability. The value expressed will also take into consideration the expenses associated with conducting the sale.

**Net Forced Liquidation Value (NFLV)** is defined as an opinion of the net amount, expressed in terms of money, that typically could be realized from a properly advertised and conducted public auction, with the seller being compelled to sell with a sense of immediacy on an as-is, where-is basis. In this case, it is assumed that the buyer considered the risk and costs associated with dismantling and removal in the price paid. The value conclusions further take into consideration location, difficulty of removal, condition, adaptability, specialization, marketability, overall appearance, and psychological appeal. Further, the ability of the asset group to draw sufficient prospective buyers to ensure competitive offers at an auction sale is considered. The value expressed will also take into consideration the expenses associated with conducting the sale.

### Asset Overview

The critical influences that strongly affect the value of the Company's assets are as follows:

- State of the market
- Composition of the equipment
- Asset condition

#### State of the Market

The secondary market for beverage equipment has softened. There have been numerous liquidations of companies in the beverage industry, which has led to a significant rise in the quantity of equipment available on the secondary market. At the same time, demand for beverage equipment has decreased, due in part to a decline in the craft beer industry.

#### Composition of the Equipment

The Company's machinery consists of production machinery and support equipment. The key factors that impact the value of the Company's assets are outlined below. These factors include, but are not limited to, age, level of technology, and original equipment manufacturer.

*Production Machinery*

The Company's beer production machinery includes stainless steel fermentation, blending, and storage tanks; a brewhouse; a pasteurization system; keg, bottle, and can filling lines; and packaging equipment. The assets are from various manufacturers, such as NSI Newlands, Mueller, GC Evans, and Unipak.

The Company's brewhouse is specific to producing beer, while the other equipment can be used by operators throughout the beverage production industry. The key factors that impact value are the state of the market, age, and condition. Most of the equipment ranges in model year from 2010 to 2022 and is in average to good condition. However, the secondary market for beverage production and packaging equipment has softened during the past several years; there have been many liquidations of companies in the beverage industry, which has led to a significant rise in the quantity of equipment available on the secondary market. As the quantity of equipment increased, sale prices decreased.

*Support Equipment*

The Company has assets that can be found in many manufacturing facilities, such as compressed air equipment, chilled water and boiler equipment, stretch wrappers, and lift trucks. In a sale, there would be a wide market for these assets.

#### Asset Condition

Tiger analyzed the appearance of assets during the site visit, as the appearance of equipment at the time of sale can positively or negatively impact value. The condition of assets is displayed on the chart below.

| Asset Condition | Orderly Liquidation Value | | Forced Liquidation Value | |
|---|---|---|---|---|
| | $ | % of Total | $ | % of Total |
| Good (G) | $2,703,600 | 83.7% | $2,175,400 | 84.1% |
| Average (A) | 527,450 | 16.3% | 411,250 | 15.9% |
| Gross Liquidation Value | $3,231,050 | 100.0% | $2,586,650 | 100.0% |

Tiger noted the condition of each asset in the exhibits of this report. The detailed definition of each asset condition is provided below:

**Good (G) –** Item is not new but appears to be fully operational and to have a "clean" appearance, free of any defects; it does not seem to require repairs or modifications.

**Average (A) –** Item shows typical physical wear and tear for its age but appears to be fully operational.

# Value Conclusions

## Projected Liquidation Values by Asset Class

The chart below displays the Net Orderly Liquidation Value and Net Forced Liquidation Value for the Company's equipment by asset class.

| Asset Classification | Orderly Liquidation Value | | Forced Liquidation Value | |
|---|---|---|---|---|
| | $ | % of Total | $ | % of Total |
| Gross Liquidation Value | | | | |
| Production Equipment | $2,702,000 | 83.6% | $2,171,250 | 83.9% |
| Support Equipment | 529,050 | 16.4% | 415,400 | 16.1% |
| Total: Gross Liquidation Value | $3,231,050 | 100.0% | $2,586,650 | 100.0% |
| Liquidation Expenses | 582,300 | N/A | 233,800 | N/A |
| Net Liquidation Value | $2,648,750 | N/A | $2,352,850 | N/A |

## Recovery Strategy

Tiger has assumed the following recovery strategies and timeframes for the liquidation of the assets:

- Net Orderly Liquidation Value – Five months
- Net Forced Liquidation Value – Three months

Tiger has assumed the use of a qualified asset liquidation specialist to manage the sale of the assets and provide the following services:

- Prepare the assets
- Clean and organize the facility
- Market the assets for sale
- Provide a dedicated liquidation supervisor to oversee the sale process
- Facilitate collections and oversee equipment removal

### Sale Assumptions

Facilitating a liquidation requires the liquidator's unrestricted access to enter and use the Company's premises for the purpose of preparing the items for sale and conducting the sale.

The estimated timeframe assumes that the sale would take place immediately, and that access would be unimpeded from the date of the initiation of the sale. Were there to be a delay in the availability for any reason, including unresolved legal issues, overdue payments to landlords or municipalities, or other unknown logistical problems, the time period, and thus the expense of the sale, would be impacted.

### Sale Costs

Tiger has prepared a budget that reflects the cost to conduct a sale of the assets. The estimated cost to conduct this sale presumes that the machinery and equipment would be sold independently of any other asset group, such as inventory or real property.

Tiger has assumed that the sale would be conducted on a non-guaranteed basis. Tiger has assumed that the liquidator's agent would be compensated with a liquidator's fee. Based on the makeup and quantity of assets, Tiger assumed a fee of 7% of the total gross orderly liquidation value. In the event of an orderly liquidation, an additional buyer's premium may be charged to the purchasers; Tiger has not included the buyer's premium in the revenue or the expenses of this report.

Tiger has further assumed that, in the event of a forced liquidation sale, the liquidator's agent would be compensated with a buyer's premium. Tiger has not included the buyer's premium in the revenue or in the expenses of this report.

Tiger's projected expense schedule can be found in Exhibit A, and includes:

- Rent/Mortgage
  (provided by the Company)
- Utilities/Insurance/Other Occupancy
  (provided by the Company)
- Labor to prepare assets and implement a liquidation or auction sale
- Advertising to promote the sale
- Travel, security, supplies, and support costs

## Approaches to Value

Tiger follows the Uniform Standards of Professional Appraisal Practice's ("USPAP") guidelines, which require appraisers to address and consider the three approaches to value: the sales comparison (market) approach, the cost approach, and the income approach. The appraiser will utilize the approaches to value in varying degrees based upon the nature of assets under appraisement, the purpose and scope of the appraisal, and the judgment of the appraiser and how they relate to the assignment at hand.

## Value Definitions

The definition of each value approach is provided below.

- Sales Comparison (Market) Approach – The appraiser considers sale prices of similar equipment, adjusting price based on differences between the assets being appraised and the comparable assets, such as model year and manufacturer.
- Cost Approach – The appraiser adjusts the replacement cost (new) of the item being appraised for the loss in value caused by physical deterioration, functional obsolescence, and economic obsolescence. The cost approach is based on the principle of substitution: A prudent buyer will not pay more for an item than the cost of acquiring a substitute property of equivalent utility.
- Income Approach – The appraiser determines the present value of the future economic benefits of owning the property.

## Current Appraisal Assumptions

For the purposes of this report, Tiger has relied primarily upon the market approach, and to a lesser extent the cost approach, in establishing its values.

The income approach was considered; however, it was not applied in this report. The income approach cannot be properly applied without the benefit of a detailed financial analysis, which is beyond the scope of this report.

## Appraisal Process

Assigning values to assets requires not only the judgment and ability of the appraiser to evaluate a specific item, but also the experience to anticipate what could happen under a given set of circumstances based upon actual sales of like or similar equipment, with adjustments made for the following information when available:

- Age, manufacturer, model, characteristics, size, and capabilities of the subject assets
- Accessories, optional features, or modifications to the subject assets
- Subject assets' appearance and maintenance programs, inclusive of periodic upgrades and refurbishment
- Availability of comparable new and used items in the marketplace
- Quantity, mix, and composition of the assets in their entirety
- Current market demand and conditions
- Technological, functional, and/or economic obsolescence of the subject assets
- Consideration of the highest and best use of the subject assets

## Statement of Limitations

This Report is subject to specific assumptions and limiting conditions as noted throughout this Report and in the list below. The use and interpretation of this Report without a thorough appreciation and understanding of these assumptions and limiting conditions would likely lead to erroneous conclusions.

- This Report dated August 22, 2025, constitutes Tiger Valuation's entire Report and should be read in its entirety. The Report does not purport to express an all-inclusive list of all of the considerations undertaken in order to arrive at Tiger Valuation's opinion of value.
- Tiger Valuation completed its analysis and research on August 21, 2025, and the value expressed reflects information received to that date. Subsequent changes, including changes in the market; changes in the composition, location, or condition of assets; and force majeure, including without limitation earthquake, riot, fire, war, epidemic, terrorism, Acts of God, and other unforeseen and uncontrollable events, which could have a significant effect on the projected values, have not been considered.
- Tiger Valuation, its officers and employees have no interest or contemplated future interest in the items appraised. The fee for this Report is not contingent upon the value expressed nor is any guarantee or liability to be assumed or implied.
- This Report and the conclusions arrived at herein are for the exclusive use of the Client. The conclusions reached herein represent the considered opinion of Tiger Valuation based upon information obtained from various sources, and should not be considered investment or legal advice. The appraiser(s) assumes no liability or responsibilities for changes in the marketplace or in technology, which may in some way, alter or change the stated values.
- Public information and industry and statistical information have been obtained from sources Tiger Valuation assumes to be reliable; however, Tiger Valuation makes no representation as to the accuracy or completeness of such information and have accepted the information without further verification.
- This Report is of a confidential nature and should not be disseminated or reproduced in any manner without the prior written consent of Tiger Valuation. Tiger Valuation will retain all records pertaining to the Report in its files for a period of time, and maintain these in a confidential manner, subject only to legal administrative processes or proceedings.
- Tiger Valuation reserves the right to recall or amend this Report to correct any omission or error.
- This Report is subject to the Uniform Standards of Professional Appraisal Practice ("USPAP") as promulgated by the Appraisal Standards Board of The Appraisal Foundation.
- Unless noted otherwise, Tiger Valuation shall not be required to give further substantive consultation or be required to give testimony as an expert witness in any legal hearing or before any court of law unless advance arrangements have been made with the appraiser at an additional fee.
- The prior sale of any significant portion of the appraised items could have an effect on the value of the remaining items.
- Electrical distribution, transformers, lines, light fixtures, air, water, or gas distributing systems, which would be considered standard building fixtures that alterations to or removal of may not be reasonable under standard conditions, are not part of this Report.
- This Report does not contemplate any unknown or latent defect associated with the items appraised. Tiger Valuation assumes that all items in use or installed for operation are operating to manufacturer specifications, as well as safety and regulatory guidelines. The physical inspection of the items was conducted by visual means only. Unless otherwise noted, and if applicable, Tiger Valuation has accepted the Company's statements as to the physical attributes and operating capacities of the items without further verification or testing.
- Unless otherwise noted, Tiger Valuation has made no investigation of and assumes no responsibility for title to the items appraised. The sale of any of the items appraised is made without the benefit of warranties and/or return privileges that are normally available with an ongoing business. Furthermore, Tiger Valuation's Report is based on the premise that there are no existing contractual agreements, restrictions, obligations, or other items of a similar nature that would preclude the sale of the items, as defined in this Report.
- This Report ***DOES NOT*** attribute value to general intangibles and/or intellectual properties. This includes, but is not limited to: patents, royalties, license agreements, contractual relationships, trademarks, trade names, customer lists, product lines and related tooling, software, engineering and design records, etc.
- Environmental considerations from any source go beyond the scope of this Report. Tiger Valuation recommends this matter be addressed by a qualified environmental specialist. For the purpose of this Report, Tiger Valuation assumes that all items are environmentally clean and safe for transport. The valuation does not consider costs of decontamination.
- Tiger Valuation has not taken into consideration costs for removal of any unsold items or "broom cleaning" of the facility. Tiger Valuation assumes that, in the event of a sale, there would not be extraordinary problems involved in the removal of the items by a purchaser(s).
- Leasehold improvements have not been taken into consideration unless specifically noted in the appraisal Report.

## Appraisal Certification

We certify that, to the best of our knowledge and belief:

The statements of fact contained in this Report are true or correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is Tiger's impartial and unbiased professional analyses, opinions, and conclusions.

We have no present or prospective interest in the property that is the subject of this Report, and we have no personal interest with respect to the parties involved.

We have no bias with respect to any property that is the subject of this Report or to the parties involved.

Our compensation for completing this assignment is not contingent upon reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result or the occurrence of a subsequent event directly related to the intended use of this Report.

Our analyses, opinions, and conclusions were developed, and this Report has been prepared, in conformity with USPAP.

Terry Paddack inspected the equipment.

Harry Davis provided significant professional assistance to the person(s) signing this Report.

Dated: August 22, 2025

| *Appraised by:* | *Reviewed by:* |
| --- | --- |
| Bryan Seeley | Matthew Robison, ASA |

## Engagement Letter

TIGER

July 15, 2025

Scott Frederick
VP Business Development
Climate First Bank
scott.frederick@climatefirstbank.com

**RE: Brew Hub Machinery & Equipment Appraisal**

Dear Scott:

This letter will set forth a proposal by Tiger Valuation Services, LLC ("Tiger") to provide Climate First Bank (the "Client") with an assessment of the machinery and equipment of Brew Hub (the "Company"). Our report will meet the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP). Tiger and its employees have no interest or contemplated future interest in the items appraised. The fee for the appraisal is not contingent upon the value expressed nor is any guarantee or liability to be assumed or implied.

Scope of Work – Full Scope Appraisal

At the Client's request, Tiger's employees or representatives will perform Field Inspections, which is a visual accounting of the asset(s) at Company's Location(s). An appraisal that includes Field Inspections is commonly referred to as a "Full Scope Appraisal."

- Information Source(s): The Client has provided a list of assets (the "Fixed Asset Schedule") that will be the be the basis of the appraisal. Tiger will confirm the accuracy of the list during its Field Inspection(s), and will amend the list as necessary.
- Asset Listing and Lotting: The final Fixed Asset Schedule presented in the appraisal will include a comprehensive description of each major asset, including as applicable: make, model, serial number, and age. All major items will be valued on an individual, group or production line basis. Items of lesser significance, such as plant support equipment, will be listed in appropriate lots.
- Documentation: Tiger will take photographs of select items in the Fixed Asset Schedule and of facility(ies). Tiger will also request photos for major assets that are not physically inspected.

Locations

Tiger will value assets located at the following locations:

| Count | Address | Appraisal Basis |
|---|---|---|
| 1 | 3900 Frontage Rd. S. Lakeland FL. 33815 | Site Visit |

Value Basis

Tiger will value the Company's machinery and equipment on the following value premise(s):

Net Orderly Liquidation Value (NOLV) is defined as the net proceeds in terms of money that could be expected from a properly advertised and conducted orderly liquidation sale of the items appraised. It presumes that the facility(ies) is(are) not in operation and there is not a willing seller. The items would be disposed of individually or through appropriate lots, under which scenario the purchaser(s) are buying as-is, where-is, for cash or cash equivalent, and are responsible for removal of the items purchased. The Net Orderly Liquidation Value takes into consideration current economic trends, condition, location, difficulty of removal, and marketability. The value expressed will represent net proceeds and will take into consideration the expenses associated with conducting the sale.

Net Forced Liquidation Value (NFLV) is defined as the net proceeds in terms of money that could be realized at a properly advertised and conducted public auction sale of the items appraised, under forced conditions. The items would be disposed of individually or through appropriate lots, under which scenario the purchaser(s) are buying as-is, where-is, for cash or cash equivalent, and are responsible for removal of the items purchased. The Net Auction Sale Value takes into consideration current economic trends, condition, location, difficulty of removal, and marketability. The value expressed will represent net proceeds and will take into consideration the expenses associated with conducting the sale. This value is also known as Auction Sale Value.

**Appraisal Process**

During the course of the appraisal process, we will perform appropriate research in order to establish and substantiate the appraised value. Our research may include the following: discussions with original equipment manufacturers and/or suppliers, used equipment dealers and/or brokers, and other industry sources. This methodology may necessitate the disclosure of an item's specifications, serial number, and/or its geographical location. In certain cases, it may be necessary for Tiger to disclose the subject company's name in researching the values of specific items. In no instance, however, shall Tiger disclose the purpose or nature of its asset research.

Unless otherwise noted by the Company or noticed by Tiger during Field Inspection(s), Tiger will assume all assets are in working condition, are operating to manufacturer's specifications, and meet safety and regulatory guidelines. Tiger notes that Field Inspections are intended to be only a visual accounting of the assets; Tiger does not perform operational tests on the equipment.

Unless otherwise noted by the Company, Tiger will assume that all items are environmentally clean and safe for transport. Furthermore, Tiger's valuation will not include any potential costs of decontamination.

Unless requested by the Client and agreed to by Tiger in Special Requirements above, Tiger's appraisal report will not include any value for inventory items, intellectual property, or other general intangibles. This includes but is not limited to: patents, royalties, license agreements, contractual relationships, trademarks, trade names, customer lists, product lines and related tooling, software, engineering and design records, etc.

**Fee and Timing**

Tiger's fee for the appraisal described will be [redacted] plus actual out-of-pocket expenses. Payment in full for the completed appraisal is due upon receipt of invoice.

Upon receipt of the signed engagement letter, we will contact the suggested individuals at the Company. Tiger estimates completion of the report will be approximately four weeks from completion of the field visits. This is only possible with the Company's timely delivery of necessary information and Company management's availability for interviews and site visits.

**Confidentiality**

Tiger will request information from the Company concerning its machinery and equipment and, when performing valuations on a net basis, will also request detailed operating expenses. We acknowledge that information and documentation received in conjunction with this engagement is proprietary and confidential, including, but without limitation, non-public financial and business information furnished by the Company. We agree not to disclose, distribute, publish or release any of the information, without written consent of the Company, to any third-party except as directed to by law or to our representatives for the purpose of evaluating the possible transaction, in which event such representatives will agree to be bound by this confidentiality agreement.

<u>Delivery of Final Report</u>
Tiger will email a PDF version of the appraisal report upon completion of the project.

If the terms and conditions of this letter are acceptable, please acknowledge your acceptance below by executing and returning this letter via email to eschloemer@tigergroup.com.

If you have any questions, please do not hesitate to contact me at (224)-470-3001. We look forward to working with you on this project.

Very truly yours,

Eric Schloemer
Director of Business Development

Agreed to and accepted:

Signed:__________________________
Scott Frederick
VP Business Development
Climate First Bank

Date: 7.16.25

# EXHIBIT 8

| Description | Manufacturer | Model Number | Serial Number |
|---|---|---|---|
| (1) DEPALLETIZER, 72" X 96"; | BFT | | |
| (1) TABLE TOP CHAIN CONVEYOR, W/ GUARD RAILS & 90° TURN SECTION, APPROX. 311/2" X 15'; | UNIPAK | 6000K2791B | 15-8204 |
| (1) LABELER, 6-HEAD, W/ ALLEN BRADLEY PANELVIEW 700 TOUCH SCREEN OPERATOR CONSOLE; | QUADREL | CG/CLR6/3/MP/30 | C5414 |
| (1) TABLE TOP CHAIN CONVEYOR, W/ GUARD RAILS, APPROX. 311/2" X 30'' (NOTE: CONTINUES THROUGH | UNIPAK | 6000K2791B | 15-8204 |
| (1) BOTTLE FILLER, 24 HEAD; | OFFICINE AVE | RA124 | 1707 |
| (-) TABLE TOP CHAIN CONVEYOR, W/ GUARD RAILS & 90° TURN SECTION, APPROX. 3-1/2" X 40'; | UNIPAK | 6000K2791B | 15-8204 |
| LABELER (NOTE: NOT IN USE) | ZHANGJIAGANG MARS PACKAGING MACHINERY | DTB-100 | MP20211216 |
| (1) BOILER; | SUSSMAN | ES100 | N6-18428-R04 |
| (1) STAINLESS STEEL TANK; | | | |
| (1) KEG FILLER; | FREMAX | F-1-KEYKEG 34/45 | 16-11202 |
| (1) WRAP AROUND CARTONING MACHINE W/ NORDSON GLUE APPLICATOR, /N SA21C06762; | ECONOCORP | SPARTAN WRAP/TRAY 11703 | 11067B |
| (1) BAG-IN-BOX FILLER; | HARTNESS | 2200 | |
| JACKETED STATELESS STEEL TANK, 15,000 GAL. CAP. | | | |
| JACKETED STATELESS STEEL TANK, 15,000 GAL. CAP. | MUELLER | | |
| PLASTIC TANKS, APPROX. 1,000 GAL. CAP. | | | |
| PLASTIC TANK, W/ STAND APPROX 1,500 GAL. CAP. | | | |
| ELECTRIC PALLET POSITIONER | ULINE | H-8935 | 23Y3577768-1 |

# EXHIBIT 9

<u>EXHIBIT C</u>
(list of excluded equipment)

1. USED 2018 CROWN C51050-50 PNEUMATIC GAS TRUCK S/N: 10077228

2. DMM CONTINUOUS MOTION CARTONER MODEL NUMBER: CHA-3-5C SERIAL NUMBER: 2208, SKA DEPAL MODEL: CAN-I-BUS SERIAL NUMBER: 0420-645 AND MCE INTRALOX CONVEYOR OVER STAINLESS STELL FRAM (APPROX. 18”X10’) MODEL NUMBER: DEBTOR ACKNOWLEDGES THAT THE MODEL NUMBER TAG IS PARTIALLY RUBBED OFF, SECURED PARTY BELIEVES MODEL IS MCE 41319-949.

3.ALTAS COPCO GA45VSD+55, FA45FF, AND NPG100 COMPRESSORS.

4. USED CROWN RC5545-40 FORLIFT S/N 1A435459, W/LEA NEW V-FORCE 18-125-17 BATTERY S/N 057016533 AND USED V-FORCE CHARGER S/N 3M20030449.

5. USED CROWN RC5500 SERIES FORKLIFT S/N 1A550201 W/LEA NEW V-FORCE 18-125VTA-17 BATTERY.

6. THREE (3) NEW 2024 CROWN WP3235-45 WALKIE PALLET TRUCKS S/N 10555007, 10555178, AND 10555177.

7. WALKIE STACKER MODEL ST3000-25 WITH SERIEL NUMBER 10261102.